**ROBERT J. KOSSACK, ESQ.**
Nevada Bar No. 2734
**KOSSACK LAW OFFICES**
4535 W. Sahara Avenue, Suite 101
Las Vegas, Nevada 89102
Ph. (702) 253-7068
Fx. (702) 368-0471
Email rjkossack@cox.net
*Attorney for Plaintiff Chrissy Israel Mazzeo*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

# SOUTHERN DIVISION

| | |
|---|---|
| CHRISSY ISRAEL MAZZEO, | ) |
| Plaintiff, | ) **CASE NO**    2:08-cv-01387-RLH-PAL |
| JAMES ARTHUR "JIM" GIBBONS; SIGMUND "SIG" ROGICH; LAS VEGAS METROPOLITAN POLICE DEPARTMENT; BILL YOUNG DONALD J. CAMPBELL; PENNIE MOSSETT-PUHEK; DOES 1-20, | ) ) ) ) ) **COMPLAINT** ) **JURY DEMAND** ) |
| Defendants. | ) |

**COMES NOW**, CHRISSY ISRAEL MAZZEO, by and through her attorney, ROBERT J. KOSSACK, ESQ., of KOSSACK LAW OFFICES, and herein, upon information and belief, complains and alleges as follows:

**Jurisdiction and Venue**

1.     This complaint alleges violations of Plaintiff's Fourteenth Amendment rights to due process and the equal protection of the law and for violations of 18 USC § 241 and 18 USC § 245 for which Plaintiff may seek redress in this Honorable Court pursuant to 42 USC §§ 1983, 1985 and 1988; jurisdiction of this Honorable Court is invoked pursuant to 28 USC § 1331 regarding Federal questions and 28 USC § 1243 regarding civil rights, and

Plaintiff invokes the supplemental jurisdiction of this Honorable Court to hear her pendent state tort claims pursuant to 28 USC § 1367 regarding supplemental jurisdiction; venue is properly in the United States District Court, District of Nevada, Southern Division pursuant to 28 USC § 1391 regarding venue generally because all Defendants reside in Nevada and a majority of Defendants reside in Clark County, Nevada, or can be found in Clark County, Nevada, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Clark County, Nevada.

**Parties**

2.      Plaintiff Chrissy Israel Mazzeo ("Mazzeo") is presently a resident of Orange County, California.  At the time of the incident alleged herein, Mazzeo was a resident of Clark County, Nevada.

3.      Defendant James Arthur "Jim" Gibbons ("Gibbons") is the Governor of the State of Nevada and is a resident of Carson City, Nevada, and he maintains a State office in Clark County, Nevada.  Gibbons was sworn in as Governor on January 1, 2006, and since that time for purposes of this Complaint, Gibbons has acted under color of law as Nevada's chief executive officer.

4.      Defendant Sigmund "Sig" Rogich ("Rogich") is a resident of Clark County, Nevada.  Rogich was campaign manager for Gibbons and former Clark County Sheriff Bill Young.

5.      Defendant Las Vegas Metropolitan Police Department ("Metro" or "LVMPD") is a political subdivision of the State of Nevada with jurisdiction over most of Clark County, Nevada, including where the incident alleged in this Complaint occurred.

6.      Defendant Bill Young ("Young") is the former Sheriff of Clark County, Nevada, and was the chief executive officer of Metro at all times relevant to this Complaint until he left office and Douglas C. Gillespie was sworn in as the new Clark County Sheriff on January 2, 2007.  At all times relevant to this Complaint prior to January 2, 2007, Young acted under color

2

1  of law. Young set policy for Metro at all times relevant to this Complaint until January 2, 2007,
2  and, therefore, Metro is liable for the actions and inactions of Young from October 13, 2006, to
3  January 2, 2007, as they relate to the allegations made in this Complaint as Young set and,
4  therefore, acted pursuant to Metro policy.

5        7.    Defendant Donald J. Campbell ("Campbell") is an attorney licensed to practice
6  law in the State of Nevada and is a resident of Clark County, Nevada. Campbell was retained by
7  Rogich to represent Gibbons in regard to the incidents of October 13, 2006.

8        8.    Defendant Pennie Mossett-Puhek ("Pennie") is a resident of Clark County,
9  Nevada.

10       9.    Defendant Does 1-20 are Metro officers, employees of Clark County and/or the
11 Clark County District Attorney's Office, and/or private individuals who conspired and engaged
12 in a deprivation of Mazzeo's constitutional and federally protected rights or defamed Mazzeo
13 with their statements and whose identities are presently unknown to Plaintiff or the extent of
14 their involvement not clear at the time of the filing of this Complaint. Plaintiff reserves the right
15 to amend this Complaint and name such Does with particularity once their identities are
16 ascertained or the extent of their involvement becomes better known.

17 **Statement of Facts**

18       10.    Mazzeo was age 32 at the time of the incident alleged herein and was at the height
19 of her earning potential as a cocktail waitress on the Las Vegas Strip. A small town girl, she was
20 born and raised in Flagstaff, Arizona, attended the Bryman Dental School at age 19 and
21 graduated with a National Education Center Diploma in Dental Assisting in April, 1995.
22 Mazzeo applied to work as a dental assistant and went to work for Dr. Thomas Puhek following
23 Strip layoffs which occurred as a consequence of the September 11, 2001, terrorist attack on the
24 New York World Trade Center which negatively impacted the airline and tourism industry.
25 Mazzeo worked for Dr. Puhek as a dental assistant for three months before she returned to work
26 as a cocktail waitress at The Bellagio, and she became best friends with Dr. Puhek's wife,

27
28                                  3

Pennie. During the time of the incident and its later cover-up as will be more fully described herein, Mazzeo was working at The Bellagio and then left that position to finish her internship training with The Art Institute of Las Vegas from where she earned an Associate of Arts in Interior Design Degree in September, 2007. Mazzeo also has received a Certificate of Completion from MoneyWorld School of Real Estate for a 90-Hour Real Estate Pre-Licensing Course in July, 2007. Even though Mazzeo never received a negative review during her work as a cocktail waitress, as a result of the incidents described herein including the libel and slander perpetrated upon her during the subsequent cover-up, Mazzeo was blacklisted from working as a cocktail waitress to her financial detriment. Mazzeo has always been apolitical, never voting in her lifetime and allowing her registration to long ago expire, and prior to the incident described herein, neither recognized Gibbons, who at that time was a United States Congressman running for the office of Governor for the State of Nevada, nor his campaign manager, Rogich.

11.     Mazzeo had overcome suffering from Alopecia, a disease causing complete hair loss, the symptoms of which first manifested themselves when Mazzeo was two and one-half years old, and thyroid cancer, papillary malignant carcinoma, the symptoms of which first manifested themselves when Mazzeo was nineteen years old, causing her to have a total thyroidectomy and subsequent treatment with radioactive iodine, I-131. Mazzeo will need to take levothyroxine sodium for the rest of her life, and her cancer metastasized, then going into remission and subsequently recurring several times. These traumas and her subsequent religious awaking caused thereby gave Mazzeo the strength to fight back against Gibbons when he tried to sexually force himself upon her as will be more fully described herein.

12.     On March 15, 2003, Mazzeo gave birth to a healthy baby girl, and Mazzeo is a single mother. Threats were made against Mazzeo's child, three years, seven months old at the time, as part of the subsequent cover-up of the incident described herein, to which Mazzeo was very susceptible.

. . . .

4

13.     Mazzeo was the victim of sever domestic violence at a Laughlin hotel three months before the incident alleged herein.  In an attempt to sway the perpetrator into giving damaging testimony against Mazzeo, Campbell recommended to the perpetrator that he retain attorney Amy Chelini, who called and solicited her representation of the perpetrator for a fee in violation of Nevada Supreme Court Rule 73(a) and, upon information and belief, with the assistance of Campbell and Gibbons, who set out to deprive Mazzeo of the equal protection of the law in violation of the Fourteen Amendment, caused a crime which constituted domestic violence pursuant to NRS 33.018(1)(a) and (c) and NRS 33.028(2)(a) and which was first charged as Coercion Inflicting Injury upon the other person. a category B felony in violation of NRS 107.190(1) (a) and (b)and NRS 107.190(2)(a), and which was Sexually Motivated as could be determined pursuant to NRS 107.193, to first be pled down to Domestic Violence Second Offense. a misdemeanor in violation of NRS 200.485(1)(b), and then pled further down to Disorderly Conduct a less serious misdemeanor in violation of Clark County Code 12.33.010, and these plea arrangements were offered by the Deputy District Attorney handling the case (a) even though Mazzeo fully cooperated and at first communicated with the Victim Advocate and with the Deputy District Attorney handling the case on a regular basis, (b) even though Mazzeo always made sure the Victim Advocate and the Deputy District Attorney knew of her whereabouts and how to reach her and supplied them with her telephone numbers, (c) even though Mazzeo later attempted on numerous occasions to speak with the Victim Advocate and with the Deputy District Attorney handling the case after they stopped talking to her and after no one would return her calls, (d) even though no one spoke to Mazzeo prior to the charges being reduced and the plea bargains made, (e) even though Mazzeo was at all times ready. willing and able to testify, (f) even though there existed abundant evidence from independent witnesses such as the desk clerk at the Laughlin hotel who could testify that Mazzeo asked him to call 911 and such as the doctors who initially suspected Mazzeo had taken a beating at the hands of another and who were prepared to testify  that Mazzeo sustained injuries from a beating at the hands of

5

1   another consisting of a concussion and loss of movement in her hand which was later diagnosed

2   as permanent nerve damage and, (f) even though NRS 200.485(7) states in pertinent part,

3         If a person is charged with committing a battery which constitutes domestic
          violence pursuant to NRS 33.018, a prosecuting attorney shall not dismiss such a
4         charge in exchange for a plea of guilty, guilty but mentally ill or nolo contendere
          to a lesser charge or for any other reason unless he knows, or it is obvious, that the
5         charge is not supported by probable cause or cannot be proved at the time of
          trial....

6

7         14.    A few weeks prior to the incident, Mazzeo had been seen by Dr. Puhek to have

8   her and her daughter's teeth cleaned. At that time, she and Pennie were excited to see each other

9   and made promises to get together for lunch or dinner.

10        15.    On the date of the incident, October 13, 2006, Mazzeo and Pennie made

11  arrangements to meet at McCormick & Schmick's Seafood Restaurant ("McCormick &

12  Schmick's") in the late afternoon so they could enjoy happy hour. Mazzeo arrived and parked

13  her truck in the McCormick and Schmick's south parking lot, her truck being lifted up as a

14  monster truck and too high to safely park in most covered parking garages. *See*, attached

15  Exhibit 1 which contains a detailed written account and pictures showing a visual recreation of

16  the incident in question, Plaintiff's Exhibits 1- 6. Blow-ups of all the pictures within Exhibit 1

17  can be viewed at vindicatemazzeo.com.

18        16.    Mazzeo and Pennie initially sat in a back booth at the McCormick & Schmick's

19  cocktail lounge and at first ordered two glasses of water. They then ordered two glasses of wine,

20  one for the each of them. Mazzeo told Pennie of the Laughlin incident and how she was

21  surviving her cancer, and they toasted to a new beginning. They talked for more than an hour

22  until 5:50 P.M., when they ordered dinner to get happy hour prices. After dinner, Mazzeo and

23  Pennie went outside to an auction in the McCormick & Schmick's parking lot, had one beer

24  apiece and listened to a band for about one hour. It then began to rain, and in response to a fairly

25  hard rain, Mazzeo and Pennie retreated back inside McCormick & Schmick's where they sat at

26  . . . .

27

28                                                    6

one of the round tables in the back of the cocktail lounge, and they each ordered a Bailey's and coffee. *See*, Exhibit 1, Plaintiff's Exhibit 98.

17.   Around 7:45 P.M., Pennie, a staunch member of the Republican political party, spotted Gibbons, who Pennie knew was running for Governor at the time, sitting across from his campaign manager, Rogich, at a booth with two women sitting one on each side of the table on the inside against the wall. Pennie then sent Gibbons' table a round of drinks telling the waitress to say it was from Dr. Puhek's office. Gibbons then invited Mazzeo and Pennie to join them, and Mazzeo, being completely political naive, said, "Nice to meet you Bill Clinton," causing the whole table to laugh. The waitress pulled over two chairs to the end of the booth's table causing very close quarters, and Mazzeo sat closest to Gibbons, and Pennie to sat closest to Rogich. *See*, Exhibit 1, Plaintiff's Exhibit 99.

18.   Gibbons was immediately infatuated with Mazzeo, and as everyone in the party drank for the next hour and fifteen minutes, Gibbons kept touching Mazzeo's thigh with his hand and her calf and foot by wrapping his leg around her leg, and Gibbons kept telling Mazzeo how beautiful she was and what big eyes she had and how "overly boring" his marriage was after twenty years. Meanwhile, Mazzeo kept trying to move closer and closer to Pennie to avoid someone she merely considered a boring and undesirable old man. At the table, Gibbons told Mazzeo that he was staying at the hotel next to the restaurant, that they could walk there and, "It's so close, we could crawl back." Gibbons was in fact at the time staying at the Marriott Residence Inn ("Residence Inn") which is, in fact, just across Hughes Center Drive from McCormick & Schmick's, although slightly further than crawling distance on the rain soaked street. *See*, Exhibit 1, Plaintiff's Exhibits 82-83, 93-94.

19.   Other people in the restaurant began taking pictures of Gibbons with their cell phones in light of just how aggressive he was becoming toward Mazzeo and the sexually flirtatious table conversation filled with double-entendres, nasty jokes and sexual narratives, many of which went over Mazzeo's head so engaged was she in escaping from Gibbons' grasp

1  without seeming to be overtly rude or resorting to physical force like a well-deserved, public slap

2  in the face. At one point, Mazzeo complained to Pennie, and Pennie conveyed Mazzeo's

3  complaint to Rogich, and Rogich told Gibbons that he needed to calm down because people were

4  watching, and he was acting "inappropriately."

5        20.    When later interviewed by the Metro police, Gibbons explained,

6      ....They were, you know, gonna sell it to, uh...you know, the, the trade magazines
   and say, "Here's Jim Gibbons out convorting [sic] with the women. You know?
7      A...and I just laughed at it. I said, "Well, you know. I'm sixty, close to sixty-two
   years old, married, this isn't gonna fly very far." But I didn't think much about it.
8      But they said something about it. And I looked over and I didn't see 'em taking
   any pictures so I didn't think much about it.

9

10        21.    Everyone at the table had been drinking to the point that the bartender was

11  considering cutting them off from more liquor, and the waitress, Julie Lauren Vick, wrote in her

12  statement that, "Everybody at the table had been drinking heavily." After being at Gibbons' table

13  about two hours, Mazzeo got out her keys and put them on the table readying to leave. Gibbons

14  went to the bathroom, came back, shook everyone's hand and handed Mazzeo his business card

15  as if he expected her to call him. Mazzeo then went to the bathroom, and before she got back,

16  Gibbons had stolen her keys off the table and left. Mazzeo came back, stayed with the others for

17  about fifteen to twenty minutes and then walked out the front of the restaurant under the valet

18  parking ramada where she began to look for her keys in her purse, but she could not find them.

19  As part of the later police investigation, a thorough search of the McCormick & Schmick's and

20  the bushes surrounding it was made that evening, but Mazzeo's keys were never found. The

21  police never did search Gibbon's person or hotel room. The total bill Rogich paid at McCormick

22  & Schmick's that evening was $302.12.

23        22.    As Mazzeo was in the women's bathroom and then remaining at the table for

24  fifteen to twenty  minutes after Gibbons had left, Gibbons was standing in the rain between two

25  bushes north of the valet ramada as he lay in wait for Mazzeo to come out of the restaurant. *See,*

26  Exhibit 1, Plaintiff's Exhibits 8-9. When Mazzeo finally did come out and started looking in her

27

28                                      8

purse for her keys, a rain-soaked Gibbons approached Mazzeo and startled her by saying, "Are you looking for me?"

23.    Mazzeo was surprised and responded, "No. I'm looking for my keys." Mazzeo knew that her truck was in the parking lot bordering Flamingo Road to her left, but Gibbons wanted her to come with him to her right.

24.    Gibbons said, "Just come with me. You'll be fine. I'll take you to your car."

25.    Mazzeo said, "Mr. Gibbons, do you have my keys? That's weird?"

26.    Gibbons evaded answering Mazzeo's question and said, "Don't worry. We'll find them. I'll take you to your car."

27.    Mazzeo mistakenly allowed Gibbons to play his game and lead her north across Hughes Center Drive and down the stairs into the first floor of the Hughes Center parking garage. *See*, Exhibit 1, Plaintiff's Exhibits 10-16. On their way into the garage, people coming down the steps caused Mazzeo to look behind her, and she saw the first of the surveillance cameras ("Camera No. 1"). *See*, Exhibit 1, Plaintiff's Exhibits 17-19.

28.    Gibbons then led Mazzeo to the northwestern side of the first floor of the Hughes Center parking garage, and turning northeast, they both walked past the southwest elevator on the northwest side of the first floor of the parking garage and past another surveillance camera ("Camera No. 2) which was in line with the southwest elevator. Then, suddenly and completely uninvited and in response to nothing more than his uncontrolled, sexual lust, Gibbons grabbed a hold of both of Mazzeo's arms, his left hand grasped around her right biceps and his right hand grasped around her left biceps, and Gibbons shoved Mazzeo ten feet until she was pinned against the northwest wall, the upper half of which was chainlink fence, in a corner formed by a column northeast of the elevator causing scratches to Mazzeo's back. *See*, Exhibit 1, Plaintiff's Exhibits 20-28.

29.    Startled and afraid, Mazzeo asked, "What are you doing? Are you serious? Please let me go!"

30.    At the time there was no expression on Gibbons' face as he started squeezing Mazzeo's arms harder and harder. Gibbons said, "You can try to run away or you can let this happen. I'm not going to fuck you. I'm going to rape you."

31.    Mazzeo said, "What? Are you seriously going to rape me?"

32.    Gibbons responded, "This isn't what I want from you. You have two choices. You can try to run away or you can let this happen."

33.    From where Mazzeo had been seized, forced into a corner and confined, she could see Camera No. 1 across the garage, and she could see Camera No. 2 in line with the elevator. *See*, Exhibit 1, Plaintiff's Exhibits 29-37.

34.    Mazzeo said, "I have a baby. Please don't do this to me. There's a camera there."

35.    Gibbons said, "I don't care about the cameras."

36.    Mazzeo said, "What are you doing. You're running for governor."

37.    Gibbons said, "You have two choices."

38.    Mazzeo said, "What are my choices."

39.    Gibbons coldly said, "You either listen to me and do what I say, or you're fucked!"

40.    Gibbons had apparently expected Mazzeo to go with him on a circuitous route through the Hughes Center parking garage, round the back of the Residence Inn, through a break in the hedges, down a trail, through the Residence Inn parking garage, through the Residence Inn back gate and pool area, in the Residence Inn back door and up to his room. *See*, Exhibit 1, Plaintiff's Exhibits 85A-92.

41.    Mazzeo pleaded, "No way. Please don't do this. I just survived cancer for eleven years."

42.    Gibbons said, "Lucky you. You survived cancer."

43.    Mazzeo pleaded, "And then you're going to turn around and do this."

. . . .

44.     Mazzeo started crying, looked to her right and said to herself a prayer. She thought back to the Laughlin incident with her former boyfriend choking her out and banging her head against the floor and thought to herself that she was not going to go through what she had just gone through in Laughlin and that she needed to fight back. Then her prayer was answered as three teenagers ran through the garage from the elevator area causing Gibbons to look up nervously and distracting Gibbons just enough that with a swift kick to Gibbons' shins, Mazzeo shook herself free from his grasp, said, "Go fuck yourself!" and ran toward the northeast first floor parking garage entrance passing underneath another camera monitoring the entrance ("Camera No. 3"). *See*, Exhibit 1, Plaintiff's Exhibits 38-43F.

45.     On her way out, Mazzeo turned and said, "Now say something!" and then ran as fast as she could and yelled back, "Now who's fucked?"

46.     In response, Gibbons said, "Chrissy, you are!" and using his Republican connections, the loyalty of his supporters in his race for Governor, including Pennie, who turned on her best friend faster than a pancake flipped by a short-order cook, and the power of his office, Gibbons made good on his word, starting first with the aid and corruption of fellow Republican, then Sheriff Young, who had publically endorsed Gibbons and who shared Rogich as his campaign manager.

47.     After running out the northeast entrance to the first floor of the Hughes Center garage, Mazzeo cried as she ran east on the sidewalk bordering the south side of Center Circle and the north side of the Residence Inn as she headed toward Paradise Road. She could see the La Quinta Inn & Suites ("La Quinta Inn") across Paradise Road, made that her destination and came to rest in the La Quinta Inn lobby where she could call out on the hotel's telephone. Out of breath, half-hysterical, crying and nervously laughing, a personality characteristic Mazzeo acquired as a little girl when teased about her lack of hair and which especially manifests itself when she's scared and excited, Mazzeo sat in the La Quinta Inn lobby and called 911, hung up, and then called 911 from her cell phone at 10:23 PM, then she called Pennie, which turned out to

1  be a mistake, then her friend, Stephanie Dimillio ("Stephanie"), and then Pennie a second time,

2  and told them what happened.  On three occasions, Mazzeo also attempted to call an

3  exboyfriend, Joe Hernandez, who worked for Metro, but she could not reach him.  The 911

4  operator told Mazzeo to wait at the La Quinta Inn for the police to arrive.  *See*, Exhibit 1,

5  Plaintiff's Exhibits 44-54.

6       48.    When Mazzeo talked to Pennie, Pennie said not to call the police, but Mazzeo told

7  Pennie that she had already called.  Pennie said to Mazzeo to undo the call to the police and that

8  she (Mazzeo) did not understand what she was getting into.  On information and belief, upon

9  learning Mazzeo was at the La Quinta Inn, Pennie tipped Gibbons off as to Mazzeo's

10  whereabouts.

11       49.    On information and belief, Gibbons had returned to McCormick & Schmick's,

12  and upon learning of Mazzeo's whereabouts, crossed to the Residence Inn parking lot, got in his

13  car taking off his wet jacket, drove northeast on Hughes Center Drive and across Paradise Road

14  to the La Quinta Inn and  got out of his car.

15       50.    Gibbons came up to the La Quinta Inn lobby windows with his jacket off.

16  Mazzeo, looking south through the La Quinta Inn lobby windows saw Gibbons looking in at her

17  from the outside, and in response, Mazzeo ran out the lobby door, past Gibbons, across Paradise

18  Road, through the hedges on the south side of the Starbucks Coffee ("Starbucks") parking lot

19  bordering Paradise Road and into the Starbucks where she called 911 a second time at 10:52 PM

20  to tell the operator of her new location, and Mazzeo then took refuge in the Starbucks' women's

21  bathroom and sat on the bathroom floor.  As Mazzeo passed Gibbons just outside the La Quinta

22  Inn lobby, Gibbons grabbed her arm and said, "Wait, I need to talk to you.  You screwed up

23  because you called 911.  You'll be sorry."  Mazzeo pulled herself free of Gibbons' grip, pointed

24  her finger at Gibbons and responded, "Go fuck yourself."  The night desk clerk for the La Quinta

25  Inn, Kim Hartnett, witnessed this altercation.  *See*, Exhibit 1, Plaintiff's Exhibits 55-68.

26  . . . .

27

28                          12

51.     While Mazzeo was in the Starbucks, she had been told by the 911 operator to go outside and wait for the police, which Mazzeo did, sitting on one of the parking blocks just outside the Starbucks front door.  By this time, Mazzeo was quite disheveled in her appearance having run several blocks in the rain, and it continued to rain as she sat outside the Starbucks waiting for the police to arrive.  People entering and leaving the Starbucks stared at Mazzeo as she unnaturally sat on the parking block in the rain.

52.     From the Starbucks, Mazzeo could see to her north by northwest the Gordon Biersch Brewing Company ("Gordon Biersch"), so she decided to go over to Gordon Biersch hoping to get out of the rain, blend in with the crowd, call 911 again and wait for the police over there.  Mazzeo then walked north by northwest through the hedges at the edge of the west side of the Starbucks parking lot toward Gordon Biersch and went inside where she tidied up her appearance in the women's bathroom.  Mazzeo first called her sister, Anna Freteluco ("Anna"), and then called the 911 operator a third time at 11:12 PM, but Gordon Biersch was extremely crowded, and it had stopped raining, so Mazzeo went outside, sat on a concrete bench just outside the western front entrance to Gordon Biersch and told the 911 operator of her new location.  The first Metro police arrived shortly thereafter.  *See,* Exhibit 1, Plaintiff's Exhibits 69-81.  The entire route Mazzeo took the evening of October 13, 2006, is shown in Exhibit 1, Plaintiff's Exhibit 84.  The red dot on Plaintiff's Exhibit 84 marks the spot where Gibbons seized and confined Mazzeo against the northwest wall on the first floor of the Hughes Center parking garage.

53.     In the meantime, Gibbons had driven back to the Residence Inn only to discover that he had lost his hotel room key card.  Instead of asking the clerk to issue him a new key card, on information and belief, Gibbons was afraid that he had dropped it in the garage and that it could be used as evidence against him, so Gibbons retraced his steps, searched the garage, found his key card and reentered the Residence Inn from the back gate.  Gibbons could not account for the forty-five minute delay to initial investigating Metro officers when the records showed a

forty-five minute gap between when Gibbons left McCormick & Schmick's with Mazzeo and when he finally entered his Residence Inn room using his key card. Gibbons initially told investigating Metro officers that he had went up to his hotel room and went to bed just after he had "grabbed [Mazzeo] to straighten her up."

54.     While waiting for the police to arrive at Gordon Biersch, Mazzeo while still excited, crying and half-hysterical, called her friend, Stephanie, a second time. When the police arrived, Mazzeo got into the police car and was driven to McCormick & Schmick's and spoke to her sister, Anna, several more times by phone while in the police car. Mazzeo told the police what happened, and the police said they had to question everybody.

55.     After Anna arrived, Mazzeo got into Anna's truck. The police told Mazzeo, "It's going to be another hour. We're pulling the video cameras up." About an hour later, Metro Officer Ortega, P# 6747, came up to Anna's truck and told Mazzeo and Anna, "Chrissy, we believe you. There is so much evidence. We got the tapes, we believe you."

56.     Mazzeo said, "I told you I'm telling you the truth."

57.     Officer Ortega said, "I know."

58.     Mazzeo said, "You can go arrest him then."

59.     Officer Ortega said, "Yes. We just have to wait."

60.     Mazzeo said, "But you have the tapes."

61.     Officer Ortega said, "Yeah, but we have to wait."

62.     Officer Ortega was never heard from again. He was not further interviewed by Metro detectives though nearly everyone else was. He is not listed as a witness in the follow-up investigative reports. His only mention is in an Officer's Report authored by Metro Detective M. Hnatuick, P#3582 ("Detective Hnatuick") dated October 16, 2006, where the following half truth/half lie appears,

> ....According to detective Colon's original officer's report, Officer Ortega,
> P#6747, contacted Hughes Center Security Officer Aaron and learned the parking
> structure where the incident allegedly occurred did have surveillance cameras,
> however they were not recording at the time of the incident.

63.   In another report specifically address the existence of video tapes authored by Clark County District Attorney David Roger, Assistant District Attorney Christopher J. Lalli, Chief Deputy District Attorney of the Case Assessment Unit Ronald Bloxham, and Chief Deputy District Attorney of the Special Victims Unit Thomas Carroll, to Metro Deputy Chief Greg McCurdy, dated December 26, 2006, Officer Ortega's name is not mentioned. Instead, the following language appears:

> ....The video surveillance system located at 3960 Howard Hughes Parkway is monitored only till 10:00 p.m. On the evening of October 13, 2006, LVMPD contacted the security desk for Hughes Center properties and asked if there was video surveillance from the outside of McCormick & Schmick's. They were told by Aaron Duenas there were none. Aaron Duenas was also asked if there was video surveillance for inside the elevators. Duenas responded there were not, but there were video cameras inside the parking garage. Duenas also told *the caller* that the video surveillance was "real time video only and the system did not record". (*Emphasis added.*)

64.   In another report authored by Detective M. Hnatuick dated November 30, 2006, in which he lists eleven Metro detectives and crime scene personal "at the scene," Hnatuick fails to make any mention of Officer Ortega.

65.   Rogich had learned of the incident from Pennie, and Rogich discussed it with Sheriff Young the evening of its occurrence and in the early morning hours the next day, and Young had already called Gibbons numerous times and discussed all the known facts of the case with Gibbons before Detective Hnatuick was assigned to the case at 9:00 AM the next morning.

66.   Detective Hnatuick's report also states the following,

> According to Matt Gillia, P#6432, a Major Crimes detective who responded to the original call, Mazzeo had two small scratches, one on her shoulder and one on her back. These scratches were photographed at Mazzeo's residence by CSI E. Mcghee, P# 5158, at approximately 0300 hours on October 14, 2006. During the interview with Mark Colon, P# 7585, a Major Crimes detective, Mazzeo offered no explanation as to how she received the scratches.

67.   The fact of the matter is, Mazzeo also had bruising to both her upper arms where Gibbons had clinched her tightly, and those injuries were also photographed by Metro CSI E. Mcghee. Between the time Mazzeo first came in contact with the police and the time the

15

1 | pictures were taken by the Metro Crime Scene Investigator, Mazzeo was not let out of the Metro

2 | officer's sight to make sure that she did not self-inflict any injuries to herself and to maintain a

3 | chain of custody. *See*, Exhibit 1, Plaintiff's Exhibits 119-128.

4 |       68.     Meanwhile, Pennie had been in communication with Rogich and was relaying

5 | threats from Rogich to Mazzeo. Pennie was frantic and was telling Mazzeo, "You have to drop

6 | the charges....They will hire someone to kill you and your family and your baby....Trust me, I

7 | know this stuff....You don't know what these people are capable of....They have power....They

8 | will hurt you and your family and your baby....You don't want to go through with this...Tell the

9 | police you don't want to be involved in a three ring circus....Don't tell them I told you to say

10 | this," and other words to such effect.

11 |       69.     Mazzeo said, "No. He's guilty."

12 |       70.     Pennie said, "I know he is. I saw how he was acting. I watched everything...but if

13 | you don't drop the charges they are going to kill you and all of your family. Rethink your

14 | decision....You don't know who you are messing with or who they know."

15 |       71.     Meanwhile, Detective Hnatuick was telling Mazzeo that there were no videos and

16 | that it was a "he said, she said, situation."

17 |       72.     In response, by the time Mazzeo was interviewed by Detective Hnatuick on

18 | October 14, 2008, by phone at 16:11 hours (4:11 PM), Mazzeo said, that she was concerned

19 | about going forward with the investigation and no longer wanted to prosecute the matter.

20 | Mazzeo said she had a lot going on and she felt it would become a "three-ring circus" and did not

21 | want to hurt Gibbons' political career. Later, in the presence of Detective T. Barker, P# 4106, at

22 | 16:30 hours (4:30 PM), Mazzeo confirmed to Detective Hnatuick that she no longer wanted to go

23 | forward "mainly because of who he [Gibbons] is," and Mazzeo confirmed that she was

24 | concerned it might become a "three-ring circus" and claimed that no one had contacted her or

25 | influenced her. That fact of the matter was, Pennie and Mazzeo talked four times prior to

26 | . . . .

27

28 |                     16

4:11 PM on October 14, 2006, at which time Pennie relayed the threats to Mazzeo and her family's life and limb.

73.    Mazzeo spoke with Pennie over the phone again following Mazzeo's telephone conversation with Detective Hnatuick at 4:11 PM and prior to the taped interview at 4:30 PM, and Mazzeo spoke to Pennie over the phone again just as soon as the detectives left her home, Mazzeo and told Pennie what she had said to the Metro detectives. Pennie then spoke to Rogich and called Mazzeo back less than an hour later in a panic and said that Mazzeo had said it wrong and that Mazzeo needed to tell the police that it was all a big mistake, it was all a misunderstanding and that alcohol was involved, not that she did not want to proceed simply because of the media attention it would draw or because of who Gibbons was.

74.    Pennie said, "Get a pen and write down this statement...that it was a misunderstanding and that alcohol was involved." Mazzeo contemporaneously wrote Pennie's instructions on the back of one of the policemen's business cards.

75.    Pennie told Mazzeo that Gibbons' lawyer was drafting a "silence" form and that they wanted to go over her statement. "We need to meet with the Gibbons people," Pennie said. Later, Pennie admitted that she had been talking to Michelle Diegel ("Diegel"), one of the women who had been sitting with them at the table in McCormick & Schmick's, and that Diegel had been relaying everything that Mazzeo said to Pennie to Rogich. Witness statements were drafted for Diegel and Georganne W. Bradley, the other women who had been sitting at the table with Gibbons and Rogich, to sign. Pennie also signed a statement. Two of the statements were acknowledged by not signed under oath to give Pennie and Diegel the ability to someday testify truthfully under oath without committed perjury.

76.    After the story first came out in the *Las Vegas Review Journal*, Pennie made several calls to Mazzeo, and finally Mazzeo answered. Pennie told Mazzeo, "They are going to cut off your arms if you do not sign a silence paper....The only way to make it go away is to sign the silence clause...They need to go over your statement with you...As soon as we sign the paper,

they will give you money and me too." Mazzeo said it sounded like extortion and bribery and that she was going to bed. Pennie said to Mazzeo that she was "naive" and "it's all about the money."

77.     Private investigator David Groover ("Groover") called Mazzeo and said he was a legal representative of Gibbons and that he needed to meet with her to go over her statement, that the media had the story now and they were not going to drop it and that if she wanted it to go away, she needed to meet with him. Groover said, "The problem is that your statement doesn't match Mr. Gibbons' statement...Everything will be fine, I have a wife, and we can just meet for coffee."

78.     Mazzeo said, "That's because he's lying."

79.     Mazzeo conferred with California attorney Harold L. Collins ("Collins") who called Groover. Groover admitted to Collins that his purpose in calling Mazzeo was that the press was pushing for the release of the police report in the matter and there were conflicts between what Mazzeo said and what Gibbons said, and he wanted to speak with Mazzeo, "to go over her statements with her, line by line." Groover said the report was being released to the news media on Wednesday and that Mazzeo's name would become public and there was not a lot of time to get together to explain the discrepancies.

80.     Collins then referred Mazzeo to attorney Richard Wright ("Wright").

81.     Mazzeo's keys had still not been found, and Mazzeo discovered that the garage door opener was missing from her truck. The front tire of Mazzeo's sister's car, which was parked in the driveway of Mazzeo's home was flattened. Mazzeo was afraid to go into her house, and Mazzeo called the Metro police upon Collins' advice, but responding officers said they knew who she was and failed to take a report over the missing keys and garage door opener. However, one of the officers did go through Mazzeo's house at her request, but they took no report. Mazzeo was terrified, so Mazzeo wrote a letter to her landlord asking to break her lease, the landlord agreed and within three weeks, Mazzeo moved out of her house to an apartment.

1    82.    Pennie later called and asked Mazzeo if she got her calls. Pennie told Mazzeo,

2   "We need to make sure your statement matches Gibbons." When Mazzeo said she was not going

3   to lie, Pennie said, "What would you rather do, change your statement or have your arms cut

4   off?" That was the last Mazzeo heard from Pennie, and no such acts of violence occurred even

5   though Mazzeo truly feared for her life and the life of her daughter for weeks. In total, between

6   October 13, 2006, the night of the incident, and October 28, 2006, Mazzeo placed twelve (12)

7   phone calls to Pennie, and Pennie called Mazzeo twenty-one (21) times. Pennie and Rogich

8   communicated by phone eighteen (18) times.

9    83.    Throughout the Metro investigation, Sheriff Young kept Rogich and Gibbons

10   informed of the investigation's progress and released to them the information the police gathered

11   as quickly as it was coming in. Rogich had retained Campbell to represent he and Gibbons, and

12   Campbell was allowed to view the parking garage videos in Sheriff Young's office even though

13   Wright was denied the same opportunity.

14    84.    As a general rule applicable to all others subject to Metro investigations of

15   criminal activity, no attorney representing a defendant or prospective defendant is allowed to

16   view the evidence assembled by Metro until charges are brought and the defendant is arraigned.

17   However, in this instance, Gibbons was kept advised of the progress of the investigation from its

18   inception.

19    85.    When Metro police detectives took Mazzeo on a re-enactment tour of the incident

20   in the Hughes Center parking garage, they constantly interrogated Mazzeo and questioned

21   whether the incident occurred right as she entered the garage up against the southwest wall, then

22   suggested that she ran out the first floor southeast entrance, then suggested she was up against the

23   first floor southeast fence, then suggested she went up the ramp to the second floor, then when

24   Mazzeo stated that she passed the elevator, led her to the southwest elevator on the first floor and

25   had her go up the elevator to the second floor and out the second floor southwest exit, then up the

26   southwest elevator to the third floor, then up the southwest elevator to the fourth floor, then up to

27

28                                              19

the fifth floor and the roof, then to the northwest elevator, then down the southwest stairs, then out the second floor southwest entrance, then around the west side of the Hughes Center parking garage toward the McCormick & Sahmick's at which time they were successful in throughly confusing Mazzeo and tiring her out as Metro and television news cameras blared around her. Metro personnel would suggest Mazzeo take the elevator to the second floor by saying, "Well, let's make sure," literally suggesting she traveled everywhere in the garage other than where the incident actually occurred. *See*, Exhibit 1, Plaintiff's Exhibits 101-117. Although the place of the incident, consistent with Mazzeo's description of the place of the incident being near the elevator and of her back being scratched by a metal fence and of a concrete wall underneath the fence, and even though such an area could be seen by the Metro investigators, Mazzeo was encouraged to stay away from the northwest half of the first floor northeast of the southwest elevator, especially not to go out the first floor northeast entrance and east on the sidewalk bordering the south side of Circle Center toward the La Quinta Inn where the police had verified that Mazzeo had sought refuge from Gibbons. Metro police detectives constantly berated Mazzeo and suggested that she was too drunk to remember or had made the entire incident up or had hallucinated the entire event or that she was only out to discredit Gibbons so as to cause him to lose the election for Governor.

86.     Only videos cleared for viewing by Young acting in concert with Campbell were later released to the press. These videos showed nothing, and some videos were not even from the day in question. Some videos displayed the wrong date. None of the released videos show wet tire marks in the garage even though it had been raining heavily all the evening of October 13, 2006. A camera on the top of the south corner of the Hughes Center parking garage which would have filmed Gibbons and Mazzeo entering the garage by walking down the steps was allegedly inactive (*see*, Exhibit 1, Plaintiff's Exhibits 96-97B) as were all the cameras within McCormick & Schmick's.

. . . .

87.    Mazzeo re-instituted her charges against Gibbons, but because of the Metro police cover-up and a host of lies stated by others due to Rogich's meddling, no charges were ever brought against Gibbons by the Clark County District Attorney's Offices.

88.    NRS 200.481(1)(a) and (2)(a) state in pertinent part,

Battery: Definitions; penalties.

    1.    As used in this section:

        (a)    "Battery" means any willful and unlawful use of force or violence upon the person of another.

    2.    ...[A] person convicted of a battery...shall be punished:

        (a)    If the battery is not committed with a deadly weapon, and no substantial bodily harm to the victim results...for a misdemeanor.

89.    Gibbons committed upon Mazzeo the crime of battery, a misdemeanor, in violation of NRS 200.481(1)(a) and NRS 200.481(2)(a).

90.    NRS 200.460(1) and (2) state in pertinent part,

    1.    False imprisonment is an unlawful violation of the personal liberty of another, and consists in confinement or detention without sufficient legal authority.

    2.    A person convicted of false imprisonment shall pay all damages sustained by the person so imprisoned, and...is guilty of a gross misdemeanor.

91.    Gibbons committed upon Mazzeo the crime of false imprisonment, a gross misdemeanor, in violation of NRS 200.460(1) and NRS 200.460(2).

92.    NRS 200.310(2) states in pertinent part,

A person who willfully and without authority of law seizes...another person with the intent to keep the person...in any manner...detained against his will, is guilty of kidnapping in the second degree which is a category B felony.

93.    Gibbons committed upon Mazzeo the crime of kidnapping in the second degree, a category B felony, in violation of NRS 200.310(2).

21

94. NRS 199.230 states in pertinent part,

> Preventing or dissuading person from testifying or producing evidence. A person who, by persuasion...threat, intimidation, deception or otherwise, and with the intent to obstruct the course of justice, prevents or attempts to prevent another person from appearing...as a witness in any...investigation or other official proceeding...shall be punished:
>
> * * * *
>
> 2. Where no physical force or immediate threat of physical force is used, for a gross misdemeanor.

95. NRS 199.480(3)(a) and (g) state in pertinent part,

> * * * *
>
> 3. Whenever two or more persons conspire:
>
> (a) To commit any crime...and no punishment is otherwise prescribed by law;
>
> * * * *
>
> (g) To accomplish any criminal or unlawful purpose....,
>
> each person is guilty of a gross misdemeanor.

96. So as to deprive Mazzeo of justice, Rogich in conspiracy with Pennie and though Pennie, by persuasion, threat, intimidation, deception or otherwise, and with the intent to obstruct the course of justice, attempted to prevent Mazzeo from appearing as a witness in the investigation of Gibbons for the commission of the crimes of battery, false imprisonment and kidnapping, such investigation being made by Metro officers acting in their official capacities and, therefore, Rogich and Pennie committed the crime of preventing or dissuading person from testifying or producing evidence, a gross misdemeanor, in violation of NRS 199.230(2), and Rogich and Pennie committed the crime of a conspiracy, a gross misdemeanor, in violation of NRS 199.480(3)(a) and NRS 199.480(3)(g).

97. NRS 199.305(1) and (2) states in pertinent part,

> Preventing or dissuading victim...commencing prosecution or causing arrest.

22

1.    A person who, by intimidating or threatening another person, prevents or dissuades a victim of a crime...from:

* * * *

(b)    Commencing a criminal prosecution...or assisting in such a prosecution or proceeding; or

(c)    Causing the arrest of a person in connection with a crime,

or who hinders or delays such a victim...in his effort to carry out any of those actions is guilty of a category D felony and shall be punished...

2.    As used in this section, "victim of a crime" means a person against whom a crime has been committed.

98.    So as to deprive Mazzeo of justice, Rogich in conspiracy with Pennie and through Pennie, by intimidation and threats made to Mazzeo, hindered and delayed Mazzeo commencing the prosecution or causing the arrest of Gibbons for the crimes of battery, false imprisonment and kidnapping and, therefore, Rogich and Pennie committed the crime of dissuading victim from commencing prosecution or causing arrest, a category D felony, in violation of NRS 199.305(1)(b) and NRS 199.305(1)(c), and Rogich and Punek committed the crime of conspiracy, a gross misdemeanor, in violation of NRS 199.480(3)(a) and NRS 199.480(3)(g).

99.    NRS 199.150 states in pertinent part,

Attempt to suborn perjury. Every person who, without giving, offering or promising a bribe, shall incite or attempt to procure another to commit perjury, or to offer any false evidence, or to withhold true testimony, though no perjury be committed or false evidence offered or true testimony withheld, shall be guilty of a gross misdemeanor.

100.    So as to deprive Mazzeo of justice, Rogich incited and attempted to procure Pennie and others to commit perjury and offer false evidence and to withhold true testimony such as to harm and discredit Mazzeo and, therefore, Rogich committed the crime of attempt to suborn perjury, a gross misdemeanor, in violation of NRS 199.150.

23

101.   NRS 199.520 states in pertinent part,

Disclosure of information to subject of investigation. An officer or employee of a...law enforcement agency who, with the intent to obstruct a criminal investigation, directly or indirectly:

1.   Notifies any person who is the subject of the investigation about the existence of the investigation; or

2.   Discloses to any such person any information obtained in the course of the investigation,

is guilty of a category D felony and shall be punished...

102.   NRS 193.019(2) states in pertinent part,

"Officer" and "public officer" defined. "Officer" and "public officer" include all officers, members and employees of:

* * * *

2.   Any political subdivision of this State....

103.   NRS 280.080 states in pertinent part,

"Political subdivision" defined. "Political subdivision" means a county in this state...

104.   So as to deprive Mazzeo of justice, Young notified Gibbons and Campbell of the Metro investigation directed against Gibbons for the crimes of battery, false imprisonment and kidnapping, and Young allowed Campbell to view the video of the incident between Gibbons and Mazzeo and other videos relevant thereto prior to Gibbons being charged, and Young disclosed information obtained in the course of said investigation to Gibbons and Campbell, even though Gibbons was the subject of said investigation, and Young so notified and so informed Gibbons and Campbell with the intent to obstruct a criminal investigation and, therefore, Young committed the crime of disclosure of information to subject of investigation, a category D felony, in violation of NRS 199.520, NRS 193.019(2) and NRS 280.080.

105.   NRS 199.220 states in pertinent part,

Destroying evidence. Every person who, with intent to conceal the commission of any felony, or to protect or conceal the identity of any person committing the same, or with intent to delay or hinder the administration of the law or to prevent the production thereof at

24

any time...before any officer... shall willfully destroy, alter, erase, obliterate or conceal any book, paper, record, writing, instrument or thing shall be guilty of a gross misdemeanor.

106.    Upon information and belief, so as to deprive Mazzeo of justice, Young and Campbell conspired together and acted to willfully destroy the videos showing Gibbons committing the felonies of battery, false imprisonment and kidnapping against Mazzeo as Gibbons victim to hinder the administration of the law and/or to prevent the production thereof before the Clark County District Attorney and, therefore, Young and Campbell committed the crime of destroying evidence, a gross misdemeanor, in violation of NRS 199.220, NRS 193.019(2) and NRS 280.080, and Young and Campbell committed the crime of conspiracy, a gross misdemeanor, in violation of NRS 199.480(3)(a) and NRS 199.480(3)(g).

107.    18 USC § 241 regarding conspiracy against rights states in pertinent part,

If two or more persons conspire to...oppress, threaten, or intimidate any person in any State...in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same....

They shall be fined under this title or imprisoned not more than ten years, or both....

108.    Rogich and Pennie and Does conspired to oppress, threaten and intimidate Mazzeo in the free exercise and enjoyment of her right to due process and the equal protection of the law guaranteed by the Fourteenth Amendment because she had reported Gibbons to the police, and Rogich through Pennie did so by threats of violence to Mazzeo's person and to her family in violation of 18 USC § 241.

109.    Metro receives federal funds and assistance including funds and assistance from the United States Department of Justice.

110.    18 USC § 245 regarding federally protected activities states in pertinent part,

* * * *

(b) Whoever, whether or not acting under color of law, by force or threat of force willfully...intimidates or interferes with, or attempts to...intimidate or interfere with—

25

(1) any person because he is or has been, or in order to intimidate such person or any other person...from—

\* \* \* \*

(E) participating in or enjoying the benefits of any program or activity receiving Federal financial assistance...--

shall be fined under this title, or imprisoned not more than one year, or both...

111.    Rogich through Pennie and Does acting or not acting under color of law by threat of force willfully intimidated, interfered with and attempted to intimidate and interfere with Mazzeo enjoying the benefits of the activities of Metro properly investigating the events of October 13, 2006, and bringing Gibbons to justice.

112.    Young acting under color of law caused Mazzeo to be deprived of due process and the equal protection of the law by informing Gibbons, Campbell and Rogich of the progress of the investigation into Gibbons' activities on the night of October 13, 2008, when all other criminal suspects are deprived of such information until the time of their arraignment on criminal charges, by depriving Mazzeo the opportunity to prove she was wrongfully defamed by Gibbons', Rogich's, Pennie's and Doe's lies about the conduct of Gibbons on the evening of October 13, 2006, and by depriving Mazzeo of her ability to have criminal charges brought against Gibbons for the crimes he committed upon her..

113.    Young acting under color of law caused Mazzeo to be deprived of due process and the equal protection of the law by acting in concert and conspiracy with Campbell to destroy the video evidence of Gibbons committing the crimes of battery, false imprisonment and kidnapping with Mazzeo as his victim.

. . . .

. . . .

. . . .

26

114.   NRS 199.310 relating to the crime of malicious prosecution states in pertinent part.

> A person who maliciously and without probable cause therefor, causes or attempts to cause another to be arrested or proceeded against for any crime of which he is innocent:
>
> 1.    If the crime is a felony, is guilty of a category D felony and shall be punished as provided in NRS 193.130; and
>
> 2.    If the crime is a gross misdemeanor or misdemeanor, is guilty of a misdemeanor.

115.   Gibbons physical acts of offensively touching Mazzeo in McCormick & Schmick's and his seizing, pushing into the wall and chainlink fence, squeezing of upper arms, and detaining Mazzeo against her will up against the northwest wall of the first floor of the Hughes Center parking garage combined with Gibbons' oral threats of greater physical harm, rape of her person and not caring about being caught on camera made in the Hughes Center parking garage and Gibbons' oral threats made in the Hughes Center parking garage and outside the lobby of the La Quinta Inn implying harm to Mazzeo's reputation, ability to secure work and ability to secure justice, all of which occurred on the evening of October 13, 2006, caused Mazzeo pain, suffering , mental anguish and emotional distress causing Mazzeo damages in an amount in excess of $10,000.00.

116.   Gibbons lied about what occurred in the Hughes Center parking garage defaming Mazzeo as a lying opportunist and the filer of a false police report and implying by insinuation and innuendo that Mazzeo was guilty of the crime of malicious prosecution in violation of NRS 199.310 causing Mazzeo mental anguish and emotional distress, causing great harm to Mazzeo's reputation and causing Mazzeo lost  employment opportunities causing Mazzeo damages in an amount in excess of $10,000.00.

117.   Gibbons, Rogich, Pennie and Does lied about the conduct of Gibbons at the table in McCormick & Schmick's with respect to the amount of drinking, the sexuality of the conversation and the oral and physical advances Gibbons made upon Mazzeo defaming Mazzeo

as a lying opportunist and the filer of a false police report and implying by insinuation and innuendo that Mazzeo was guilty of the crime of malicious prosecution in violation of NRS 199.310 causing Mazzeo mental anguish and emotional distress, causing great harm to Mazzeo's reputation and causing Mazzeo lost employment opportunities causing Mazzeo damages in an amount in excess of $10,000.00.

118.   Since Officer Ortega had already confirmed the existence of videos showing the event of October 13, 2006, between Gibbons and Mazzeo in the Hughes Center parking garage just as Mazzeo described it, on information and belief, Young, Campbell and Does conspired to suppress the existence of videos showing the event of October 13, 2006, between Gibbons and Mazzeo in the Hughes Center parking garage and/or other videos supportive of Mazzeo's claims and/or conspired to destroy and did destroy the actual videos which proved Mazzeo's case, and Young kept Gibbons and Campbell informed of all aspects of the investigation against Gibbons depriving Mazzeo of her Fourteen Amendment rights to due process and the equal protection of the law and thereby assisting and acting as accomplices and allowing Gibbons, Rogich, Pennie and/or Does to successfully defame Mazzeo as a lying opportunist and the filer of a false police report and to imply by insinuation and innuendo that she was guilty of the crime of malicious prosecution in violation of NRS 199.310 causing Mazzeo mental anguish and emotional distress, causing great harm to Mazzeo's reputation, causing Mazzeo lost employment opportunities and causing Mazzeo to be deprived of justice causing Mazzeo damages in an amount in excess of $10,000.00.

119.   As a result of the actions of the Defendants, Mazzeo could no longer find employment in Las Vegas as a cocktail waitress regardless of her good looks and excellent reputation for good service without any writeups of negative remarks in any of her employment files and causing people to shun her and consider her untruthful without merit or true cause causing Mazzeo damages in an amount in excess of $10,000.00.

. . . .

28

120. With the exception of Metro, which cannot be found liable for punitive damages, the actions of the Defendants were intentional and malicious entitling Mazzeo to receive punitive damages from all Defendants with the exception of Metro in an amount of more than $10,000.00 each.

**Causes of Action**

**First Cause of Action**
**(42 USC § 1983)**

121. 42 USC § 1983 regarding civil action for deprivation of rights states in pertinent part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State...subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

122. Gibbons, Young, Campbell and/or Does, acting separately and/or in conspiracy deprived Mazzeo of her Fourteenth Amendment rights of due process and/or equal protection as described herein and, therefore, Gibbons, Metro, Young, Campbell and/or Does are liable to Mazzeo for her damages as described herein caused by such deprivation(s) pursuant to 42 USC § 1983.

123. Rogich, Pennie and/or Does, acting separately and/or in conspiracy violated 18 USC § 241 and/or 18 USC § 245 as described herein and, therefore, Rogich, Pennie and/or Does are liable to Mazzeo for her damages as described herein caused by such violations pursuant to 42 USC § 1983.

. . . .

. . . .

. . . .

. . . .

29

**Second Cause of Action**
**(42 USC § 1985)**

124.   42 USC § 1985(2) regarding conspiracy to interfere with civil rights states in

pertinent part,

> (2) Obstructing justice; intimidating party, witness, or juror

> If...two or more persons conspire for the purpose of impeding,
> hindering, obstructing, or defeating, in any manner, the due course
> of justice in any State...with intent to deny to any citizen the equal
> protection of the laws...;

> the party so injured or deprived may have an action for the
> recovery of damages occasioned by such injury or deprivation,
> against any one or more of the conspirators.

125.   Gibbons, Young, Rogich, Campbell, Pennie and/or Does conspired for the

purpose of impeding, hindering, obstructing and/or defeating the course of justice in the State of

Nevada with the intent to deny Mazzeo the equal protection of the laws as described herein and,

therefore, Gibbons, Metro, Young, Rogich, Campbell, Pennie and/or Does are liable to Mazzeo

for her damages as described herein caused by such conspiracy(ies) pursuant to 42 USC § 1985.

**Third Cause of Action**
**(42 USC § 1988)**

126.   42 USC § 1988(b) regarding proceedings in vindication of civil rights states in

pertinent part,

(b)   Attorneys fees

> In any action or proceeding to enforce a provision of sections...1983, 1985...the
> court, in its discretion, may allow the prevailing party...a reasonable attorney's fee
> as part of the costs...

127.   Pursuant to 42 USC § 1988, Mazzeo is entitled to be awarded reasonable

attorney's fees as part of costs of her suit.

. . . .

. . . .

30

**Fourth Cause of Action**
**(Battery)**

128.    Gibbons battered Mazzeo causing Mazzeo damages as described herein.

**Fifth Cause of Action**
**(False Imprisonment)**

129.    Gibbons falsely imprisoned Mazzeo causing Mazzeo damages as described herein.

**Sixth Cause of Action**
**(Negligence *per se*)**

130.    Gibbons committed the crimes of battery, false Imprisonment, kidnapping, and conspiracy as described herein constituting negligence *per se* causing Mazzeo damages as described herein.

131.    Rogich, Pennie and/or Does committed the crimes of preventing or dissuading person from testifying, conspiracy to prevent or dissuade person from testifying, preventing or dissuading person from commencing prosecution or causing arrest, conspiracy to prevent or dissuade person from commencing prosecution or causing arrest, attempt to suborn perjury, conspiracy against the exercise of rights in violation of 18 USC § 241, and conspiracy to prevent participation in a federally protected activity in violation of 18 USC § 245 as described herein constituting negligence *per se* causing Mazzeo damages as described herein.

132.    Young and/or Does committed the crimes of disclosure of information to subject of investigation as described herein constituting negligence *per se* causing Mazzeo damages as described herein.

133.    Upon information and belief, Young, Campbell and/or Does committed to crime of destroying evidence as described herein constituting negligence *per se* causing Mazzeo damages as described herein.

. . . .

31

**Seventh Cause of Action**
**(Defamation: Slander, Slander *per se*, Libel, Libel *per quod*)**

134.   Gibbons, Pennie and/or Does committed slander, slander *per se*, libel and/or libel *per quod* with comments they knew or had reason to know would be published against Mazzeo causing Masseo to be defamed by allegations which by insinuation and innuendo caused Mazzeo to be accused of committing the crime of malicious prosecution as described herein and causing Masseo to otherwise be defamed as described herein causing Mazzeo damages as described herein.

**Prayer for Relief**

135.   **Wherefore,** Mazzeo prays for judgment against Defendants Gibbons, Metro, Young, Rogich, Campbell, Rogich, Pennie and Does, with the singular exception that no punitive damages are sought from Metro, as follows:

136.   General damages in an amount in excess of $10,000.00;

137.   Special damages in an amount to be determined in discovery but at least $10,000.00;

138.   Punitive damages to be assessed against all Defendants except Metro in an amount in excess of $10,000.00, each;

139.   Costs of suit;

140.   Reasonable attorney's fees:

141.   Interest on the judgment at the applicable legal rate from the time of service of the Summons and Complaint upon Defendants until complete satisfaction of judgment pursuant to NRS 17.130(2); and,

. . . .

. . . .

. . . .

142.    Such other and further relief as this Honorable Court deems just, equitable and proper under the circumstances.

**Dated** this 13th day of October, 2008.

KOSSACK LAW OFFICES

By _____
ROBERT J. KOSSACK, ESQ.
Nevada Bar No. 2734
4535 W. Sahara Avenue, Suite 101
Las Vegas, Nevada  89102
Ph. (702) 253-7068
Fx. (702) 368-0471
Email  rjkossack@cox.net

**VERIFICATION**

State of Nevada  )
                 )  ss.
County of Clark  )

I, CHRISSY ISRAEL MAZZEO, being duly sworn, depose and say:

I am the Plaintiff in the above-entitled action, have read the foregoing **COMPLAINT** and know the contents thereof, know the same is true and correct of my own knowledge except as to those matters therein stated on information and belief and, as to those matters, I believe them to be true.

_____
CHRISSY ISRAEL MAZZEO

SUBSCRIBED and SWORN to before me
this 13th day of October, 2008.

_____
NOTARY PUBLIC in and for said
COUNTY and STATE

JEFFERYANN ROUSE
NOTARY PUBLIC
STATE OF NEVADA
My Commission Expires: 9-8-2012
Commission No: 04-92109-1

33

# EXHIBIT  1

# EXHIBIT  1

**EXHIBIT 1:  PICTORIAL RECREATION AND HISTORY OF THE ATTACK UPON MAZZEO BY GIBBONS AND ITS AFTERMATH:**

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|
| 1. | Picture of the front of McCormick & Schmick's Seafood Restaurant ("McCormick & Schmick's") photographed from west of the restaurant. |
| 2. | Picture of Chrissy Israel Mazzeo ("Mazzeo") standing where her truck was parked in the McCormick & Schmick's south parking lot bordering Flamingo Road. |
| 3. | Picture of McCormick & Schmick's photographed from south of the restaurant from where Mazzeo parked her truck. |
| 4 A. | First of a panorama of photographs taken from southwest of McCormick & Schmick's showing the Hughes Center parking garage in the left background and showing the Marriott Residence Inn ("Residence Inn") in the right background. |
| 4 B. | Second of a panorama of photographs (rotating clockwise) taken from southwest of McCormick & Schmick's showing the Residence Inn in the background. |
| 4 C. | Third of a panorama of photographs (rotating clockwise) taken from southwest of McCormick & Schmick's Seafood Restaurant showing the south parking lot where Mazzeo parked her truck. |
| 4 D. | Fourth of a panorama of photographs (rotating clockwise) taken from southwest of McCormick & Schmick's showing the south parking lot truck and part of Flamingo Road. |
| 5. | Picture of McCormick & Schmick's photographed from southwest of the restaurant. |
| 6. | Ariel photograph (from Google Earth) of a portion of the Hughes Center parking garage and the Residence Inn (top), McCormick and Schmick's (center) and the McCormick and Schmick's south parking garage bordering Flamingo Road (bottom) with the area where Mazzeo parked her truck highlighted in turquoise. |
| 7. | Picture taken by Metro SCI of McCormick & Schmick's taken from northwest of the restaurant showing the valet parking ramada. |

# EXHIBIT  1

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|

8.  Picture of Mazzeo recreating where she stood at the McCormick & Schmick's front entrance under the ramada where the valet parking attendant was and where she searched her purse for her keys.

9.  Picture of the north side of McCormick & Schmick's taken from west of the restaurant showing Mazzeo standing where Gibbons stood between the bushes in the rain laying in wait for Mazzeo to come out of the restaurant.

10.  Close-up picture of the north side of the McCormick & Schmick's taken from west of the restaurant showing Mazzeo is standing where Gibbons stood between the bushes in the rain laying in wait for Mazzeo to come out of the restaurant.

11.  Picture of Mazzeo walking on the sidewalk bordering the west side of McCormick & Schmick's heading north retracing the route Gibbons convinced her to take with him toward the Hughes Center parking garage.

12.  Picture of Mazzeo at the end of the sidewalk bordering the west side of McCormick & Schmick's where she and Gibbons began to walk north across Hughes Center Drive to enter the Hughes Center parking garage.

13.  Picture of Mazzeo where she and Gibbons were on the sidewalk bordering the south side of the Hughes Center parking garage after they walked north across Hughes Center Drive on their way to the steps leading down to the first floor of the Hughes Center parking garage.

14.  Picture of Mazzeo pointing to the stairway she and Gibbons took leading down into the Hughes Center parking garage.

15.  Picture of the steps Mazzeo and Gibbons walked down into the first floor of the Hughes Center parking garage through the south pedestrian entrance.

16.  Picture of the view one sees from the top of the steps looking north into the first floor of the Hughes Center parking garage showing Mazzeo standing where she and Gibbons began walking northwest into the garage.

17.  Close-up picture of the view one sees from the top of the steps looking northwest into the first floor of the Hughes Center parking garage showing Mazzeo standing where she and Gibbons began walking northwest into the first floor of the Hughes Center parking garage.

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|
| 18. | Picture of Camera Number 1 (center top) in the south corner of the first floor of the Hughes Center parking garage which people coming down the stairs (center to right) caused Mazzeo to look back and see when she and Gibbons initially entered the garage. |
| 19. | Closer-up picture of Camera No. 1 (center top) in the south corner of the first floor of the Hughes Center parking garage. |
| 20. | Close-up picture of Camera No. 1 in the south corner of the first floor of the Hughes Center parking garage. |
| 21. | Picture of Mazzeo retracing the steps she and Gibbons made as they walked further into the Hughes Center parking garage in a northwestern direction to the northwest side of the first floor of the garage. |
| 22. | Picture of Mazzeo retracing the steps she and Gibbons made as they continued to walk on the northwest side of the first floor of the Hughes Center parking garage and began walking northeast parallel to the northwest wall of the first floor of the garage. |
| 23. | Picture of Mazzeo retracing the steps she and Gibbons made as they continued to walk northeast on the northwest side of the first floor of the Hughes Center parking garage past the southwest elevator. |
| 24. | Picture of the southwest elevator on the northwest side of the first floor of the Hughes Center parking garage. |
| 25. | Closer view picture of the southwest elevator on the northwest side of the first floor of the Hughes Center parking garage showing the emergency stairway to its immediate northeast. |
| 26. | Picture of Camera No. 2 (black ball eye-in-the-sky type) in front of the southwest elevator on the northwest first floor of the Hughes Center parking garage. |
| 26 A. | Picture of Camera No. 2 in front of the southwest elevator on the northwest first floor of the Hughes Center parking garage as it appeared on the day of the incident. |

. . . .

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|

**26 B.**  Picture taken by Metro CSI of Camera No. 2 in front of the southwest elevator on the northwest first floor of the Hughes Center parking garage as it appeared on the day of the incident taken from the elevator.

**27.**  Picture taken by Metro CSI of Mazzeo retracing the steps she and Gibbons made heading northeast on the first floor of the Hughes Center parking garage where Gibbons grabbed and seized Mazzeo by both arms and pushed her approximately ten feet against the northwest wall of the garage.

**28.**  Picture of Mazzeo where Gibbons confined her up against the northwest wall of the first floor of the Hughes Center parking garage in a corner created by the support column northeast of the southwest elevator.

**29.**  Picture of the northwest wall of the first floor of the Hughes Center parking garage with its upper chain link fence which left scratches on Mazzeo's back when Gibbons seized her and pushed her up against it.

**30.**  Close-up picture of the northwest wall of the first floor of the Hughes Center parking garage with its upper chain link fence which left scratches on Mazzeo's back when Gibbons seized her and pushed her up against it.

**31.**  Picture of Camera No. 1 across the first floor of the Hughes Center parking garage as Mazzeo could view it when Gibbons had her confined against the northwest wall of the first floor of the Hughes Center parking garage.

**32.**  Picture of Camera No. 2 (right) in front of the southwest elevator on the first floor of the Hughes Center parking garage as Mazzeo could view it when Gibbons had her confined against the northwest wall of the garage.

**33.**  Picture of Camera No. 1 (center) and Camera No. 2 (right) taken from where Gibbons had Mazzeo confined against the northwest wall of the garage.

**34.**  Closer-up view of Camera No. 2 in front of the southwest elevator on the first floor of the Hughes Center parking garage as Mazzeo could view it when Gibbons had her confined against the northwest wall of the garage.

**35.**  Close-up view of Camera No. 2 in front of the southwest elevator on the first floor of the Hughes Center parking garage as Mazzeo could view it when Gibbons had her confined against the northwest wall of the garage.

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
| --- | --- |

36.   Picture of Mazzeo where she was confined by Gibbons against the northwest wall of the first floor of the Hughes Center parking garage as taken from the location of Camera No. 1.

37.   Closer- up picture of Mazzeo where she was confined by Gibbons against the northwest wall of the first floor of the Hughes Center parking garage as taken from the location of Camera No. 1.

38.   Picture of Mazzeo where she was confined by Gibbons against the northwest wall of the first floor of the Hughes Center parking garage photographed from the location of Camera No. 2.

39.   Picture of Mazzeo retracing the steps she ran toward the northeast entrance to the first floor of the Hughes Center parking garage after Gibbons was distracted by young men running out of the elevator area, she kicked him in the shins and shook herself free of his grasp.

40.   Picture of Mazzeo retracing the steps she ran as she approached the northeast entrance to the first floor of the Hughes Center parking garage after escaping from Gibbons' grasp.

41.   Picture of Camera No. 3 which is located so as to monitor vehicles coming in and out of the northeast entrance to the first floor of the Hughes Center parking garage and which was in position to record Mazzeo running out the northeast entrance.

42.   Picture of Mazzeo retracing the steps she ran out the northeast entrance to the northwest side of the first floor of the Hughes Center parking garage after she freed herself from Gibbons' grasp.

43 A.   First of a panorama of photographs taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

43 B.   Second of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

43 C.   Third of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|
| 43 D. | Fourth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage. |
| 43 E. | Fifth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage. |
| 43 F. | Sixth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage. |
| 43 G. | Seventh of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage. |
| 43 H. | Eighth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage. |
| 43 I. | Ninth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage. |
| 43 J. | Tenth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage. |
| 43 K. | Eleventh of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage. |
| 43 L. | Twelfth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage. |
| 43 M. | Thirteenth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage. |

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|

43 N.   Fourteenth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

43 O.   Fifteenth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

43 P.   Sixteenth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

43 Q.   Seventeenth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

43 R.   Eighteenth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

43 S.   Nineteenth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

43 T.   Twentieth of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

43 U.   Twenty-first of a panorama of photographs (rotating clockwise) taken from where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

44A.   First of a panorama of photographs taken from across where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

44 B.   Second of a panorama of photographs (rotating clockwise) taken from across where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|

**44 C.** Third of a panorama of photographs (rotating clockwise) taken from across where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

**44 D.** Fourth of a panorama of photographs (rotating clockwise) taken from across where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

**44 E.** Fifth of a panorama of photographs (rotating clockwise) taken from across where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

**44 F.** Sixth of a panorama of photographs (rotating clockwise) taken from across where Gibbons had Mazzeo detained against the northwest wall of the first floor of the Hughes Center parking garage.

**45.** Picture of Mazzeo (right) retracing the steps she ran east on the sidewalk bordering the south side of Center Circle and the north side of the Residence Inn toward Paradise Road after running out of the northeast entrance to the Hughes Center parking garage.

**46.** Picture of Mazzeo retracing the steps she ran east on the sidewalk as she reached the north entrance to the Residence Inn parking lot.

**47.** Picture of Mazzeo retracing the steps she ran east on the sidewalk after crossing the north entrance to the Marriott Residence Inn parking lot.

**48.** Close-up picture of the La Quinta Inn & Suites ("La Quinta Inn") photographed from the east corner of the north entrance to the Marriott Residence Inn parking lot.

**49.** Picture of Mazzeo retracing the steps she ran east on the sidewalk as she reached the corner of Center Circle and Hughes Center Drive.

**50 A.** First of a panorama of photographs taken from the southwest corner of Center Circle and Hughes Center Drive showing the south side of the Gordon Biersch Brewing Company ("Gordon Biersch").

**50 B.** Second of a panorama of photographs (rotating clockwise) taken from the southwest corner of Center Circle and Hughes Center Drive.

| **EXHIBIT NUMBER** | **PICTORIAL DESCRIPTION** |
|---|---|
| 50 C. | Third of a panorama of photographs (rotating clockwise) taken from the southwest corner of Center Circle and Hughes Center Drive showing the La Quinta Inn across Paradise Road. |
| 50 D. | Fourth of a panorama of photographs (rotating clockwise) taken from the southwest corner of Center Circle and Hughes Center Drive. |
| 50 E. | Fifth of a panorama of photographs (rotating clockwise) taken from the southwest corner of Center Circle and Hughes Center Drive. |
| 50 F. | Sixth of a panorama of photographs (rotating clockwise) taken from the southwest corner of Center Circle and Hughes Center Drive showing the Starbucks Coffee ("Starbucks"). |
| 51. | Picture of Mazzeo retracing the steps she ran northeast on the sidewalk bordering the southeast side of Hughes Center Drive toward Paradise Road. |
| 52. | Picture of Mazzeo retracing the steps she ran northeast on the sidewalk bordering the southeast side of Hughes Center Drive as she reaches the southwest corner of Hughes Center Drive and Paradise Road. |
| 53. | Picture of Mazzeo retracing the steps she ran east across Paradise Road to the La Quinta Inn. |
| 54. | Picture of Mazzeo retracing the steps she ran northeast across the La Quinta Inn south parking lot to the south lobby entrance after she crossed Paradise Road. |
| 55. | Picture of Mazzeo retracing her steps as she stopped running and walked north into the lobby of the La Quinta Inn. |
| 56. | Picture of Mazzeo standing in the lobby of the La Quinta Inn where she took initially took refuge from Gibbons. |
| 57. | Picture of the phone in the lobby of the La Quinta Inn similar to this one that Mazzeo made her first telephone call to 911 but quickly hanging up, then called 911 again, called her sister, Anne Freteluco, and called Pennie Puhuk ("Pennie") to tell them what happened. |
| 58. | Picture of Mazzeo recreating her looking south through the lobby windows of the La Quinta Inn as she waited for the police to arrive. |

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|

59.    Picture of the southeastern view out the lobby of the La Quinta Inn where Mazzeo first saw Gibbons come up to the lobby to look in at her.

60.    Picture of the southwestern view out the lobby of the La Quinta Inn where Mazzeo saw Gibbons cross over and look in directly at her as she waited for the police.

61.    Picture of Mazzeo retracing the steps she ran out the south entrance of the La Quinta Inn, after she broke free of Gibbons grabbing, and to the southwest corner of the La Quinta Inn property as she ran toward Starbucks across Paradise Road.

62.    Picture of Mazzeo retracing the steps she ran southwest across Paradise Road toward Starbucks where she hoped to find refuge from Gibbons' stalking.

63.    Picture of Mazzeo retracing the steps she ran southwest having crossed Paradise Road toward Starbucks where she hoped to find refuge from Gibbons' stalking.

64.    Picture of Mazzeo retracing the steps she ran through the opening in the hedges northeast of Starbucks to enter the Starbucks parking lot.

65.    Picture of Mazzeo retracing the steps she walked south through the Starbucks parking lot to Starbucks after passing through the opening in the hedges.

66.    Picture of Starbucks photographed from northwest of Starbucks from the southwest corner of Center Circle and Hughes Center Drive.

67.    Picture of Mazzeo retracing her steps as she entered Starbucks to find refuge from Gibbons and to call 911 a second time to tell the police of her new location.

68.    Picture of Mazzeo retracing her steps as she turned right and headed west by southwest to find refuge in the Starbucks women's restroom.

69.    Picture of Mazzeo retracing her steps as she prepared to enter the Starbucks women's restroom where she sat on the floor and talked to the 911 operator.

70.    Picture of Mazzeo recreating how she sat in the rain on one of the parking blocks in front of Starbucks after being directed by the 911 operator to go outside and wait for the police.

. . . .

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|

71.  Picture of the Gordon Biersch taken from where Mazzeo waited for the police in front of Starbucks.

72.  Close-up picture of Gordon Biersch taken from where Mazzeo waited for the police in front of Starbucks.

73.  Picture of Mazzeo retracing the steps she walked north by northwest toward Gordon Biersch in response to being rained upon and stared at by people entering and exiting Starbucks.

74.  Picture of Mazzeo retracing the steps she walked north by northwest through the hedges at the edge of the west side of the Starbucks parking lot toward Gordon Biersch.

75.  Picture of Mazzeo retracing the steps she walked north by northwest across Hughes Center Drive toward the sidewalk bordering the north side of Hughes Center Drive and bordering the south side of Gordon Biersch.

76.  Picture of Mazzeo retracing her steps after she walked north by northwest across Hughes Center Drive to the sidewalk bordering the south side of Gordon Biersch.

77.  Picture of Mazzeo retracing her steps as she walked north on the sidewalk bordering the  west side of Gordon Biersch leading to its front entrance.

78.  Picture of Mazzeo retracing her steps as walked north on the sidewalk bordering the west side of Gordon Biersch as she neared its front entrance.

79.  Picture of Mazzeo retracing her steps as she walked up to the west entrance to Gordon Biersch.

80.  Picture of Mazzeo retracing her steps as she entered the Gordon Biersch to call 911 a third time, tell the operator of her new location and wait for the police.

81.  Picture of Mazzeo retracing her steps after she entered Gordon Biersch to call 911 a third tome, tell the operator of her new location and wait for the police before she found it too crowded and decided to wait outside.

82.  Picture of Mazzeo depicting how she sat on the bench outside Gordon Biersch where she finished her conversation with the 911 operator and waited for the police to arrive.

. . . .

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|

83.   Picture of the Residence Inn photographed from the McCormick & Schmick's valet parking lot.

84.   Ariel photograph (from Google Earth) of all the areas Mazzeo covered the evening Gibbons attempted to sexually molest her which are color coded as follows:  McCormick & Schmick's Seafood Restaurant - yellow; Hughes Center parking garage - pink; Marriot Residence Inn - purple; Marriott Residence Inn parking garage - dark red/brown; La Quinta Inn & Suites - orange; Starbucks Coffee - green; Gordon Biersch Brewing Company - blue.

85.   Ariel photograph (from Google Earth) of all the areas Mazzeo covered the evening Gibbons attempted to sexually molest her showing the route Mazzeo took from the McCormick & Schmick's Seafood Restaurant to the Gordon Biersch Brewing Company in yellow;  the red dot marks the spot where Gibbons seized and confined Mazzeo against the northwest wall of the first floor of the Hughes Center parking garage.

86 A.   First of a panorama of photographs showing the pedestrian back route from the break in the hedge leading to the first floor of the Residence Inn parking garage to the northeast entrance to the first floor of the Hughes Center parking garage.

86  B.   Second of a panorama of photographs (rotating clockwise) showing the pedestrian back route from the break in the hedge leading to the first floor of the Residence Inn parking garage to the northeast entrance to the first floor of the Hughes Center parking garage.

86 C.   Third of a panorama of photographs (rotating clockwise) showing the pedestrian back route from the break in the hedge leading to the first floor of the Residence Inn parking garage to the northeast entrance to the first floor of the Hughes Center parking garage.

86 D.   Fourth of a panorama of photographs (rotating clockwise) showing the pedestrian back route from the break in the hedge leading to the first floor of the Residence Inn parking garage to the northeast entrance to the first floor of the Hughes Center parking garage.

86 E.   Fifth of a panorama of photographs (rotating clockwise) showing the pedestrian back route from the break in the hedge leading to the first floor of the Residence Inn parking garage to the northeast entrance to the first floor of the Hughes Center parking garage.

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|

**86 F.**  Sixth of a panorama of photographs (rotating clockwise) showing the pedestrian back route from the break in the hedge leading to the first floor of the Residence Inn parking garage to the northeast entrance to the first floor of the Hughes Center parking garage.

**87.**  Picture of the break in the hedge bordering the sidewalk bordering the south side of Center Circle and north of the Residence Inn parking garage.

**88.**  Picture of the path leading southwest from the break in the hedge to the first floor of the Residence Inn parking garage.

**89.**  Picture looking south through the first floor of the Residence Inn parking garage photographed from north of the Residence Inn parking garage from the path leading southwest from the break in the hedge.

**90.**  Picture photographed from the north corner of the Residence Inn parking garage looking south toward the area of the first floor of the Residence Inn parking garage perpendicular to the back gate leading to the Residence Inn pool area and back entrance.

**91.**  Picture of the gate to the back pool area of the Residence Inn photographed from northwest of the gate and from inside on the first floor of the Residence Inn parking garage

**92.**  Close-up picture of the gate to the back pool area of the Residence Inn photographed from northwest of the gate and from inside on the first floor of the Residence Inn parking garage

**93.**  Ariel photograph (from Google Earth) of all the areas Mazzeo covered the evening Gibbons attempted to sexually molest her showing the route Gibbons more than likely planned to use to secretly enter the Residence Inn with Mazzeo through the first floor of the Hughes Center parking garage, east on the sidewalk to the break in the hedges, south through the first floor of the Residence Inn parking garage, southeast though the back gate to the Residence Inn pool area and then through the back doors of the Residence Inn and up to his room.

**94.**  Picture of the Residence Inn (background left) and the McCormick & Schmick's (foreground right) photographed from the McCormick & Schmick's valet parking lot west by southwest of the two buildings.

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|
| 95. | Close-up picture of the Residence Inn photographed from the McCormick & Schmick's valet parking lot. |
| 96. | Picture of Camera No. 4 on the top of the south corner of the Hughes Center parking garage. |
| 97 A. | Close-up picture of Camera No. 4 on the top of the south corner of the Hughes Center parking garage. |
| 97 B. | Picture taken by Metro CSI of Camera No. 4 on the top of the south corner of the Hughes Center parking garage. |
| 98. | Picture of the southeast entrance onto the first floor of the Hughes Center parking garage. |
| 99. | Picture of Mazzeo sitting at the table where she and Pennie were sitting before they joined the Gibbons party. |
| 100. | Picture of Mazzeo sitting at a booth similar to the one occupied by Gibbons and Rogich and two other women before one of the round tables like the one depicted in Plaintiff's Exhibit 98 was moved up to it to accommodate Mazzeo and Puhek. |
| 101. | Picture taken by Metro CSI of the southwest wall of the first floor of the Hughes Center parking garage. |
| 102. | Picture taken by Metro CSI of the southwest entrance to the first floor of the Hughes Center parking garage looking out. |
| 103. | Picture taken by Metro CSI of the southwest entrance to the first floor of the Hughes Center parking garage looking in. |
| 104. | Picture taken by Metro CSI of the southeast call of the first floor of the Hughes Center parking garage. |
| 105 A. | First of a panorama of photographs showing the up ramp to the second floor of the Hughes Center parking garage where Metro detectives, in an effort to confuse Mazzeo, took her on their "reconstruction tour" of the Hughes Center parking garage in order to avoid the northwest half of the first floor of the garage where the seizure and confinement of Mazzeo by Gibbons actually took place. |

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|
| 105 B. | Second of a panorama of photographs (rotating clockwise) showing the up ramp to the second floor of the Hughes Center parking garage. |
| 105 C. | Third of a panorama of photographs (rotating clockwise) showing the up ramp to the second floor of the Hughes Center parking garage. |
| 105 D. | Fourth of a panorama of photographs (rotating clockwise) showing the up ramp to the second floor of the Hughes Center parking garage. |
| 105 E. | Fifth of a panorama of photographs (rotating clockwise) showing the up ramp to the second floor of the Hughes Center parking garage. |
| 106. | Picture taken by Metro CSI of the first floor southwest elevator as seen from the southeast wall of the Hughes Center parking garage. |
| 107. | Picture taken by Metro CSI of the second floor northwest elevator of the Hughes Center parking garage. |
| 108. | Picture taken by Metro CSI of the second floor southwest elevator of the Hughes Center parking garage. |
| 109. | Picture taken by Metro CSI of the southwest entrance on the second floor of the Hughes Center parking garage (left) and the southwest elevator. |
| 110. | Picture taken by Metro CSI of the third floor southwest elevator of the Hughes Center parking garage. |
| 111. | Picture taken by Metro CSI of the fourth floor southwest elevator of the Hughes Center parking garage. |
| 112. | Picture taken by Metro CSI of the fifth floor southwest elevator of the Hughes center parking garage. |
| 113. | Picture taken by Metro CSI of the sixth floor northwest elevator of the Hughes center parking garage. |
| 114. | Picture taken by Metro CSI of the route from the Hughes Center parking garage second floor southwest entrance to the McCormick & Schmick's along the sidewalk southwest of the Hughes Center parking garage. |

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|

115.    Ariel photograph (from Google Earth) of all the areas Mazzeo covered the evening Gibbons attempted to sexually molest her showing the route Gibbons more than likely took that evening first to the southwest first floor of the Hughes Center parking garage where he tried to force himself upon Mazzeo, then back to McCormick & Schmick's where he probably learned from Pennie that Mazzeo was inside the La Quinta Inn, then to his car in the Residence Inn parking lot where he took off his coat which was wet from the time he lay in wait for Mazzeo to exit McCormick & Schmick's and placed it in his car as he got into his car and then drove northeast up Hughes Center Drive and across Paradise Road to the La Quinta Inn parking lot, then out of this car to look through the windows into the lobby of the La Quinta Inn where he saw Mazzeo, then after being unsuccessful in holding on to and engaging Mazzeo in conversation as she exited the La Quinta Inn lobby and ran back across Paradise Road, he got back into his car and drove across Paradise Road and southwest on Hughes Center Road to the Residence Inn where he parked in the parking lot and entered the front entrance to the hotel only to discover that he has lost his room key card, then instead of asking for another key card and fearing that he dropped his key card in the Hughes Center parking garage and that it was some evidence of the events of the evening, he set off on foot retracing his steps into the Hughes Center parking garage where he found his room key card, and then he took his back route through the Hughes Center parking garage, out its northeast first floor entrance, along the sidewalk, though the break in the hedges, through the first floor of the Residence Inn parking garage, though the back gate to the Residence Inn pool area and through the back door of the Residence Inn and up to his room which accounts for the 45 minute gap between the time Gibbons left McCormick & Schmick's and the time he finally entered his hotel room.

116.    Picture taken by Metro CSI in the early morning hours of October 14, 2008, of Mazzeo's person as she was dressed, minus the tennis shoes, on the evening of the incident.

117.    Picture taken by Metro CSI in the early morning hours of October 14, 2008, of Mazzeo's neck showing a scratch.

118.    Picture taken by Metro CSI in the early morning hours of October 14, 2008, of Mazzeo's right shoulder showing a scratch.

119.    Picture taken by Metro CSI in the early morning hours of October 14, 2008, of Mazzeo's left shoulder showing a scratch.

| EXHIBIT NUMBER | PICTORIAL DESCRIPTION |
|---|---|
| 120. | Close-up picture taken by Metro CSI in the early morning hours of October 14, 2008, of Mazzeo's left shoulder showing a scratch being measured. |
| 121. | Picture taken by Metro CSI in the early morning hours of October 14, 2008, of Mazzeo's upper right arm showing initial bruising caused by Gibbons grasping her upper right arm. |
| 122. | Close-up picture taken by Metro CSI in the early morning hours of October 14, 2008, of Mazzeo's upper right arm showing initial bruising caused by Gibbons grasping her upper right arm. |
| 123. | Picture taken by Metro CSI in the early morning hours of October 14, 2008, of Mazzeo's left arm showing initial bruising caused by Gibbons grasping her upper left arm. |
| 124. | Close-up picture taken by Metro CSI in the early morning hours of October 14, 2008, of Mazzeo's left arm showing initial bruising caused by Gibbons grasping her upper left arm (arm down by side). |
| 125. | Close-up picture taken by Metro CSI in the early morning hours of October 14, 2008, of Mazzeo's left arm showing initial bruising caused by Gibbons grasping her upper left arm (arm pictured horizontally). |



Plaintiff's Exhibit 1

Plaintiff's Exhibit 2

Plaintiff's Exhibit 3

Plaintiff's Exhibit 4 A

Plaintiff's Exhibit 4 B

Plaintiff's Exhibit 4 C

Plaintiff's Exhibit 4 D

Plaintiff's Exhibit 5

Plaintiff's Exhibit 6

Plaintiff's Exhibit 7

Plaintiff's Exhibit 8

Plaintiff's Exhibit 9



Plaintiff's Exhibit 10

Plaintiff's Exhibit 11

Plaintiff's Exhibit 12

Plaintiff's Exhibit 13

Plaintiff's Exhibit 14

Plaintiff's Exhibit 15

Plaintiff's Exhibit 16

Plaintiff's Exhibit 17

Plaintiff's Exhibit 18

Plaintiff's Exhibit 19

Plaintiff's Exhibit 20

Plaintiff's Exhibit 21

Plaintiff's Exhibit 22



Plaintiff's Exhibit 23

Plaintiff's Exhibit 24

Plaintiff's Exhibit 25

Plaintiff's Exhibit 26 A

Plaintiff's Exhibit 26 B



Plaintiff's Exhibit 26 C



Plaintiff's Exhibit 27



Plaintiff's Exhibit 28



Plaintiff's Exhibit 29



Plaintiff's Exhibit 30



Plaintiff's Exhibit 31
Plaintiff's Exhibit 32
Plaintiff's Exhibit 33
Plaintiff's Exhibit 34
Plaintiff's Exhibit 35

Plaintiff's Exhibit 36
Plaintiff's Exhibit 37
Plaintiff's Exhibit 38
Plaintiff's Exhibit 39
Plaintiff's Exhibit 40

Plaintiff's Exhibit 41
Plaintiff's Exhibit 42
Plaintiff's Exhibit 43 A
Plaintiff's Exhibit 43 B
Plaintiff's Exhibit 43 C

Plaintiff's Exhibit 43 D
Plaintiff's Exhibit 43 E
Plaintiff's Exhibit 43 F
Plaintiff's Exhibit 43 G
Plaintiff's Exhibit 43 H

Plaintiff's Exhibit 43 I
Plaintiff's Exhibit 43 J
Plaintiff's Exhibit 43 K
Plaintiff's Exhibit 43 L
Plaintiff's Exhibit 43 M

Plaintiff's Exhibit 43 N
Plaintiff's Exhibit 43 O
Plaintiff's Exhibit 43 P
Plaintiff's Exhibit 43 Q
Plaintiff's Exhibit 43 R

Plaintiff's Exhibit 43 S
Plaintiff's Exhibit 43 T
Plaintiff's Exhibit 43 U
Plaintiff's Exhibit 44 A
Plaintiff's Exhibit 44 B


Plaintiff's Exhibit 44 C


Plaintiff's Exhibit 44 D


Plaintiff's Exhibit 44 E


Plaintiff's Exhibit 44 F


Plaintiff's Exhibit 45


Plaintiff's Exhibit 46


Plaintiff's Exhibit 47


Plaintiff's Exhibit 48


Plaintiff's Exhibit 49


Plaintiff's Exhibit 50 A


Plaintiff's Exhibit 50 B


Plaintiff's Exhibit 50 C


Plaintiff's Exhibit 50 D


Plaintiff's Exhibit 50 E


Plaintiff's Exhibit 50 F


Plaintiff's Exhibit 51


Plaintiff's Exhibit 52


Plaintiff's Exhibit 53


Plaintiff's Exhibit 54


Plaintiff's Exhibit 55


Plaintiff's Exhibit 56


Plaintiff's Exhibit 57


Plaintiff's Exhibit 58


Plaintiff's Exhibit 59


Plaintiff's Exhibit 60


Plaintiff's Exhibit 61


Plaintiff's Exhibit 62


Plaintiff's Exhibit 63


Plaintiff's Exhibit 64


Plaintiff's Exhibit 65


Plaintiff's Exhibit 66


Plaintiff's Exhibit 67


Plaintiff's Exhibit 68


Plaintiff's Exhibit 69


Plaintiff's Exhibit 70



Plaintiff's Exhibit 71



Plaintiff's Exhibit 72



Plaintiff's Exhibit 73



Plaintiff's Exhibit 74



Plaintiff's Exhibit 75



Plaintiff's Exhibit 76



Plaintiff's Exhibit 77



Plaintiff's Exhibit 78



Plaintiff's Exhibit 79



Plaintiff's Exhibit 80



Plaintiff's Exhibit 81



Plaintiff's Exhibit 82



Plaintiff's Exhibit 83

Plaintiff's Exhibit 84



Plaintiff's Exhibit 85



Plaintiff's Exhibit 86 A



Plaintiff's Exhibit 86 B



Plaintiff's Exhibit 86 C



Plaintiff's Exhibit 86 D



Plaintiff's Exhibit 86 E



Plaintiff's Exhibit 86 F



Plaintiff's Exhibit 87



Plaintiff's Exhibit 88



Plaintiff's Exhibit 89



Plaintiff's Exhibit 90



Plaintiff's Exhibit 91



Plaintiff's Exhibit 92



Plaintiff's Exhibit 93



Plaintiff's Exhibit 94



Plaintiff's Exhibit 95



Plaintiff's Exhibit 96



Plaintiff's Exhibit 97 A



Plaintiff's Exhibit 97 B



Plaintiff's Exhibit 98



Plaintiff's Exhibit 99

Plaintiff's Exhibit 100

Plaintiff's Exhibit 101

Plaintiff's Exhibit 102

Plaintiff's Exhibit 103

Plaintiff's Exhibit 104

Plaintiff's Exhibit 105 A

Plaintiff's Exhibit 105 B

Plaintiff's Exhibit 105 C

Plaintiff's Exhibit 105 D

Plaintiff's Exhibit 105 E

Plaintiff's Exhibit 106

Plaintiff's Exhibit 107

Plaintiff's Exhibit 108

Plaintiff's Exhibit 109

Plaintiff's Exhibit 110

Plaintiff's Exhibit 111

Plaintiff's Exhibit 112

Plaintiff's Exhibit 113

Plaintiff's Exhibit 114

Plaintiff's Exhibit 115

Plaintiff's Exhibit 116

Plaintiff's Exhibit 117

Plaintiff's Exhibit 118

Plaintiff's Exhibit 119

Plaintiff's Exhibit 120

Plaintiff's Exhibit 121

Plaintiff's Exhibit 122

Plaintiff's Exhibit 123

Plaintiff's Exhibit 124

Plaintiff's Exhibit 125

