1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

**\* \* \***

| | |
|---|---|
| CHRISSY ISRAEL MAZZEO,        ) | Case No.: 2:08-cv-01387-RLH-PAL |
| 　　　　　　　　　　　　　　) | |
| 　　　　Plaintiff,             ) | **ORDER** |
| 　　　　　　　　　　　　　　) | |
| 　　vs.                        ) | (Motion to Dismiss–#13; |
| 　　　　　　　　　　　　　　) | Motion to Dismiss–#15; |
| JAMES ARTHUR "JIM" GIBBONS;   ) | Motion to Dismiss–#16; |
| SIGMUND "SIG" ROGICH; LAS VEGAS ) | Motion to Dismiss–#17; |
| METROPOLITAN POLICE DEPARTMENT; ) | Motion to Dismiss–#35; |
| BILL YOUNG; DONALD J. CAMPBELL; ) | Motion to Amend–#44) |
| PENNIE MOSSETT-PUHEK; DOES 1–20, ) | |
| 　　　　　　　　　　　　　　) | |
| 　　　　Defendants.           ) | |
| ―――――――――――――――――――――――――　) | |

        In this Order, the Court considers five motions to dismiss filed by Defendant James

Arthur Gibbons (#13), Defendants Las Vegas Metropolitan Police Department ("Metro") and Bill

Young (#15), Defendant Pennie Mossett-Puhek (#16), Defendant Donald Campbell (#17), and

Defendant Sigmund Rogich (#35). The Court also considers Plaintiff Chrissy Israel Mazzeo's

Motion to Amend (#44). In considering these motions, the Court has reviewed the oppositions,

replies, joinders, and exhibits submitted by the parties. (*See* Dkt. ##18, 34, 36, 47, 49, 50–53, 55,

57–60, 63, 65, 69, 70, & 73.)

//

1

AO 72
(Rev. 8/82)

# BACKGROUND

## I.     The Incident

On a rainy Friday the 13th in October 2006, Chrissy Israel Mazzeo met up with her friend Pennie Mossett-Puhek to enjoy happy hour at McCormick & Schmick's Seafood Restaurant in Las Vegas. A few hours later, at about 7:45 p.m., Puhek spotted Jim Gibbons in the restaurant. At that time, Gibbons was a United States Congressman and a candidate in the upcoming gubernatorial election. Gibbons was seated at a nearby booth with his campaign manager, Sig Rogich, and two women, Michelle Diegel and Georganne Bradley. Puhek sent Gibbons's table a round of drinks, asking the waitress to tell them it was from her husband Dr. Puhek. Gibbons then invited Puhek and Mazzeo to join them at their table. The two friends agreed and took their seats at the end of Gibbons's table, with Mazzeo seated by Gibbons and Puhek by Rogich.

Mazzeo alleges that Gibbons immediately began making unwelcome advances towards her. She claims that over the course of the next two hours, while everyone in the party drank, Gibbons repeatedly touched her thigh with his hand and wrapped his leg around hers. He purportedly told her how beautiful she was and how bored he was with his marriage. He also allegedly invited her to his hotel room. According to Mazzeo, she tried to move away from Gibbons to avoid his advances without being overtly rude or making a scene. At one point, she complained to Puhek. Puhek told Rogich, and Rogich purportedly told Gibbons to calm down because people were watching his inappropriate behavior.

After a couple of hours in which everyone drank heavily, Mazzeo took out her keys and put them on the table in preparation for leaving. Gibbons went to the restroom, and when he returned, he allegedly shook hands with everyone and handed Mazzeo his business card. Mazzeo then went to the restroom, during which time she alleges Gibbons took her keys from off the table and left the restaurant. When she returned from the restroom, she stayed with the group for another fifteen or twenty minutes before leaving the restaurant.

AO 72
(Rev. 8/82)

1         Mazzeo claims that when she stepped outside the restaurant, she began searching in

2 her purse for her keys. While she stood there, Gibbons purportedly approached her and asked if

3 she was looking for him. She told him she was not, but was looking for her keys. Gibbons

4 allegedly offered to take her to her car and told her not to worry about her keys. Mazzeo then

5 followed Gibbons into a nearby parking garage.

6         According to Mazzeo, as they were walking past the elevator on the first floor of

7 the parking garage, Gibbons suddenly grabbed her by the arms, holding her tightly by her biceps,

8 and shoved her back ten feet until she was pinned with her back against the wall. Frightened,

9 Mazzeo asked Gibbons what he was doing. Gibbons purportedly squeezed her arms tighter and

10 told her he was going to rape her. He then allegedly told her she could try to run away or let it

11 happen. Mazzeo claims she pled with Gibbons to let her go, but he would not. At that moment,

12 three teenagers ran through the parking garage and Gibbons looked towards them. While Gibbons

13 was distracted, Mazzeo claims she kicked him in the shin, freed herself from his grasp, and ran

14 from the scene.

15         Mazzeo ran to a nearby hotel and called 911 from her cell phone. She then waited

16 in the lobby for the police to arrive. While waiting, she also called Puhek and told her what

17 happened. Puhek purportedly told her not to call the police, but Mazzeo said she already had.

18 Puhek told her to undo the call because she did not understand the trouble she was getting herself

19 into.

20         After they hung up, Puhek allegedly told Gibbons, who had returned to the

21 restaurant, what hotel Mazzeo was at. Gibbons purportedly drove to the hotel where Mazzeo was

22 waiting, got out of his car, and approached the door to the lobby. When Mazzeo saw him looking

23 at her through the door, she took off running and tried to run past him. Gibbons grabbed her and

24 told her she would be sorry for calling 911. She freed herself from his grip and ran to a nearby

25 Starbucks. Inside, she called 911 a second time to tell the police her new location. She then took

26 refuge in the women's bathroom.

1    The 911 operator told her to wait outside for the police to come, so she eventually

2    left the bathroom and went outside. She sat down on a bench in front of Starbucks even though it

3    was raining. According to Mazzeo, she was wet and disheveled by this point, having run several

4    blocks through the rain, and people began to stare at her as she sat there. She decided to move to

5    the nearby Gordon Biersch Brewing Company to get out of the rain and blend in with the crowd.

6    When she arrived at the brewery, Mazzeo first went to the women's bathroom where she tidied her

7    appearance. After that, she called her sister and then called 911 for the third time. The brewery was

8    extremely noisy and by that time it had stopped raining, so she went outside again, sat on a

9    concrete bench, and told the 911 operator her new location. Officers from the Las Vegas

10   Metropolitan Police Department arrived shortly thereafter.

11   The police took Mazzeo back to McCormick & Schmick's. On the way over,

12   Mazzeo again called her sister. Once Mazzeo and the police arrived at the restaurant, Mazzeo told

13   the police what had happened, and the police purportedly told her that they had to question

14   everybody. Later, Mazzeo's sister arrived and Mazzeo went and waited in her sister's truck.

15   About an hour later, Officer Ortega allegedly told Mazzeo that Metro had obtained

16   the parking structure surveillance videos and that the videos proved she was telling the truth. He

17   also purportedly told her, however, that they would have to wait to arrest Gibbons. As part of their

18   investigation, Metro officers allegedly photographed two small scratches on Mazzeo's shoulder

19   and back. Mazzeo also claims she had bruises on her upper arms where Gibbons had grabbed her.

20   **II.    The Coverup**

21   Rogich allegedly learned of this incident from Puhek shortly after Puhek spoke with

22   Mazzeo on the phone. He in turn allegedly contacted Bill Young, who at the time was the Sheriff

23   of Metro. Young had publicly endorsed Gibbons in the gubernatorial election, and both he and

24   Gibbons employed Rogich as their campaign manager. Rogich and Young purportedly had

25   numerous conversations that night about the incident while the police investigation was ongoing.

26   Mazzeo also alleges that Young contacted Gibbons that night to talk about the investigation.

4

1      During the night and into the next day, Puhek allegedly called Mazzeo four times to

2  relay threats from Rogich. Mazzeo claims Puhek told her to drop the charges or she and her baby

3  would be killed. Puhek instructed her to tell the police she did not want to be involved in a three-

4  ring circus. She also told her not to tell the police about their conversation. Initially, Mazzeo

5  refused. But Puhek then allegedly told her to reconsider because she did not understand who she

6  was dealing with.

7      By Saturday afternoon, Mazzeo told the police she did not want to go forward with

8  the charges. She told them it would become a three-ring circus and she did not want to hurt

9  Gibbons's political career.

10      Following her conversation with the police, Mazzeo purportedly called Puhek and

11  told her what she had told the police. Puhek then allegedly spoke with Rogich, after which she

12  called Mazzeo back in a panic. She told Mazzeo that she had said the wrong thing to the police.

13  Puhek told her that she needed to tell the police that the whole thing was a misunderstanding and

14  that alcohol was involved. Puhek had her write down with pen and paper exactly what she needed

15  to tell the police.

16      Puhek also allegedly told Mazzeo that Gibbons's lawyer was drafting a silence form

17  and that he wanted to go over her witness statement with her. She purportedly told Mazzeo that

18  they needed to meet with Gibbons's people. Puhek also admitted that she had been talking to

19  Diegel, one of the women at the table with them in McCormick & Schmick's, and that Diegel was

20  relaying their conversations to Rogich. Gibbons's attorney allegedly drafted witness statements for

21  Puhek, Diegel, and the third woman, Bradley, which they all acknowledged or signed.

22      Later, when the story hit the news, Puhek again called Mazzeo. Mazzeo claims

23  Puhek told her she needed to sign the silence form or they would cut her arms off. She also told

24  Mazzeo that Gibbons's people needed to go over her witness statement with her and that as soon

25  as she signed it, they would give both of them money. Mazzeo claims she told Puhek that what

26

AO 72
(Rev. 8/82)

1    Gibbons was trying to do was extortion and bribery and that she refused to go along with it. Puhek

2    then purportedly told her she was naive and that it was all about the money.

3    Mazzeo was next contacted by Gibbons's private investigator, David Groover.

4    Groover allegedly told her that he needed to go over her statement with her. He explained that the

5    media was aware of the story now and that they would not drop it unless she met with him because

6    her statement did not match Gibbons's statement. Mazzeo claims she told Groover that the

7    statements did not match because Gibbons was lying.

8    Following her conversation with Groover, Mazzeo contacted Harold Collins, a

9    California attorney. Collins contacted Groover. Groover purportedly explained to Collins that the

10   police report was going to be released to the press and he needed to speak with Mazzeo because

11   there were conflicts between Mazzeo's and Gibbons's statements. He also told Collins that her

12   name would be released with the report and that there was not a lot of time to fix the discrepancies

13   in their statements. After his conversation with Groover, Collins referred Mazzeo to Las Vegas

14   attorney Richard Wright.

15   On October 28, 2006, Puhek called Mazzeo for the last time. She allegedly told her

16   again that they needed to make sure her statement matched Gibbons's. Mazzeo again claims she

17   refused to lie. Puhek allegedly again told Mazzeo that if she did not sign the statement, her arms

18   would be cut off.

19   Mazzeo alleges that throughout Metro's investigation, Young provided Rogich and

20   Gibbons information regarding the evidence as it came in. Young purportedly did this even though

21   Metro, as a general rule, does not allow potential criminal defendants to view the evidence against

22   them until after charges are filed and the defendant is arraigned.

23   Mazzeo also alleges that Young, Gibbons, Rogich, and Donald

24   Campbell—Gibbons's attorney—destroyed the surveillance videos that recorded the incident. She

25   claims Young allowed Campbell to view the surveillance videos Metro recovered from the parking

26   garage and restaurant, but he would not permit her attorney to see them. She also claims that Metro

only released to the press videos cleared by Young and Campbell. These released videos purportedly showed nothing and were from a day other than the day of the incident. According to Mazzeo, this is evident from the videos themselves, because even though it was raining that night, there were no wet tire marks in the parking garage. Moreover, the police investigation purportedly found that the cameras that would have recorded the incident were inactive that night.

Lastly, Mazzeo claims that when she accompanied Metro detectives to the scene of the crime to reenact the incident, the detectives intentionally confused and humiliated her in order to discredit her story. She claims that while she was attempting to walk them through what happened, the detectives berated her, asked her questions intended to confuse her, and accused her of being too drunk at the time to remember, of hallucinating, or of intentionally making up the incident to hurt Gibbons's political career.

**III.      The Fallout**

Mazzeo claims that as a result of the incident and its coverup, Gibbons was never prosecuted even though she reinstated her charges. Further, she claims Gibbons, Puhek, Rogich, Young, and Campbell conspired and made comments to the press that were intended to portray her as a criminal, an opportunist, and a liar.

In addition, Mazzeo claims that as a result of the threats communicated to her through Puhek, she feared for her life. Mazzeo alleges that the keys to her truck were never found, and that shortly after the incident, the garage door opener was stolen from her truck. She purportedly called the police about the missing keys and garage door opener, but they failed to make a report of it. According to Mazzeo, because of the threats made against her and her baby and the missing garage door opener, she was forced to break her lease and move into an apartment.

Mazzeo also alleges that because she maintained her charges against Gibbons, she was blacklisted from working in Las Vegas. According to Mazzeo, she was a successful cocktail waitress before this incident, but after bringing charges against Gibbons, no casino would hire her and she was forced to move to California in order to find employment.

**IV.     This Lawsuit**

Mazzeo filed this lawsuit on October 14, 2008. The next day she filed her First Amended Complaint. The First Amended Complaint asserts seven claims for: (1) deprivation of due process and equal protection pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment against all Defendants; (2) conspiracy to interfere with civil rights pursuant to 42 U.S.C. § 1985 against all Defendants; (3) attorney fees pursuant to 42 U.S.C. § 1988 against all Defendants; (4) battery against Gibbons; (5) false imprisonment against Gibbons; (6) negligence per se against all Defendants; and (7) defamation against Gibbons and Puhek. After Defendants filed their Motions to Dismiss, Mazzeo moved for leave to amend and attached her proposed Second Amended Complaint. In the proposed Second Amended Complaint, Mazzeo expands her first claim to include a deprivation of her First Amendment right to free speech and press, and to petition the government for redress of her grievances; broadens her seventh claim for defamation to include Rogich, Young, and Campbell; and adds an eighth claim for intentional infliction of emotional distress against Gibbons, Puhek, Young, Rogich, and Campbell. For the reasons discussed below, the Court grants in part and denies in part Defendants' Motions to Dismiss, and grants Plaintiff's Motion to Amend subject to the directives of this Order.

**DISCUSSION**

**I.     Motion to Amend**

Under Rule 15 of the Federal Rules of Civil Procedure, after a party has amended its pleading once as a matter of course, it may only amend its complaint with the opposing party's written consent or the court's leave. Fed. R. Civ. P. 15(a)(1)–(2). The court has discretion to give leave and should do so freely "when justice so requires." *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (quoting Fed. R. Civ. P. 15(a)). In exercising its discretion, a court may deny leave if (1) the amendment will cause undue delay or (2) undue prejudice to the opposing party, (3) the request is made in bad faith, (4) the party has repeatedly failed to cure deficiencies,

1    or (5) the amendment would be futile. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532

2    (9th Cir. 2008).

3       Here, the Court concludes that justice requires it to grant leave to amend. The Court

4    finds none of the factors identified by the Ninth Circuit in *Leadsinger* are present in this case.

5    First, permitting the amendment will not unduly delay the case because none of the Defendants

6    have filed an answer and the Court limited significant aspects of discovery until after it ruled on

7    Defendants' Motions to Dismiss. (*See* Dkt. #75, Order of Magistrate Judge Leen.) Second,

8    allowing the amendment would not unduly prejudice Defendants: Defendants responded to the

9    amended allegations in their Replies to Plaintiff's Opposition to the Motions to Dismiss. Third, the

10   Court finds no indication that the request to amend is in bad faith. Fourth, even though this is

11   Plaintiff's second amendment, the Court never ruled that the prior complaints were deficient;

12   instead, Plaintiff submitted the Amended Complaint on her own initiative. Lastly, as the Court

13   discusses below, Plaintiff's proposed amendments are not futile because they add claims that are

14   sufficient to survive Defendants' Motions to Dismiss. Nevertheless, as the Court discusses below,

15   the Second Amended Complaint contains substantial objectionable material and several deficient

16   legal theories. Accordingly, the Court grants Plaintiff's Motion to Amend and directs Plaintiff to

17   file her Second Amended Complaint. However, it also orders Plaintiff to revise the Second

18   Amended Complaint to comport with the directives of this Order.

19   **II.  Motions to Dismiss**

20      "A pleading that states a claim for relief must contain … a short and plain statement

21   of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give

22   the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests,"

23   *Conley v. Gibson*, 355 U.S. 41, 47 (1957), *abrogated on other grounds by Bell Atl. Corp. v.

24   Twombly*, 550 U.S. 544 (2007). While a pleading generally need not contain detailed allegations, it

25   must allege sufficient facts "to raise a right to relief above the speculative level." *Twombly*, 550

26   U.S. at 555. A party may challenge the sufficiency of a pleading by motion under Rule 12(b)(6). In

AO 72
(Rev. 8/82)

ruling on a 12(b)(6) motion, a court assumes all factual allegations are true and construes them in the light most favorable to the nonmoving party. *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). However, a court does not assume the truth of legal conclusions merely because the plaintiff casts them in the form of factual allegations. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). A court should dismiss a claim if it lacks a cognizable legal theory or if there are insufficient facts alleged under a cognizable legal theory. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008). Although this burden is not onerous, *id.*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### A.   Deprivation of Constitutional Rights Under 42 U.S.C. § 1983 Against All Defendants

In order to state a claim under 42 U.S.C. § 1983, Mazzeo must allege Defendants deprived her of a federal right while acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). In her Second Amended Complaint, Mazzeo alleges Defendants deprived her of her rights under the First Amendment, Fourteenth Amendment, and 18 U.S.C. §§ 241 and 245(b). The Court first analyzes whether Defendants acted under color of state law and then examines Mazzeo's constitutional and statutory theories.

#### 1.   State-Action Requirement

"The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). "The traditional definition of acting under color of state law requires that the defendant in a § 1983

1   action have exercised power 'possessed by virtue of state law and made possible only because the

2   wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988)

3   (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). Within this umbrellian formulation,

4   courts have articulated four separate tests, any of which is sufficient to establish state action: (1)

5   the public function test; (2) the joint action test; (3) the government compulsion test; and (4) the

6   governmental nexus test. *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003). Because the joint

7   action test is the most applicable theory under the facts Mazzeo alleges, the Court now discusses

8   that test.

9          Under the joint action test, a private party acts under color of law if she is a willful

10   participant in a joint action with the state or its agents. *Dietrich v. John Ascuaga's Nugget*, 548

11   F.3d 892, 899–900 (9th Cir. 2008). A private party is a willful participant if her actions are

12   inextricably intertwined with those of the government, or she has conspired with the state to

13   violate another's constitutional rights. *Brunette v. Humane Soc'y of Ventura County*, 294 F.3d

14   1205, 1211 (9th Cir. 2002). "'To be liable, each participant in the conspiracy need not know the

15   exact details of the plan, but each participant must at least share the common objective of the

16   conspiracy.'" *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) (quoting *United Steelworkers of*

17   *Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir. 1989)).

18          The Court concludes Mazzeo has sufficiently alleged Defendants were all state

19   actors and are therefore subject to § 1983 liability. First, it is undisputed that Metro and Young, in

20   his former capacity as the Sheriff of Metro, are state actors. Second, as to the remaining

21   Defendants, Mazzeo has sufficiently alleged that they conspired with Young and Metro to violate

22   Mazzeo's constitutional rights. The Court discusses the sufficiency of Mazzeo's allegations of

23   constitutional deprivations below. It simply notes here that Mazzeo alleges that the remaining

24   Defendants acted in concert with Young and Metro with the objective to coverup the events

25   surrounding Gibbons's attempted sexual assault of Mazzeo. Assuming as it must that these

26

AO 72
(Rev. 8/82)

allegations are true, the Court concludes that Mazzeo has adequately alleged a joint action between the private-party Defendants and the state actors, Young and Metro.[1]

### 2.   Qualified Immunity

Defendants Young and Metro argue they are immune from suit under the doctrine of qualified immunity. State officials are entitled to qualified or "good faith" immunity from suits for money damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 815 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). When evaluating qualified immunity defenses, Courts look to see (1) whether the official's conduct, taken in the light most favorable to the party asserting the injury, violated a constitutional right; and (2) whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A right is clearly established if it would be clear to a reasonable officer that his conduct was unlawful. *Millender v. County of Los Angeles*, 564 F.3d 1143, 1148 (9th Cir. 2009). If both questions are answered in the affirmative, the state official is not entitled to qualified immunity. *Id.* Courts are given "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

The Court first considers which of Mazzeo's legal theories state plausible constitutional claims. For each theory that survives, the Court then analyzes whether that right was clearly established for purposes of qualified immunity.

---

[1] Mazzeo also alleges Gibbons was a state actor because he was sworn in as governor of Nevada on January 1, 2006—prior to the events in this case. The Court ignores this allegation in its state-action analysis, however, because it is clearly incorrect. The Court takes judicial notice that Gibbons was not elected governor until November 7, 2006. *See* 2006 Official Statewide General Election Results, http://sos.state.nv.us/elections/results/2006StateWideGeneral/ElectionSummary.asp. As such, it need not accept as true Mazzeo's allegation. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not … accept as true allegations that contradict matters properly subject to judicial notice.").

1

a.      § 1983 Claim Based on the First Amendment

2          Mazzeo asserts two theories under the First Amendment. She first claims

3   Defendants deliberately retaliated against her for exercising her First Amendment right to petition

4   the government for a redress of her grievances. She also claims Defendants interfered with her

5   First Amendment right of access to the courts by destroying and fabricating evidence.

6

i.      Retaliation

7          Mazzeo argues Defendants defamed her and caused her to suffer severe emotional

8   distress in retaliation for filing a police report claiming Gibbons attempted to rape her. Deliberate

9   retaliation by state actors against an individual's exercise of her First Amendment right to petition

10   the government for redress of grievances is actionable under § 1983. *Soranno's Gasco, Inc. v.*

11   *Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989). To demonstrate retaliation in violation of the First

12   Amendment, a plaintiff must prove: (1) a defendant took action that would chill a person of

13   ordinary firmness from future First Amendment activities, and (2) the defendant would not have

14   taken the action but for the defendant's desire to chill plaintiff's speech. *Skoog v. County of*

15   *Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006).[2] Further, "[f]iling a police report may implicate

16   speech that is protected under the Petition Clause of the First Amendment." *Doe v. San Mateo*

17   *County*, 2009 WL 735149, *5 (N.D. Cal. Mar. 19, 2009); *see also Foraker v. Chaffinch*, 501 F.3d

18   231, 236 (3rd Cir. 2007).

19          The Court concludes Plaintiff has sufficiently stated a retaliation claim under the

20   First Amendment. Mazzeo alleges that after she called the police and filed a police report,

21

22          [2] In First Amendment retaliation cases involving public-employee speech, a plaintiff must also show that
23   her speech concerned an issue of public concern. *See Connick v. Myers*, 461 U.S. 138 (1983). In this context,
     however, the Court concludes that Plaintiff need not demonstrate her speech concerned an issue of public
24   concern. First, the Ninth Circuit has held that the public concern requirement does not apply to all First
     Amendment retaliation claims. *CarePartners, LLC v. Lashway*, 545 F.3d 867, 881 (9th Cir. 2008). Second,
25   Plaintiff's claim arises under the Petition Clause and not the Free Speech Clause. This distinction is significant
     because Plaintiff's petition is not directed to the public, but to the government for redress of a personal grievance,
26   and thus, unlike free speech, it need not involve a matter of public concern. *Foraker v. Chaffinch*, 501 F.3d 231,
     236 (3rd Cir. 2007).

AO 72
(Rev. 8/82)

Defendants acted in concert to smear her character and dissuade her from filing charges. She alleges that Gibbons, Rogich, and Puhek agreed to lie about the events of October 13, 2006, and to threaten Mazzeo and her family. Moreover, she alleges that Young, in agreement with Gibbons, Rogich, and Puhek, used his position as sheriff to taint the police investigation. Mazzeo alleges that rather than investigate the truth of her accusations and protect her as a potential sexual assault victim, Metro used their investigation to cover up Gibbons's, Rogich's, and Puhek's lies, and to portray her to the public as a liar, a drunk, an opportunist, and a criminal. Mazzeo also alleges that Young used his position to cause the police to disregard the threats she was receiving from Puhek, Rogich, and Gibbons. Finally, Mazzeo alleges that Campbell met with Young to view the surveillance videos, and that only videos Campbell cleared were released to the public, which further damaged her credibility. She also claims Campbell helped destroy the videos that showed Gibbons assaulting her. In the Court's view, this is sufficient to deter a person of ordinary firmness from future First Amendment activity. Furthermore, Mazzeo has adequately alleged that her filing a police report was the but-for cause of Defendant's concerted action to destroy her reputation and thus chill her from future speech.

The Court also concludes that Young and Metro are not entitled to qualified immunity. A reasonable officer would know that he was violating Mazzeo's constitutional rights by using his investigation to coverup a crime. Consequently, the Court finds that Mazzeo has adequately stated a claim for First Amendment retaliation.

### ii.      Evidence Destruction and Fabrication

Mazzeo also claims Defendants violated her First Amendment right of access to the courts by fabricating and destroying evidence and thereby avoiding criminal prosecution for their misdeeds.[3] The Supreme Court has categorized right-of-access claims as either forward-looking or

---

[3] Mazzeo asserts her right-of-access claim under the First Amendment's Petition Clause. Courts have also grounded this claim in the Article IV Privileges and Immunities Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses. *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (collecting cases).

backward-looking. In the forward-looking category "are claims that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time." *Christopher v. Harbury*, 536 U.S. 403, 413 (2002). "In cases of this sort, … official action is presently denying an opportunity to litigate … [and] the object of the denial-of-access suit, and the justification for recognizing the claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* Backward-looking right of access claims, on the other hand, "covers claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Id.* at 413–14. Mazzeo's claim clearly falls within this second category because she alleges Defendants cannot now be criminally prosecuted because they have destroyed the inculpatory evidence, namely the surveillance videos.[4]

In order to state a backward-looking denial-of-access claim, Mazzeo must allege (1) the loss of a nonfrivolous underlying claim, (2) official acts that frustrate the litigation, and (3) a remedy that may be awarded but that is otherwise not available in a future suit. *Nev. Dep't of Corr. v. Cohen*, 581 F. Supp. 2d 1085, 1091 (D. Nev. 2008) (quoting *Phillips v. Hust*, 477 F.3d 1070, 1076 (9th Cir. 2007), *vacated on other grounds by Pearson v. Callahan*, 129 S.Ct. 808 (2009)). With regard to the first element, the Supreme Court has stressed that the right of access to the courts is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher*, 536 U.S. at 415.

Here, Mazzeo's right-of-access claim fails because she has no underlying claim for the failure of Defendants to be criminally prosecuted. This is because "a private citizen lacks a

---

[4] Mazzeo does not allege that Defendants' destruction and fabrication of evidence has affected her ability to bring civil claims. To the contrary, all of her allegations involve criminal prosecution. (*See* Dkt. #44, Pl.'s Mot. to Amend Ex. B ("Proposed 2nd Am. Compl.") ¶¶ 87 ("because of the Metro police coverup and a host of lies stated by others due to Rogich's meddling, no charges were ever brought against Gibbons by the Clark County District Attorney's Offices"), 106 ("Rogich, Young and Campbell conspired together and acted to willfully destroy the videos … to prevent the production thereof before the Clark County District Attorney"), and 112 ("depriving Mazzeo of her ability to have criminal charges brought against Gibbons").)

judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Without an underlying claim, Mazzeo cannot, as a matter of law, state a backward-looking claim for the denial of her right of access to the courts. Her claim is therefore dismissed.

### b.     Section 1983 Claim Based on the Fourteenth Amendment

Mazzeo asserts numerous theories under the Fourteenth Amendment's Due Process and Equal Protection Clauses, which provide that no State shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Court examines each of Mazzeo's due process and equal protection theories in turn.

### i.     Due Process: Unbiased Tribunal

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Mazzeo argues that Defendants' destruction and fabrication of evidence deprived her of the right to testify in an unbiased criminal trial against Gibbons. She claims that Young prejudiced her case by announcing publicly that the whole incident was a misunderstanding and that Mazzeo was drunk at the time, and that he prejudged her case by submitting it to the district attorney without a recommendation to prosecute.

To state a due process claim, substantive or procedural, Mazzeo must allege the government deprived her of her life, liberty, or property. *See Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (substantive); *Thomas v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005) (procedural). Here, Mazzeo has failed to allege a protectible interest in life, liberty, or property. As discussed previously, Mazzeo has no judicially cognizable interest in Gibbons's prosecution. *See Linda R.S.*, 410 U.S. at 619. Without an interest in Gibbons's prosecution, Mazzeo has no right to have Metro recommend he be prosecuted and she has no right to testify against Gibbons in an unbiased tribunal. The Court therefore dismisses Mazzeo's due process claim under this theory.

1                **ii.**     **Due Process: Stigmatization**

2         Mazzeo alleges Defendants violated her due process rights by defaming her.

3  According to Mazzeo, her state-law defamation claim is actionable under the Fourteenth

4  Amendment because it resulted in her being blacklisted from working in Nevada. Mazzeo,

5  however, misinterprets the law in this area. To begin with, "the Fourteenth Amendment [is not] a

6  font of tort law to be superimposed upon whatever systems may already be administered by the

7  States." *Paul v. Davis*, 424 U.S. 693, 701 (1976). As such, "injury to reputation by itself [is] not a

8  'liberty' interest protected under the Fourteenth Amendment." *Siegert v. Gilley*, 500 U.S. 226, 233

9  (1991). Thus, defamation "is a tort actionable under the laws of most States, but not a

10  constitutional deprivation." *Id.* There are instances, however, when a constitutional claim may lie

11  if the plaintiff "was stigmatized in connection with the denial of a more tangible interest." *Hart v.*

12  *Parks*, 450 F.3d 1059, 1069 (9th Cir. 2006) (quotations omitted). This is known as stigma-plus,

13  and can be satisfied under either of two tests. Under the first test, "the plaintiff must show that the

14  injury to [her] reputation was inflicted *in connection with* the deprivation of a federally protected

15  right." *Id.* at 1070. Under the second test, "the plaintiff must show that the injury to reputation

16  *caused* the denial of a federally protected right." *Id.* Moreover, under this second test, plaintiff's

17  injury must be caused by the state actor, not just injury caused by the acts of some third party.

18  *WMX Techs., Inc. v. Miller*, 80 F.3d 1315, 1320 (9th Cir. 1996).

19         Mazzeo fails to state a stigma-plus claim under the Fourteenth Amendment.

20  Mazzeo attempts to state her claim on the basis that she lost her employment and was blacklisted

21  as a result of Defendant's defamatory statements. In other words, Defendants' defamatory

22  statements caused the loss of her employment. The problem with Mazzeo's claim is that

23  Defendants neither fired her nor blacklisted her. Mazzeo makes clear that she worked as a cocktail

24  waitress for a casino and that after the incident, she was blacklisted from working at any Nevada

25  casino, allegedly because Defendants' defamatory statements had tarnished her reputation. This is

26  fatal to her stigma-plus claim because the casinos are not defendants, are not state actors, and are

1    not alleged to have acted in agreement with the named Defendants. As the Supreme Court

2    explained in *Siegert v. Gilley*:

> Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a [§ 1983] action.

6    500 U.S. at 234. Accordingly, Mazzeo's stigma-plus claim is dismissed.

7                    **iii.    Due Process: Arbitrary, Wrongful Government Action**

8            The Due Process Clause protects individuals against arbitrary government action.

9    *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). It guarantees more than just fair

10   process; it also protects individual liberty against wrongful government action regardless of the

11   fairness of the procedures used to implement it. *Collins v. City of Harker Heights, Tex.*, 503 U.S.

12   115, 125 (1992). Nevertheless, only the most egregious governmental conduct is arbitrary in the

13   constitutional sense. *Lewis*, 523 U.S. at 846. To this end, to violate the substantive component of

14   due process, "government conduct must be so grossly shocking and so outrageous as to violate the

15   universal sense of justice." *United States v. King*, 200 F.3d 1207, 1213 (9th Cir. 1999) (internal

16   quotations omitted). Further, the plaintiff must provide a careful description of the asserted

17   fundamental liberty interest. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997); *see also Nunez*

18   *v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998).

19           Here, Mazzeo fails to state a substantive due process claim because she does not

20   clearly articulate the fundamental liberty interest at issue. In her Opposition, Mazzeo recognizes

21   the necessity of articulating her liberty interest, but she still fails to do so. (*See* Dkt. #44, Pl.'s Mot.

22   to Amend 32–33.) Instead, she simply asserts "[s]he was deprived of constitutionally protected

23   interests as previously described." (*Id.* at 33.) The Court can only understand this to mean the

24   liberty interests identified in her other constitutional theories because Mazzeo never identifies any

25   other liberty interest. But the Court has already analyzed her interests under the specific

26   constitutional provisions protecting those interests. And "[w]here a particular Amendment

AO 72
(Rev. 8/82)

provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Lewis*, 523 U.S. 842 (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion)). Accordingly, Mazzeo's claim under substantive due process is dismissed.

### iv.    Equal Protection

The Equal Protection Clause mandates that all persons similarly situated be treated alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). It "protects not only groups, but individuals who would constitute a 'class of one.'" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004), *overruled on other grounds by Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005). Where state action does not implicate a fundamental right or a suspect classification, a plaintiff can maintain a class-of-one claim by showing that she was intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Id.*; *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Based on her allegations, Mazzeo has adequately stated a claim under the Equal Protection Clause of the Fourteenth Amendment. Mazzeo claims Young and Metro intentionally treated her differently from other women who filed sexual assault claims because, rather than investigate a potential crime, Young used the police investigation to smear Mazzeo and to clear Gibbons's name prior to the gubernatorial election. Assuming Mazzeo's allegations are true, the Court concludes this a "paradigmatic class-of-one case … in which a public official, for some improper motive, 'comes down hard on a hapless private citizen.'" *Engquist v. Or. Dep't of Agric.*, 478 U.S. 985, 995 (9th Cir. 2007) (quoting *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005)). Furthermore, Metro and Young are not entitled to qualified immunity on this claim because a reasonable officer would recognize that this type of conduct is unlawful. The Court also concludes, however, that Mazzeo has failed to state a class-of-one equal protection claim against

AO 72
(Rev. 8/82)

1    the other Defendants, who are not public officials. Accordingly, Mazzeo's equal protection claim

2    survives as to Young and Metro, but is dismissed as to all other Defendants.

3                        **c.      Section 1983 Based on 18 U.S.C. §§ 241 and 245(b)**

4                    In addition to her constitutional claims, Mazzeo also asserts a § 1983 claim based

5    on Defendants' alleged violation of federal criminal statutes 18 U.S.C. §§ 241 and 245(b). These

6    criminal statutes, however, provide no basis for civil liability. *Aldabe v. Aldabe*, 616 F.2d 1089,

7    1092 (9th Cir. 1980); *Allen v. Gold Country Casino*, 464 F.3d 1044, 1048 (9th Cir. 2006).

8    Consequently, Mazzeo's § 1983 claim is dismissed as it pertains to 18 U.S.C. §§ 241 and 245(b).

9        **B.      Conspiracy to Interfere with Civil Rights Under 42 U.S.C. § 1985(2)
               Against All Defendants**

10

11                   Mazzeo asserts her second claim for conspiracy to interfere with civil rights under

12   the second clause of 42 U.S.C. § 1985(2). The second clause of subsection (2) creates a cause of

13   action "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or

14   defeating, in any manner, the due course of justice in any State … with intent to deny any citizen

15   the equal protection of the laws." 42 U.S.C. § 1985(2). In order to state a claim under the second

16   part of § 1985(2), a plaintiff must allege class-based animus—i.e., that she is a member of a class

17   that suffers from invidious discrimination and that the defendant's acts were motivated by animus

18   towards her class. *Deleo v. Rudin*, 328 F. Supp. 2d 1106, 1112 (D. Nev. 2004) (citing *Bretz v.*

19   *Kelman*, 773 F.2d 1026, 1028 (9th Cir. 1985)).

20                   Mazzeo admits in her Opposition that she has not alleged class-based animus. But

21   she argues that the Supreme Court has not specifically held that part two of § 1985(2) requires a

22   showing of class-based animus, and she presents several arguments why there should be no such

23   requirement. Mazzeo is correct that the Supreme Court has not specifically ruled on this issue.

24   Nevertheless, the Ninth Circuit clearly has, *see Bretz*, 773 F.2d at 1028, and this Court is obligated

25   to follow Ninth Circuit precedent unless and until it is changed or overruled. Accordingly,

26   Mazzeo's second claim under § 1985(2) is dismissed.

AO 72
(Rev. 8/82)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### C.   Attorney Fees Under 42 U.S.C. § 1988 Against All Defendants

Mazzeo's third claim is for attorney fees pursuant to 42 U.S.C. § 1988(b). "Recovery of attorney fees under section 1988 is premised on the existence of a prevailing claim under section 1983 or 1985. Section 1988 does not support an independent cause of action." *Brower v. Inyo County*, 817 F.2d 540, 546 (9th Cir. 1987), *reversed on other grounds* 489 U.S. 593 (1989); *see also N.C. Dep't of Transp. v. Crest St. Cmty. Council, Inc.*, 479 U.S. 6, 12 (1986). Because § 1988 does not support a separate cause of action, the Court dismisses Mazzeo's third claim. However in doing so, the Court makes clear that if Mazzeo ultimately prevails on her § 1983 claim, nothing in this Order will preclude her from seeking attorney fees under § 1988.

### D.   Battery & False Imprisonment Against Gibbons

In Defendant Gibbons's Motion to Dismiss, he asks the Court to decline to exercise supplemental jurisdiction over all of Mazzeo's state-law claims—including these two—because, he argues, Mazzeo has failed to state a valid federal claim. Because the Court does not dismiss all of Mazzeo's federal claims, it declines Gibbons's request.

### E.   Negligence Per Se Against All Defendants

Mazzeo alleges Gibbons committed the crimes of battery, Nev. Rev. Stat. ("NRS") 200.481(1)(a) & (2)(a), false imprisonment, NRS 200.460(1) & (2), kidnapping, NRS 200.310(2), and conspiracy, NRS 199.480(3)(a) & (g). She also alleges Gibbons, Young, Campbell, Rogich, and Puhek prevented or dissuaded a person from testifying in violation of NRS 199.230, prevented or dissuaded a person from commencing prosecution or causing arrest in violation of NRS 199.305(1) and (2), conspired to commit the two previous crimes in violation of NRS 199.480(3)(a) and (g), attempted to suborn perjury in violation of NRS 199.150, conspired against rights in violation of 18 U.S.C. § 241, and conspired to prevent participation in a federally protected activity in violation of 18 U.S.C. § 245. In addition, she claims Young and Metro committed the crimes of disclosure of information to a subject of investigation, NRS 199.520; *see also* NRS 193.019(2) & 280.080, and disclosure of the identity of the victim of sexual assault,

1    NRS 200.3773. Lastly, she claims Rogich, Young, and Campbell committed the crimes of

2    destroying evidence, NRS 199.220, and conspiring to destroy evidence, NRS 199.480(3)(a) & (g).

3    She argues that the violation of these criminal statutes constitutes negligence per se.

4           Whether a particular statute establishes a standard of care in a negligence action is a

5    question of law. *Vega v. E. Courtyard Assocs.*, 24 P.3d 219, 221 (Nev. 2001). In general, "[a]

6    statutory violation is negligence per se if the injured party belongs to the class of persons whom

7    the statute was intended to protect, and the injury suffered is of the type the statute was intended to

8    prevent." *Atkinson v. MGM Grand Hotel, Inc.*, 98 P.3d 678, 680 (Nev. 2004). However, while a

9    criminal statute can form the basis of a claim for negligence per se, *S. Pac. Co. v. Watkins*, 435

10   P.2d 498, 511 (Nev. 1967), "in the absence of legislative intent to impose civil liability, a violation

11   of a penal statute is not negligence per se." *Hinegardner v. Marcor Resorts, L.P.V.*, 844 P.2d 800,

12   803 (Nev. 1992).

13          Here, with only one exception, none of the statutes Mazzeo cites contemplate civil

14   liability. The Court has previously discussed in this Order the two federal statutes, 18 U.S.C. §§

15   241 and 245, and concluded that those sections cannot form the basis of civil liability. Further, all

16   of the Nevada criminal statutes Mazzeo cites are found in Chapter 15 of the Nevada Revised

17   Statutes, which makes clear that it has no affect on any civil right or remedy. *See* NRS 193.080 &

18   193.090. This is not to say that Nevada law provides no civil remedies for the wrongs

19   encompassed by the criminal statutes Mazzeo cites—in fact, it does provide remedies, some of

20   which Mazzeo avails herself of in this case (e.g., battery and false imprisonment). But the criminal

21   statutes she cites do not provide a basis for claims for negligence per se. This is especially true

22   given that the crimes she alleges Defendants committed are all intentional in nature and do not

23   lend themselves well to a negligence theory of recovery. The lone exception to civil liability is

24   NRS 200.3773, which prohibits the disclosure of the identity of victims of sexual assault. Nevada

25   Revised Statutes 200.3773 expressly contemplates civil liability and codifies a civil remedy at

26   NRS 41.1398. However, because Mazzeo has an express statutory remedy, the Court dismisses her

AO 72
(Rev. 8/82)

1    claim for negligence per se in its entirety and will allow Mazzeo to restate this claim against

2    Young and Metro pursuant to NRS 41.1398.

3           **F.    Defamation Against Gibbons, Puhek, Rogich, Young, and Campbell**

4                  In her seventh claim, Mazzeo alleges Gibbons lied about what occurred in the

5    parking garage, which had the effect of defaming her as a lying opportunist, the filer of a false

6    police report, and as having committed the crime of malicious prosecution. She further contends

7    that Gibbons, Puhek, and Rogich lied about what occurred at McCormick & Schmick's restaurant,

8    and that these lies resulted in similar defamatory effects. Lastly, she contends Young and

9    Campbell conspired with Gibbons, Puhek, and Rogich to defame her because they knew

10   Gibbons's, Rogich's, and Puhek's statements would be published.

11                 "It is generally accepted that for both libel and slander it is a question of law and,

12   therefore, within the province of the court, to determine if a statement is capable of defamatory

13   construction." *Branda v. Sanford*, 637 P.2d 1223, 1225 (Nev. 1981). "To create liability for

14   defamation there must be: (a) a false and defamatory statement concerning another; (b) an

15   unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of

16   the publisher; and (d) either actionability of the statement irrespective of special harm, or the

17   existence of special harm caused by the publication." *Lubin v. Kunin*, 17 P.3d 422, 425 (Nev.

18   2001). A statement is absolutely privileged if it was made in the course of judicial or quasi-judicial

19   proceedings. *Knox v. Dick*, 665 P.2d 267, 270 (Nev. 1983) (statements made to police are

20   absolutely privileged).

21                 Based on its review of Mazzeo's allegations, the Court concludes that Mazzeo has

22   failed to state a plausible claim for defamation. The only statements that Mazzeo specifically

23   identifies in her pleadings as defamatory are those that Gibbons, Puhek, and Rogich made to the

24   police about what occurred at the restaurant and in the parking garage on the night in question. As

25   a matter of law, these statements are absolutely privileged because they were made in the course of

26

AO 72
(Rev. 8/82)

1   a quasi-judicial proceeding and thus cannot form the basis of a defamation claim. Accordingly,

2   Mazzeo's seventh claim is dismissed.

3          **G.     Intentional Infliction of Emotional Distress**
               **Against Gibbons, Puhek, Rogich, Young, and Campbell**
4

5                   To state a claim for intentional infliction of emotional distress, a plaintiff must

6   show: (1) defendant acted in an extreme and outrageous manner, (2) defendant intended to or

7   recklessly disregarded the probability that his conduct would cause plaintiff emotional distress, (3)

8   plaintiff actually suffered extreme or severe emotional distress, and (4) defendant's conduct caused

9   plaintiff's distress. *Miller v. Jones*, 970 P.2d 571, 577 (Nev. 1998). A claim for intentional

10  infliction of emotional distress operates on a continuum: the less extreme the outrage, the greater

11  the need for evidence of physical injury or illness from the emotional distress. *Chowdry v. NLVH,*

12  *Inc.*, 851 P.2d 459, 483 (Nev. 1993) (quoting *Nelson v. City of Las Vegas*, 665 P.2d 1141, 1145

13  (Nev. 1983)). At the ends of this spectrum, conduct is extreme or outrageous if it is atrocious,

14  beyond all possible bounds of decency, and utterly intolerable, *Churchill v. Barach*, 863 F. Supp.

15  1266, 1275 (D. Nev. 1994), and emotional distress is severe if it is so intense that no reasonable

16  person could be expected to endure it, *Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 911 (D. Nev.

17  1993).

18                  In this case, Mazzeo's allegations are sufficient to sustain a claim for intentional

19  infliction of emotional distress against Gibbons and Puhek, but insufficient as to Rogich, Young,

20  and Campbell. Mazzeo alleges that Gibbons forcefully pinned her against a wall and told her he

21  was going to rape her. Mazzeo also alleges that Puhek made death threats against her and her child

22  that caused her to move out of her home and fear for her and her child's safety. The Court

23  concludes that these allegations are sufficient to survive Defendants' Motions to Dismiss.

24  **III.    Motion to Strike**

25                  Under Rule 12(f) a "court may strike from a pleading … any redundant, immaterial,

26  impertinent, or scandalous matter." Matter is "immaterial" if it has no bearing on the controversy

24

AO 72
(Rev. 8/82)

1  before the court. *In re 2TheMart.com, Inc Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000).

2  Allegations are "impertinent" if they are not responsive to the issues that arise in the action and

3  that are admissible as evidence. *Id.* "Scandalous" matter is that which casts a cruelly derogatory

4  light on a party or other person. *Id.* A court need not wait for a motion from the parties; it may act

5  on its own to strike matter from a pleading. Fed. R. Civ. P. 12(f)(1).

6            In this rare instance, the Court feels compelled to *sua sponte* strike certain portions

7  of the Complaint. Mazzeo's pleading includes inappropriate commentary and dramatic flourishes,

8  deviating from the directive that she need provide only "a short and plain statement of" her claims.

9  *See* Fed. R. Civ. P. 8(a)(2). In the Court's view, a significant portion of the Complaint appears

10  calculated to cast Defendants in a derogatory light and is full of wholly irrelevant material.

11  Accordingly, the Court strikes the portions of the Complaint that it describes below. It further

12  directs Mazzeo, that in filing her Second Amended Complaint, she not include the matters that the

13  Court strikes with this Order. If she fails to comply with this directive, the Court will consider

14  appropriate sanctions.

15      *Matters to Be Stricken from the Second Amended Complaint* (Dkt. #44 Ex. B):

16      •      3:16–18, "Gibbons was sworn in … as Nevada's chief executive officer."

17      •      5:8–10, "Mazzeo also has received … in July, 2007."

18      •      5:17–25 in its entirety.

19      •      7:14–19 in its entirety.

20      •      8:1–4, "*See*, attached Exhibit 1 … vindicatemazzeo.com."

21      •      8:14, "*See*, Exhibit 1, Plaintiff's Exhibit 99."

22      •      8:22–23, "*See*, Exhibit 1, Plaintiff's Exhibit 100."

23      •      9:7–8, "although slightly further … Exhibits 83-84, 94-95."

24      •      9:13–14, "like a well-deserved, public slap in the face."

25      •      9:17–21 in its entirety.

26      •      10:11–12, "*See*, Exhibit 1, Plaintiff's Exhibit 9-10."

1  •  10:22, "play his game and."

2  •  10:24, "*See*, Exhibit 1, Plaintiff's Exhibits 10-16."

3  •  10:26, "*See*, Exhibit 1, Plaintiff's Exhibits 18-20."

4  •  11:5, "and in response to … sexual lust."

5  •  11:21, "*See*, Exhibit 1, Plaintiff's Exhibits 31-38."

6  •  12:6–7, "*See*, Exhibit 1, Plaintiff's Exhibits 86A-93."

7  •  12:20, "*See*, Exhibit 1, Plaintiff's Exhibits 39-44F."

8  •  12:25, "faster than a pancake flipped by a short-order cook."

9  •  13:15–16, "*See*, Exhibit 1, Plaintiff's Exhibits 45-57."

10  •  14:10, "*See*, Exhibit 1, Plaintiff's Exhibits 58-69."

11  •  14:16, "*See*, Exhibit 1, Plaintiff's Exhibit 70."

12  •  14:26–15:4, "*See*, Exhibit 1… Hughes center parking garage."

13  •  16:6–25, "His only mention … any mention of Officer Ortega."

14  •  17:3–7 in its entirety.

15  •  17:13, "*See*, Exhibit 1, Plaintiff's Exhibits 116-125."

16  •  21:17, "*See*, Exhibit 1, Plaintiff's Exhibits 101-114."

17  •  22:9, "(*see*, Exhibit 1, Plaintiff's Exhibits 96-97B)."

18  •  22:14–26 in its entirety.

19  •  23:1–26 in its entirety.

20  •  24:4–22, "for the commission … crime has been committed."

21  •  24:26–25:10, "for the crimes … gross misdemeanor."

22  •  25:13–26:3, "and, therefore, Gibbons … county in this state…"

23  •  26:5–6, "for the crimes of battery, false imprisonment and kidnapping."

24  •  26:10–18, "and Young so notified … gross misdemeanor."

25  •  26:21–22, "committing the felonies … Gibbons victim."

26  •  26:23–27:12, "and, therefore, Rogich … guilty of a misdemeanor."

AO 72
(Rev. 8/82)

1      •      27:15–22, "and Young, Metro officers … years, or both.…"

2      •      28:2–15, "in violation of 18 U.S.C. § 241 … year, or both…"

3      •      29:1–2, "and by depriving … committed upon her.."

4      •      29:6–14, "committing the crimes … guilty of a misdemeanor."

5      •      33:17–34:13 in its entirety.

6      •      Exhibit 1 in its entirety.

7                              **CONCLUSION**

8              Accordingly, and for good cause appearing,

9              IT IS HEREBY ORDERED that Defendants' Motions to Dismiss (##13, 15, 16, 17,

10     & 35) are GRANTED in part and DENIED as follows:

11             •      Mazzeo's first claim under § 1983 is dismissed as to all but her First

12                    Amendment retaliation claim against all Defendants, and her Fourteenth

13                    Amendment class-of-one equal protection claim against Young and Metro.

14             •      Mazzeo's second claim under § 1985(2), third claim under § 1988, sixth

15                    claim for negligence per se, and seventh claim for defamation are dismissed

16                    in their entirety.

17             •      Mazzeo's eighth claim for intentional infliction of emotional distress is

18                    dismissed except as to Puhek and Gibbons.

19             IT IS FURTHER ORDERED that Plaintiff's Motion to Amend (#44) is GRANTED

20     subject to the directives of this Order. Plaintiff is ordered to file her Second Amended Complaint

21     within ten days. The Second Amended Complaint shall reflect the provisions of this Order, and

22     Plaintiff shall strike the objectionable passages and remove the dismissed claims.

23             Dated: June 29, 2009.

24

25                                          _____

26                                          ROGER L. HUNT
                                            Chief United States District Judge