WALTER R. CANNON, ESQ.
Nevada Bar No. 001505
THOMAS D. DILLARD, JR., ESQ.
Nevada Bar No. 006270
OLSON, CANNON
GORMLEY & DESRUISSEAUX
9950 West Cheyenne Avenue
Las Vegas, Nevada  89129
Telephone:  (702) 384-4012
Facsimile:   (702) 383-0701
tdillard@ocgd.com
wcannon@ocgd.com
Attorneys for Defendants
LVMPD and Bill Young

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

CHRISSY ISRAEL MAZZEO,            )
                                  )      CASE NO.:    2:08cv1387-RLH-PAL
                Plaintiff,        )
                                  )
vs.                               )
                                  )
JAMES ARTHUR "JIM" GIBBONS;       )
SIGMUND "SIG" ROGICH;             )
LAS VEGAS METROPOLITAN POLICE     )
DEPARTMENT; BILL YOUNG;           )
DONALD J. CAMPBELL;               )
PENNIE MOSSETT-PUHEK;             )
DOES 1-20,                        )
                                  )
                Defendants.       )
_____)

## OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION RE: SPEAKING OBJECTIONS AT DEPOSITIONS

This matter comes before the Court on Plaintiff's Motion to forbid defense counsel (Walter R. Cannon) from making improper objections at depositions and for sanctions.  Even though discovery has now closed and an argument could be made that the Motion is now moot, defense counsel cannot allow Plaintiff's allegations of inappropriate conduct to go unanswered. Accordingly, this response is submitted.

. . .

At the outset, defense counsel, in retrospect, would concede that at least some of the subject objections were overly verbose. However, these objections were not made, as Plaintiff suggests, to coach the witness or for any other improper purpose. Rather, the objections were made out of frustration over the manner in which Plaintiff's counsel had conducted his depositions over the past fourteen (14) days. To be sure, frustration is never an excuse for not following the Rules of Civil Procedure and the Evidence Code. By the same token, rudeness, untimeliness, lack of preparation, inefficient use of time, improper objections and out and outright coaching of witnesses can, and often does, create a deposition atmosphere where lapses in judgment can and usually do occur. Again, frustration is never an excuse but, by the same token, the conduct in question certainly doesn't justify the imposition of sanctions.

Plaintiff's Motion makes much of defense counsel's so-called speaking objections. However, an examination of the record clearly shows that Mr. Kossack utilized the exact same objections during his client's deposition (for example, see the objections on pp. 190, 225, 228, 406, 449, 513, 535, 539, 560 and 596 of Plaintiff's deposition attached hereto as Exhibit "A"). Additionally, Mr. Kossack took speaking objections to another level when he actually coached his client during her examination on a photographic exhibit used to identify a critical police officer (see pp. 429-430 of Plaintiff's deposition attached hereto as Exhibit "B"). Moreover, during an overnight break in the Plaintiff's deposition, Mr. Kossack assisted his client in the written preparation of "pat" answers for deposition questions he expected to be asked the following day. Indeed, Plaintiff even brought these written notes to her deposition, intending to use them, as necessary (see pp. 472-473 of Plaintiff's deposition and the actual notes in question attached hereto as Exhibit "C").

The deposition process did not get any easier or less contentious when Plaintiff's counsel was taking, as opposed to defending, the deposition. Mr. Kossack treated the deposition as his own personal playground where he chewed ice as he examined witnesses[1], forced a cancellation of a deposition because he forgot to pay his light bill, thereby inconveniencing the officer being

---

[1] See p. 8, Vol. I, of the deposition of Michael Hnatuick attached hereto as Exhibit "D".

OLSON, CANNON, GORMLEY & DESRUISSEAUX
Law Offices of
A Professional Corporation
9950 West Cheyenne Avenue
Las Vegas, Nevada 89129
(702) 384-4012   Telecopier (702) 383-0701

deposed[2], forced witnesses and opposing counsel to wait while he pulled and photocopied exhibits he wished to exam upon during the deposition, and by mixing pages of two separate exhibits together, resulting in an exhibit that was not only unuseable, but required correction before the deposition could proceed[3].

However, the most frustrating part of the depositions taken by Plaintiff was the time that was wasted examining witnesses on undisputed facts. For example, during the course of discovery, Plaintiff took a number of depositions from the investigating police officers. During the course of their investigations, these officers had taken statements from Plaintiff, the suspect/Defendant and/or independent witnesses. During the depositions of these officers, Plaintiff spent countless hours examining the officers by having them simply acknowledge, on a paragraph by paragraph basis, that the questions asked and answered by the witness during the witness's interrogation were true and correct. In other words, Plaintiff's questions were designed to lay foundation for the testimony contained in the statements when such testimony was not in dispute. After all, neither Metro or any of the Defendants had questioned the authenticity of the statements or its transcriptions. Indeed, Plaintiff was supplied with audiotapes for most, if not all, of the statements. Additionally, Defendants produced each of these statements, either at the

---

[2]   The deposition of Michael Hnatuick was scheduled and commenced on May 6, 2010. Mr. Hnatuick was and is a Detective with the Las Vegas Metropolitan Police Department and during the time frame of his deposition, worked the midnight shift (10:00 P.M. through 8:00 A.M.) and, therefore, had been up all night the day preceding his deposition. Mr. Hnatuick's deposition was commenced at approximately 10:00 A.M. on May 6, 2010, and adjourned for a lunch break at 12:40 P.M. The deposition was scheduled to resume at 2:00 P.M.

When the parties returned at 2:00 P.M., they were advised by Plaintiff's attorney that the lights in his office were out and the power company had been contacted. According to counsel, the power company had dispatched personnel and the problem would be fixed by 2:30 P.M. to 2:45 P.M. When the parties returned at the designated time, they were informed that the problem had not been fixed and the deposition needed to be rescheduled. It was only later that day that the parties learned that the "problem" was Plaintiff's counsel's failure to pay his power bill. The net result of the so-called "problem" was that Detective Hnatuick was forced to return on May 11, 2010, for the completion of his deposition. Once again, Detective Hnatuick had worked a midnight shift the day before.

[3]   See pp. 43, 49 and 52 of Deputy Chief Greg McCurdy's deposition attached hereto as Exhibit "E".

Law Offices of
OLSON, CANNON, GORMLEY & DESRUISSEAUX
A Professional Corporation
9950 West Cheyenne Avenue
Las Vegas, Nevada 89129
(702) 384-4012   Telecopier (702) 383-0701

initial discovery conference or in response to discovery requests.  As a consequence, the statements met all foundational requirements for submission in conjunction with a Motion for Summary Judgment or an Opposition thereto, which was the stated reason for the questions being propounded.  See Orr v. Bank of America, 285 F.3d 764 (9th Cir. 2002); see also pp. 47-52 of the deposition of Michael Hnatuick, Volume I, and pp. 157-160 of the deposition of Michael Hnatuick, Volume II, attached hereto as Exhibit "F"; see also Affidavit of Walter R. Cannon attached hereto as Exhibit "G".

As Defendant noted at the outset, frustration is never a viable excuse for "improper objections".  However, given all of the circumstances in this case, Defendant would respectfully submit that the actions of Plaintiff's counsel are certainly relevant and should be considered in regard to that portion of Plaintiff's Motion that requests sanctions be entered.  As pointed out above, the conduct of the defense counsel during these depositions pales in comparison to that of Plaintiff's attorney and Defendant would therefore respectfully submit that Plaintiff's Motion for Sanctions should be denied.

RESPECTFULLY SUBMITTED this 27th day of May, 2010.

OLSON, CANNON
GORMLEY & DESRUISSEAUX

BY: _____
WALTER R. CANNON
Nevada Bar No.  001505
THOMAS D. DILLARD, JR., ESQ.
Nevada Bar No.  006270
9950 W. Cheyenne Avenue
Las Vegas, Nevada 89129
Attorneys for Defendants LVMPD
and Bill Young

Law Offices of
OLSON, CANNON, GORMLEY & DESRUISSEAUX
A Professional Corporation
9950 West Cheyenne Avenue
Las Vegas, Nevada 89129
(702) 384-4012   Telecopier (702) 383-0701

## CERTIFICATE OF MAILING

I HEREBY CERTIFY that on the 27 day of May, 2010, I served the above

**OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION RE: SPEAKING**

**OBJECTIONS AT DEPOSITIONS** through the CM/ECF system of the United States District

Court for the District of Nevada (or, if necessary, by U.S. Mail, first class, postage pre-paid),

upon the following:

Robert J. Kossack, Esq.
KOSSACK LAW OFFICES
4535 W. Sahara Avenue, Ste. 101
Las Vegas, Nevada 89102
Attorney for Plaintiff

Pat Lundvall, Esq.
Craig Newby, Esq.
McDONALD CARANO WILSON LLP
2300 W. Sahara Avenue, Ste. 1000
Las Vegas, Nevada 89102
Attorneys for Defendant Gibbons

C. Stanley Hunterton, Esq.
HUNTERTON & ASSOCIATES
333 S. Sixth Street
Las Vegas, Nevada 89101
Attorney for Defendant Rogich

An Employee of OLSON, CANNON
GORMLEY & DESRUISSEAUX

# EXHIBIT 'A'

# EXHIBIT 'A'

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SOUTHERN DIVISION

CHRISSY ISRAEL MAZZEO,                )
                                      )
                 Plaintiff,           )
                                      )
vs.                                   )
                                      ) Case No.
JAMES ARTHUR "JIM" GIBBONS;           )
SIGMUND "SIG" ROGICH; LAS             ) 2:08-CV-01387-
VEGAS METROPOLITAN POLICE             ) RLH-PAL
DEPARTMENT; BILL YOUNG; DONALD        )
J. CAMPBELL; PENNIE                   )
MOSSETT-PUHEK; DOES 1-20,             )
                                      )
                 Defendants.          )
_____)


VIDEOTAPED DEPOSITION OF

CHRISSY ISRAEL MAZZEO

VOLUME I, PAGES 1 - 366

LAS VEGAS, NEVADA

JANUARY 18, 2010


REPORTED BY:  KIMBERLY A. FARKAS, RPR, CCR #741
              LS&T JOB NO. 1-116789

CHRISSY ISRAEL MAZZEO, VOLUME I - 1/18/2010

1    Q.    Did you make any telephone calls to

2  anyone else before placing this call after the

3  incident in the parking garage that you attribute

4  to Governor Gibbons or then Congressman Gibbons?

5    A.    You say after I left there did I call

6  anyone else?  No.  I called 911, I believe.

7    Q.    Talking about before you made the call to

8  911, did you call anyone else after the, what you

9  claim was the assault?

10   A.    The assault?  I don't think so.  I don't

11 think so.  I don't remember a hundred percent.  I

12 don't think so.

13   Q.    Where were you at when you made this

14 telephone call?

15   A.    I think I was at La Quinta on the first

16 one.

17   Q.    You think that you were there?

18   A.    I think I was there first, yes.

19   Q.    Okay.  Were you honest in your

20 description of your complaint in describing it to

21 the 911 operator?

22        MR. KOSSACK:  Objection.  Compound.  And

23 in addition, I think that we have to consider the

24 mental state of the plaintiff at the time as would

25 be indicated from listening to the phone call

1    it was either Karen Winkler or Rick Wright?

2         A.    Yes, because it's not my handwriting.

3         Q.    What phone number were you using at the

4    time?

5         A.    366-4427?

6         Q.    You're going to have to go a little bit

7    slower for me, okay.

8         A.    I'm sorry, 366-4426.

9         Q.    366 --

10        A.    4426.

11        Q.    4426.  All right.  Let me start at the

12   top and see if I determine the accuracy of some of

13   this.  At the top it indicates that there was an

14   incoming call on October 13th, 2006 from 808-8917.

15   Do you see where I'm at?

16        A.    Yes, I do.

17        Q.    Do you recall that being Pennie Puhek's

18   phone number?

19        A.    Yes, I do.

20        Q.    And then there was another call at 4:23

21   p.m. on October 13th of '06 at that same number.

22   Do you recall Pennie then, Ms. Puhek then, making a

23   telephone call to you about that time?

24        A.    Yes, I do.

25        Q.    The next number down is a number

CHRISSY ISRAEL MAZZEO, VOLUME I - 1/18/2010

1   coming back.  I don't remember.  I mean, it was

2   three years ago.

3       Q.    You had a phone conversation then or at

4   least placed a call to Eric Rockey at 8:57?

5       A.    8:57.  I don't know.

6            MR. KOSSACK:  I've got an objection.  So

7   far as who is placing the phone call, we have

8   incoming and we have outgoing.

9            THE WITNESS:  Oh, yeah, incoming.  Eric

10  was probably calling to talk to the baby or calling

11  to check to see how my daughter was doing.

12  BY MS. LUNDVALL:

13      Q.    Did you speak with Mr. Rockey?

14      A.    I don't even remember.  I might have.  I

15  might have -- I don't know what F means.  I might

16  have just told him that Paris was with my sister.

17      Q.    This would have been about the time that

18  you were seated at the booth with the other

19  individuals that evening; is that accurate?

20      A.    Yeah, that's probably accurate.

21      Q.    Did you take a phone call from him or

22  not?

23      A.    I don't remember.  I don't know what

24  F means.  If I did, I probably just said, I'm

25  eating dinner.  She's with my sister.  I don't

CHRISSY ISRAEL MAZZEO, VOLUME I - 1/18/2010

1              CERTIFICATE OF REPORTER

2     STATE OF NEVADA   )
                        )  SS:
3     COUNTY OF CLARK   )

4         I, Kimberly A. Farkas, Certified Court

5     Reporter, State of Nevada, do hereby certify:  That

6     I reported the taking of the deposition of CHRISS

7     ISRAEL MAZZEO, commencing on Monday, January 18,

8     2010 at 8:58 a.m.

9         That prior to being examined, the witness was

10    duly sworn by me to testify to the truth.  That I

11    thereafter transcribed my said shorthand notes into

12    typewriting, and that the typewritten transcript of

13    said deposition is a complete, true and accurate

14    transcription of said shorthand notes.

15         I further certify that I am not a relative or

16    employee of an attorney or counsel of any of the

17    parties, nor a relative or employee of an attorney

18    or counsel involved in said action, nor a person

19    financially interested in the action.

20        IN WITNESS WHEREOF, I have hereunto set my hand

21    in my office in the County of Clark, State of

22    Nevada, this 30th day of January, 2010.

23                        _____

24                        Kimberly A. Farkas, CCR 741

25

Las Vegas

Reno

Carson City

CERTIFIED
COPY

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SOUTHERN DIVISION

| | |
|---|---|
| CHRISSY ISRAEL MAZZEO, )<br><br>Plaintiff, )<br><br>vs. )<br><br>JAMES ARTHUR "JIM" GIBBONS;<br>SIGMUND "SIG" ROGICH; LAS<br>VEGAS METROPOLITAN POLICE<br>DEPARTMENT; BILL YOUNG; DONALD<br>J. CAMPBELL; PENNIE<br>MOSSETT-PUHEK; DOES 1-20,<br><br>Defendants. ) | Case No.<br><br>2:08-CV-01387-<br>RLH-PAL |

VIDEOTAPED DEPOSITION OF

CHRISSY ISRAEL MAZZEO

VOLUME II, PAGES 369 - 708

LAS VEGAS, NEVADA

JANUARY 19, 2010

REPORTED BY: KIMBERLY A. FARKAS, RPR, CCR #741
LS&T JOB NO. 1-116790

t 702.314.7200
f 702.631.7351

www.litigationservices.com

1640 West Alta Drive, Suite 4
Las Vegas, Nevada 89106



1    same thing, were you not?

2        A.      That is correct.

3        Q.      And you didn't take those charges

4    lightly, did you?

5        A.      No, I did not.

6              MR. KOSSACK:   Misstates facts in

7    evidence.   I don't think Rogich or Campbell's name

8    appears anywhere in any of her statements to the

9    police.

10             MR. CANNON:   Okay.

11   BY MR. CANNON:

12       Q.      Certainly when you accuse somebody of

13   charges such as those, you're going to go out of

14   your way to make sure everything you gave the

15   police investigating those charges was true and

16   correct.   Am I right?

17       A.      That's correct.

18       Q.      Now, but we know on at least one occasion

19   you didn't do that, did you, ma'am?

20       A.      What about?   I mean, you've got to be

21   specific, sorry.

22       Q.      You told Detective Hnatuick and Detective

23   Barker when they asked you when you decided you

24   weren't going to pursue this case that no one had

25   influenced you, didn't you?

CHRISSY ISRAEL MAZZEO, VOLUME II - 1/19/2010

1      A.     No.

2      Q.     Okay.

3             MR. CANNON:  Go ahead, please.

4             MR. DILLARD:  It's at 544.  The third DVD

5      we're continuing.

6             (Whereupon, the videotape was continued

7      for the witness.)

8      BY MR. CANNON:

9      Q.     Same question, ma'am?

10     A.     No.

11     Q.     Let me ask you this.  In that video you

12     indicated that the first place that you ran to was

13     the La Quinta, correct?

14     A.     That is correct.

15     Q.     But yet, when you called the 911

16     operator, you told her you were at the Starbucks

17     and that was the first place, didn't you?

18            MR. KOSSACK:  Objection.

19     Mischaracterizes the 911 call.  She also said she

20     was at the La Quinta in that first call.

21            MR. CANNON:  I appreciate the objection,

22     but we have a recording of the 911 call.

23     BY MR. CANNON:

24     Q.     Do you want to see the 911 call --

25     A.     I've already seen it.

CHRISSY ISRAEL MAZZEO, VOLUME II - 1/19/2010

1      Q.      Okay.  So that's not related?

2      A.      That's correct.

3      Q.      All right.  Then let's go to the next

4  page.  Now, in the top left-hand corner, where do

5  you see injuries there?

6      A.      I can't even really see anything.

7              MR. KOSSACK:  Again, objection.  The

8  picture quality is so low.

9  BY MR. CANNON:

10     Q.      Do you see red there, ma'am?

11     A.      I see red on the shoulder area, but I

12  can't really --

13     Q.      Did your shoulder area strike the wall or

14  the fence on top of the wall during this so-called

15  incident?

16     A.      Yes, it did.  The scratches and the arm

17  -- the redness on the arms.

18     Q.      The redness on the arm in the picture to

19  the right you claim was caused when Congressman

20  Gibbons grabbed your arm, correct?

21     A.      Yes.

22     Q.      About the muscle area?

23     A.      About the muscle area.

24     Q.      And that's your left arm?

25     A.      That's my left arm, yes.

CHRISSY ISRAEL MAZZEO, VOLUME II - 1/19/2010

```
 1   California.
 2       Q.      I'm not going to ask you to leave and go
 3   get it.  What I'm asking you though, you did agree
 4   to do that so we can figure it out for ourselves?
 5       A.      Yes.
 6       Q.      And whatever those records show, of
 7   course, would be what you made in those years and
 8   what, if you use Mr. Kossack's figure, you lost?
 9               MR. KOSSACK:  Not necessarily.  Because
10   you have to understand --
11               MR. CANNON:  Is that an objection?
12               MR. KOSSACK:  Yes, it is.  Misstates
13   facts not in evidence.
14               MR. CANNON:  Okay.  Thanks.
15               MR. KOSSACK:  Hold on.  Hold on.  As you
16   know, the government imputes a certain amount of
17   earnings to cocktail waitresses and that's all
18   they've got to pay taxes on.  If their tips are in
19   excess of that, they don't have to pay taxes on
20   that because they've already entered into the
21   agreement.
22   BY MR. CANNON:
23       Q.      You're not suggesting that you made money
24   and you didn't tell the government about it?
25       A.      No, I'm not saying that at all.
```

1    guys, okay.  All I'm asking you to do is to tell me

2    how you're damaged.  And one of your damages is you

3    were confined.  How long were you confined?

4         A.     I mean, I don't -- I mean --

5              MR. KOSSACK:  She's answered a minute.

6    Now, you're asking a woman facing a potential rape

7    to tell you to the second how long she was

8    confined?

9              MR. CANNON:  We'll get to the potential

10   rape in a minute.

11   BY MR. CANNON:

12        Q.     How long were you up against that wall?

13        A.     I don't remember.

14        Q.     So this element of damage you can't

15   really tell us what it is, how long you were there

16   or not there, right?

17        A.     Right.

18        Q.     So you would be speculating to tell us

19   how long you were confined?

20        A.     Yeah.

21        Q.     And we certainly don't want you to do

22   that.

23              Now, you suffered scratches to your

24   shoulder and to your back.  Now, we've already

25   covered those in those pictures, right?

CHRISSY ISRAEL MAZZEO, VOLUME II - 1/19/2010

Page 560

1      Q.     During the time you had whatever

2    relationship you had with him, his wife was

3    pregnant, was she not?

4      A.     I did not know that.  No, I did not.

5      Q.     Well, Gerri Rumsey went to your mother,

6    didn't she, and told her that?

7      A.     That's not true.  That is not true.

8             MR. KOSSACK:  Lack of foundation whether

9    she knows what he told her mother.

10            THE WITNESS:  Yeah, and long time ago.

11   BY MR. CANNON:

12     Q.     All right.  At any point from the time

13   you got in Las Vegas until you moved, did you ever

14   work in the escort or stripping business?

15     A.     Never.  Absolutely never.

16     Q.     Did you ever have a relationship with a

17   woman that did?

18     A.     No.  I don't know anybody that did.  I

19   don't hang out -- say anything about me, but I

20   don't do that, sorry.

21     Q.     Was your sister ever involved in that

22   business?

23     A.     You can ask her.  Don't ask me.

24     Q.     Well, do you know if she was?

25     A.     I don't think she was.  I know she

1    controlled the videotape or the video machinery in

2    the garage.

3         A.    Yeah.  Okay.  That makes sense.  Unless

4    you're talking about Marriott, but I don't think

5    they have a camera in there.

6         Q.    No, but that's a good example.  But

7    nobody has told you that Marriott or anyone else

8    had any kind of visual surveillance on that garage?

9         A.    No.

10        Q.    Do you know that Mr. Rogich was seen on

11   the video in the garage that night?

12        A.    Yes, I do.

13        Q.    Did you see him in the garage?

14        MR. KOSSACK:  I object to that night.

15   That hasn't been established.

16        MR. HUNTERTON:  October 13th, 2006.

17        MR. KOSSACK:  In the videos released is

18   what the answer would be based on.

19        THE WITNESS:  Did I see the videos

20   myself?

21   BY MR. HUNTERTON:

22        Q.    No.

23        A.    I'm sorry.

24        Q.    Did you see Mr. Rogich on the videos of

25   October 13th?

CHRISSY ISRAEL MAZZEO, VOLUME II - 1/19/2010

Page 708

```
 1              CERTIFICATE OF REPORTER
 2   STATE OF NEVADA  )
                      )  SS:
 3   COUNTY OF CLARK  )
 4       I, Kimberly A. Farkas, Certified Court
 5   Reporter, State of Nevada, do hereby certify:  That
 6   I reported the taking of the deposition of CHRISSY
 7   ISRAEL MAZZEO, commencing on Tuesday, January 19,
 8   2010 at 9:12 a.m.
 9       That prior to being examined, the witness was
10   duly sworn by me to testify to the truth.  That I
11   thereafter transcribed my said shorthand notes into
12   typewriting, and that the typewritten transcript of
13   said deposition is a complete, true and accurate
14   transcription of said shorthand notes.
15       I further certify that I am not a relative or
16   employee of an attorney or counsel of any of the
17   parties, nor a relative or employee of an attorney
18   or counsel involved in said action, nor a person
19   financially interested in the action.
20       IN WITNESS WHEREOF, I have hereunto set my hand
21   in my office in the County of Clark, State of
22   Nevada, this 2nd day of February, 2010
23
24            Kimberly A. Farkas, CCR 741
25
```

# EXHIBIT 'B'

# EXHIBIT 'B'

CERTIFIED
COPY

Las Vegas

Reno

Carson City

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

### SOUTHERN DIVISION

CHRISSY ISRAEL MAZZEO,                )
                                      )
                    Plaintiff,        )
                                      )
vs.                                   )
                                      ) Case No.
JAMES ARTHUR "JIM" GIBBONS;           )
SIGMUND "SIG" ROGICH; LAS             ) 2:08-CV-01387-
VEGAS METROPOLITAN POLICE             ) RLH-PAL
DEPARTMENT; BILL YOUNG; DONALD        )
J. CAMPBELL; PENNIE                   )
MOSSETT-PUHEK; DOES 1-20,             )
                                      )
                    Defendants.       )
_____     )

VIDEOTAPED DEPOSITION OF

CHRISSY ISRAEL MAZZEO

VOLUME II, PAGES 369 - 708

LAS VEGAS, NEVADA

JANUARY 19, 2010

REPORTED BY:  KIMBERLY A. FARKAS, RPR, CCR #741
              LS&T JOB NO. 1-116790

CHRISSY ISRAEL MAZZEO, VOLUME II - 1/19/2010

1          THE WITNESS:  They all look the same.  I

2     said they all look the same.

3          MR. KOSSACK:  I think you'll recognize

4     him.

5          MR. CANNON:  Counsel, that is totally

6     inappropriate.  You know it is.  You cannot make a

7     comment like that on a pictorial representation.

8     You cannot say to her, I think you'll recognize

9     him.  That implies that Officer Ortega is in here,

10    and I haven't suggested it is.  That's

11    inappropriate and you know it.

12    BY MR. CANNON:

13    Q.    Now, will you look at that and tell me,

14    ma'am, if you recognize any of those officers as

15    Officer Ortega?

16    A.    If it's anyone, I would think it's him,

17    but it might not.

18    Q.    On the first page --

19         MR. KOSSACK:  Look at them carefully.

20    Look at all of them carefully before you make up

21    your mind.  Look at all of them.

22         THE WITNESS:  I don't remember.  I just

23    remember looking at his name.  That's how I

24    remembered him.

25         MR. KOSSACK:  Put them all out in front

CHRISSY ISRAEL MAZZEO, VOLUME II - 1/19/2010

Page 430

1    of you.
2                    THE WITNESS:  (Inaudible)
3                    MR. CANNON:  I'm sorry?
4                    THE REPORTER:  I'm sorry?
5                    THE WITNESS:  I said -- I was talking to
6    myself.
7                    THE REPORTER:  You can't talk to
8    yourself, ma'am.  I have to hear every word you
9    say, please.
10                   THE WITNESS:  I'm sorry.  If I had to say
11   it was anybody, it would be one of those two.
12   BY MR. CANNON:
13       Q.    One of which two?  Would you put a 1 and
14   a 2 on them, please.
15       A.    I might be wrong.  I just remember the
16   name.  I would say 1 and 2.  I don't remember, to
17   be honest.
18                   MR. KOSSACK:  If you don't remember, say
19   you don't remember.
20                   THE WITNESS:  I don't remember.  I
21   remember seeing his name tag and looking at his
22   shirt and saying, you're Ortega.  I'm going to
23   remember your name.
24   BY MR. CANNON:
25       Q.    Let me get this right.  This is the

```
1                    CERTIFICATE OF REPORTER

2    STATE OF NEVADA   )
                       )  SS:
3    COUNTY OF CLARK   )

4         I, Kimberly A. Farkas, Certified Court

5    Reporter, State of Nevada, do hereby certify:  That

6    I reported the taking of the deposition of CHRISSY

7    ISRAEL MAZZEO, commencing on Tuesday, January 19,

8    2010 at 9:12 a.m.

9         That prior to being examined, the witness was

10   duly sworn by me to testify to the truth.  That I

11   thereafter transcribed my said shorthand notes into

12   typewriting, and that the typewritten transcript of

13   said deposition is a complete, true and accurate

14   transcription of said shorthand notes.

15        I further certify that I am not a relative or

16   employee of an attorney or counsel of any of the

17   parties, nor a relative or employee of an attorney

18   or counsel involved in said action, nor a person

19   financially interested in the action.

20        IN WITNESS WHEREOF, I have hereunto set my hand

21   in my office in the County of Clark, State of

22   Nevada, this 2nd day of February, 2010

23                   Kimberly A Farkas

24                   Kimberly A. Farkas, CCR 741

25
```

# EXHIBIT 'C'

# EXHIBIT 'C'

CERTIFIED
COPY

Las Vegas

Reno

Carson City

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SOUTHERN DIVISION

CHRISSY ISRAEL MAZZEO,                )
                                      )
                Plaintiff,            )
                                      )
vs.                                   )
                                      ) Case No.
JAMES ARTHUR "JIM" GIBBONS;           )
SIGMUND "SIG" ROGICH; LAS             ) 2:08-CV-01387-
VEGAS METROPOLITAN POLICE             ) RLH-PAL
DEPARTMENT; BILL YOUNG; DONALD        )
J. CAMPBELL; PENNIE                   )
MOSSETT-PUHEK; DOES 1-20,             )
                                      )
                Defendants.           )
_____)

VIDEOTAPED DEPOSITION OF

CHRISSY ISRAEL MAZZEO

VOLUME II, PAGES 369 - 708

LAS VEGAS, NEVADA

JANUARY 19, 2010

REPORTED BY:  KIMBERLY A. FARKAS, RPR, CCR #741
              LS&T JOB NO. 1-116790



CHRISSY ISRAEL MAZZEO, VOLUME II - 1/19/2010

Page 472

1    your memory today?

2        A.      Just the times when they picked me up and

3    then trying to figure out when my sister got there.

4    I was just trying to -- that was all.

5        Q.      Then underneath it says, My attorney is

6    working on it.

7        A.      Because I was like confused on answering

8    some of your questions.

9        Q.      My questions?

10       A.      Anybody's questions.

11       Q.      Okay.  So is that an answer, a pad answer

12   you decided you would give, "my attorney is working

13   on it?"

14       A.      Yeah.  And then the address that you guys

15   were asking me for Boulder Falls, that was the

16   address.

17       Q.      When it says, Phone bills show Rick

18   Coleman, what is that?

19       A.      I notice on the phone bills that you guys

20   showed me yesterday, like, that you guys were going

21   over all those phone bills, there was a Rick

22   Coleman next to it.  And that was my stepdad that

23   passed away.  That was his old number.

24               MR. KOSSACK:  Was his name Rick Coleman?

25               THE WITNESS:  No.  His name was Ed Evans.

1    That was his old number.  He passed away in '07.

2    BY MR. CANNON:

3         Q.      Then underneath that it says Mom?

4         A.      That's my mom's new cell.

5         Q.      And it says, Passed away?

6         A.      That was part of the stepdad that passed

7    away.

8         Q.      And then DA's office, tests?

9         A.      I saw that on the phone record notes too.

10   That was the number I was calling her and she was

11   giving me updates on the Nick case.

12        Q.      And then on the last page with a star it

13   says, Gibbons did supporting testimony.

14               What's that?

15        A.      Ask my counsel.  I don't remember.  We

16   were talking about something.  Gibbons did

17   supporting testimony.

18        Q.      So basically you decided that if you

19   weren't able to answer the question, you were going

20   to say, "ask my counsel?"

21        A.      Ask my counsel, yes.

22        Q.      Okay.

23        A.      Does that make sense?  Sorry.  I'm just

24   giving you everything that I did.

25        Q.      I appreciate that.  Appreciate your

CERTIFICATE OF REPORTER

STATE OF NEVADA  )
                 )  SS:
COUNTY OF CLARK  )

    I, Kimberly A. Farkas, Certified Court Reporter, State of Nevada, do hereby certify:  That I reported the taking of the deposition of CHRISSY ISRAEL MAZZEO, commencing on Tuesday, January 19, 2010 at 9:12 a.m.

    That prior to being examined, the witness was duly sworn by me to testify to the truth.  That I thereafter transcribed my said shorthand notes into typewriting, and that the typewritten transcript of said deposition is a complete, true and accurate transcription of said shorthand notes.

    I further certify that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of an attorney or counsel involved in said action, nor a person financially interested in the action.

    IN WITNESS WHEREOF, I have hereunto set my hand in my office in the County of Clark, State of Nevada, this 2nd day of February, 2010.

                         Kimberly A. Farkas, CCR 741

LQ [SB] 4/5

Mazzed
1-18-2010

Jim Denton - Noticed Gibbons of police report
phone # 355-9007

- Why was Gibbons suing for tapes?
- Why did Cambell & Young get tapes first?

- Bankruptcy - file?
  tax returns IRS federal & State

I 131 meds. Cancer
Date of last treatment

Cass complete Disk of info?

Nancy Clark counselor (theraphy) Henderson

Chrissy notest

EXHIBIT
MAZZEO 30
1/19/10   KF

* After nick was arrested @
republic services - ne was in
jail - I was @ the world market
center - getting phone calls on cell -
girls threatening me - I called
safe nest - they put temporary
emergency restraining order on nick
guard in jail ordered nick not
to call me or anyone to call me.

Kim
Jonathan Morgan

1146 last phone call

Cop Car.

1146 pumpkin = 220

240 - 305

* called sister - showed up
20-25 min later after last 911 -
she stayed in truck they
said she had to stay in cop
car - signed for my I think,
thats when I called my sister
While I was in cop car -
She was there in her truck -
then asked if I could go st
w/ her - they said yes - ortega
came up to us said - -
then I west w/ them after 30 mi
look above.

emergency 11:12 C gordonBerch

5880 Booter Falls

* my attorney is working on it.

* phone bills show rick coleman
702 2784553 - step dad
mom 7022787467    who passed away
* DA's office Tess - 702 0712800
Calling in regards to rick case
I told K?

* Gibbons did
  supporting testimony
= ask my counsel
  ~~released~~

* personally know
  Ortega told me - tapes were
  there

# EXHIBIT 'D'

# EXHIBIT 'D'

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SOUTHERN DIVISION

* * * * *

CHRISSY ISRAEL MAZZEO,              )
                                    )
            Plaintiff,              )   Case No.
                                    )   2:08-CV-01387
            vs.                     )   -R.H.-PAL
                                    )
JAMES ARTHUR "JIM" GIBBONS;         )
SIGMUND "SIG" ROGICH; LAS           )
VEGAS METROPOLITAN POLICE           )
DEPARTMENT; BILL YOUNG;             )
DONALD J. CAMPBELL; PENNIE          )
MOSSETT-PUHEK; and DOES             )
1-20,                               )
                                    )
            Defendants.             )
_____     )


DEPOSITION OF MICHAEL HNATUICK
VOLUME I

Taken on Thursday, May 6, 2010
At 10:05 A.M.


At Kossack Law Offices
4535 West Sahara Avenue
Suite 101
Las Vegas, Nevada


Reported by:  CAMEO KAYSER, RPR, CCR No. 569

1    MR. KOSSACK:  All right.  Look, we got

2  into a little tiff last time and the time before.

3  Now, Walt, if you continue to make coaching

4  objections, speaking objections, illegal objections,

5  I will put an end to the deposition and file a

6  motion with the magistrate and ask for sanctions.

7    MR. CANNON:  That's your right.  Go

8  ahead.  Rather than editorialize, just call the

9  magistrate and set an appointment.

10    MS. LUNDVALL:  And I will also object to

11  the form, and I will also ask for a simple issue of

12  politeness.  Rather than chomping on ice and kind of

13  mumbling these questions out, I would hope that you

14  might be polite to this witness and pose your

15  question without mumbling and having half of it come

16  over the top of the chomp on the ice cubes, please.

17    MR. CANNON:  Again, if you understand the

18  question, go ahead and answer it.

19    THE WITNESS:  Okay.  His notoriety as a

20  public figure had no basis on whether or not the

21  case would be assigned to us.  We would take all of

22  those cases, whether they are average citizens or

23  public figures accused of these crimes.

24  BY MR. KOSSACK:

25    Q.   **Okay.  Was there any other division that**

                        REPORTER'S DECLARATION

STATE OF NEVADA        )
                       ) ss.
COUNTY OF CLARK        )

            I, CAMEO L. KAYSER, CCR No. 569,
declare as follows:

            That I reported the taking of the
deposition of the witness, MICHAEL HNATUICK,
VOLUME I commencing on Thursday, May 6, 2010, at
10:05 a.m.

            That prior to being examined, the
witness was by me duly sworn to testify to the
truth, the whole truth, and nothing but the truth;
that, before the proceedings' completion, the
reading and signing of the deposition has been
requested by the deponent or a party.

            That I thereafter transcribed my said
shorthand notes into typewriting and that the
typewritten transcript of said deposition is a
complete, true, and accurate transcription of said
shorthand notes taken down at said time.

            I further declare that I am not a
relative or employee of any party involved in said
action, nor a person financially interested in the
action.

            Dated at Las Vegas, Nevada this 12th
day of May, 2010.




            _____
            CAMEO L. KAYSER, RPR, CCR No. 569

# EXHIBIT 'E'

# EXHIBIT 'E'

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SOUTHERN DIVISION

\* \* \* \* \*

CHRISSY ISRAEL MAZZEO,            )
                                  )
            Plaintiff,            )   Case No.
                                  )   2:08-CV-01387
            vs.                   )   -R.H.-PAL
                                  )
JAMES ARTHUR "JIM" GIBBONS;       )
SIGMUND "SIG" ROGICH; LAS         )
VEGAS METROPOLITAN POLICE         )
DEPARTMENT; BILL YOUNG;           )
DONALD J. CAMPBELL; PENNIE        )
MOSSETT-PUHEK; and DOES           )
1-20,                             )
                                  )
            Defendants.           )
_____     )

DEPOSITION OF GREG McCURDY

Taken on Tuesday, May 4, 2010
At 10:15 A.M.

At Kossack Law Offices
4535 West Sahara Avenue
Suite 121
Las Vegas, Nevada

Reported by:  CAMEO KAYSER, RPR, CCR No. 569

CAMEO KAYSER & ASSOCIATES (702) 655-5092

1      Q.   Have you ever seen the document that has
2   been marked as Exhibit 2?
3      A.   I do remember seeing this document, yes.
4      Q.   Had you seen that document before you
5   signed off on the request for investigative reports?
6      A.   I think I saw this document on the 14th
7   sometime during the day.
8      Q.   And then Exhibit 3, you don't know
9   whether you have ever seen this document before?
10     A.   I can't recall seeing this document.
11     Q.   I have handed you what I have marked as
12  Exhibit 4.  This is a transcription of the statement
13  Chrissy Mazzeo gave on --
14          MR. CANNON:  It is on the 14th.
15  BY MR. KOSSACK:
16     Q.   This is the written one.
17     A.   It looks like there's two different
18  documents, so I think you need to look at how you've
19  given me that.
20     Q.   Yeah, let us strike Exhibit 4.
21          MR. CANNON:  Just so I'm clear, it's the
22  first three pages of the October 14th statement of
23  Chrissy Mazzeo and then followed by the 911 call?
24          MR. KOSSACK:  No.  I'm not going to use
25  that document, I just got through saying.

1        Q.   If we turn to page 831, it states there

2    where she's telling the detectives, quote, He said

3    to go with him because he said was staying at

4    Embassy Suites?  He said he was --

5        A.   831 looks like a dispatch call.  It looks

6    like this is dispatch of Mazzeo.  It does not look

7    like conversation between the detectives.

8             MR. CANNON:  It is the same thing you did

9    earlier, Bob.  You mixed up two statements.

10   BY MR. KOSSACK:

11       Q.   These are actually Bates stamped one

12   after another.

13            MR. CANNON:  And those are your

14   Bates stamps, aren't they?

15            MR. KOSSACK:  Oh, I'm sorry.  I'm reading

16   from the wrong one.

17   BY MR. KOSSACK:

18       Q.   Yes.  We are talking about the 911 call.

19       A.   You said detective, so that's what

20   through me off.

21       Q.   The 911 call she says, quote, He said to

22   go with him because he was staying at

23   Embassy Suites.  He said he was staying at

24   Embassy Suites, and followed him, and then we were

25   on the second floor, and there were people following

1   exhibits back over to her.

2          THE WITNESS:  Page 4?  Is that 0152?

3   BY MR. KOSSACK:

4      Q.   0154, page 6.

5          MR. CANNON:  They are not in order again.

6          Okay, which one?

7          MR. KOSSACK:  On page 6.

8          THE WITNESS:  6.

9   BY MR. KOSSACK:

10      Q.   And that's at the top here where it says

11   page 6.

12          She states there, quote, "He just, just

13   started talking about how his, his marriage wasn't

14   successful and how he had two children.  He was

15   married for 20 years and that, uh, marriage wasn't

16   everything that it was cracked up to be and then

17   that's when he gave me his card."

18          And then that's when he started.  He

19   started playing like footsies with me.  With me, and

20   then Pennie noticed it, and some of the waitresses

21   noticed it.  And so I started hugging Pennie and I

22   started telling everybody at the table that Pennie

23   was my best friend.  I was -- what I was trying to

24   do was actually move away from him.  He put his hand

25   on my leg, and then I just scooted closer to Pennie.

### REPORTER'S DECLARATION

STATE OF NEVADA      )
                     ) ss.
COUNTY OF CLARK      )

        I, CAMEO L. KAYSER, CCR No. 569, declare as follows:

        That I reported the taking of the deposition of the witness, GREG McCURDY, commencing on Tuesday, May 4, 2010, at 10:15 a.m.

        That prior to being examined, the witness was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth; that, before the proceedings' completion, the reading and signing of the deposition has been requested by the deponent or a party.

        That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true, and accurate transcription of said shorthand notes taken down at said time.

        I further declare that I am not a relative or employee of any party involved in said action, nor a person financially interested in the action.

        Dated at Las Vegas, Nevada this 10th day of May, 2010.


_____
CAMEO L. KAYSER, RPR, CCR No. 569

# EXHIBIT 'F'

# EXHIBIT 'F'

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SOUTHERN DIVISION

* * * * *

| | |
|---|---|
| CHRISSY ISRAEL MAZZEO, | ) |
| | ) |
| Plaintiff, | ) Case No. |
| | ) 2:08-CV-01387 |
| vs. | ) -R.H.-PAL |
| | ) |
| JAMES ARTHUR "JIM" GIBBONS; | ) |
| SIGMUND "SIG" ROGICH; LAS | ) |
| VEGAS METROPOLITAN POLICE | ) |
| DEPARTMENT; BILL YOUNG; | ) |
| DONALD J. CAMPBELL; PENNIE | ) |
| MOSSETT-PUHEK; and DOES | ) |
| 1-20, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

DEPOSITION OF MICHAEL HNATUICK
VOLUME I

Taken on Thursday, May 6, 2010
At 10:05 A.M.

At Kossack Law Offices
4535 West Sahara Avenue
Suite 101
Las Vegas, Nevada

Reported by:  CAMEO KAYSER, RPR, CCR No. 569

1    asking the questions.  He was there, but we're not

2    sure -- your question is, did he ask those

3    questions?

4    BY MR. KOSSACK:

5         Q.   It says, Persons present are myself,

6    Detective Hnatuick, Barker, Jim Gibbons, also

7    present is Sergeant McCarthy and James Denton.

8         A.   Yes.  I believe I was the one asking

9    those questions, yes.

10              MR. CANNON:   Okay.

11   BY MR. KOSSACK:

12        Q.   Now, if we turn to page 20 -- and that

13   would be page 20 of Exhibit 10, do you recall

14   Detective Barker asking Jim Gibbons and Jim Gibbons

15   giving the following answer?

16              "Okay.  Were you, at the time that you

17   picked her up, were you close to any, um, a wall or

18   any part of the structure of the garage?

19              "Answer:  I think there was a, like

20   the -- uh, a wall or a bench that was right there.

21   You know.  I just kind of stood her up."

22              Was that the question asked and the

23   answer Jim Gibbons gave to the police on

24   October 14th, 2006?

25        A.   Yes.  And that question was asked by

1   Detective Barker.

2        Q.   And was the description of the location

3   where Chrissy stumbled or fell as given by Gibbons

4   on October 14th, 2006 consistent with the location

5   that he marked as 3 in the diagram that has been

6   marked as Plaintiff's Exhibit 8 to your deposition?

7        A.   I believe it is the same general area,

8   yes.

9        Q.   And then looking at the November 10th

10  statement, Exhibit 9.

11            MR. CANNON:   Page 3, I think that's where

12  we are going.

13            THE WITNESS:   Okay.

14  BY MR. KOSSACK:

15       Q.   It says -- just first of all, looking at

16  page 2 it says, Persons conducting the interview are

17  myself, Detective Hnatuick, and then you mention

18  Detective Barker, also present are Jim Gibbons and

19  his attorney, Don Campbell.

20            If there's simply a question without

21  initials, was that you asking the question?

22       A.   Yes.   Because that would be the way it

23  would be for the person initializing the tape and

24  beginning the interview.   If there was a change in

25  people asking the questions, it would be noted by

1    their initials.

2         Q.   So, in other words, on page 2 where we

3    see DC, then that would be Don Campbell?

4         A.   Yes.

5         Q.   And if we look at page 3 of the

6    Exhibit 9, one of the first questions that you asked

7    Mr. Gibbons at the time was whether or not he had

8    had any corrections to make to his prior statement.

9    Do you recall that?  Page 3, the second question.

10        A.   Okay.  Yes.

11        Q.   So did Jim Gibbons say that he had had an

12   opportunity to review the statement, which is

13   Plaintiff's Exhibit 10, the statement taken on

14   10/14/06?

15        A.   Yes.

16        Q.   And then you asked him whether he had any

17   changes to that statement and he said no; correct?

18        A.   That is correct, he said none.

19        Q.   And then it was at that time that -- to

20   get a little more specific, you brought in a

21   diagram, which is Plaintiff's Exhibit 8, and asked

22   him to actually draw on the diagram where certain

23   incidents took place.  Would that be correct?

24        A.   Yes, that is correct.

25        Q.   And if we look at page 5, did you ask

1    Gibbons, and did he respond at that time, starting

2    with the second question on that page, "Could you,

3    uh, tell us when it was about here that you run into

4    her?  About what time do you believe that is?"

5              "  Answer:  At about this point right

6    here?

7              "Question:  And -- and just show me.

8    Yes.

9              "Answer:  I'm going to put a 1.  I would

10   say at point 1 we are close to 10:00 o'clock.

11   Sometime between 10:00 -- 9:30 and 10:00 o'clock.

12             "Question:  Okay.  And did you come out

13   to meet -- and did you come out to meet her or did

14   she come out to meet you?

15             "Answer:  I was already outside."

16             And then it goes on.  So again, based on

17   that portion of his statement is what he was

18   referring to by point 1 as to where he met her when

19   she came outside?

20        A.   I believe so.

21             MS. LUNDVALL:  I will have to object to

22   that question.  It is very vague and ambiguous and

23   rambling and convoluted.

24   BY MR. KOSSACK:

25        Q.   And if you look at page 5 and 6 down at

CAMEO KAYSER & ASSOCIATES (702) 655-5092

1  the bottom, did Jim Gibbons tell you on

2  October 10th, 2006, quote, And we walked down here

3  to say point 2.  At point 2, there was a discussion

4  about her car.

5              And on point 2 on Plaintiff's Exhibit 8,

6  is that the point 2 that he's referring to where he

7  and Chrissy walked down to?

8        A.    I believe it is, yes.

9        Q.    And then point 3, he also mentions in

10 that same answer, looking about halfway through that

11 first paragraph, and this would be the answer given,

12 "So I started walking back and for some reason we

13 crossed here.  She started to go this way, and I

14 went across the street.  But then she turned and

15 came.  She followed me across the street, uh, and,

16 you know, we were walking together at this point,

17 uh, across here to point 3 which I, I believe would

18 be very close to 10:00 o'clock.  And, uh, that's

19 where she stumbled.  That's where I caught her."

20             Is that how Jim Gibbons -- is that the

21 statement he gave on November 10, 2006?

22       A.    Yes.

23       Q.    And the point 3 on the diagram of

24 Plaintiff's 8, that's where he marked that she

25 stumbled?

1     A.   Yes.

2     Q.   And then with respect to point 4, if we

3 turn to page 11, the question is, "Okay. And can

4 you show us here from point 3, how did you enter the

5 hotel?

6          "Answer: Well, I went down -- there is a

7 gate right here, 4. So I went this way. And I

8 never entered the garage."

9          Is that what Jim Gibbons told you at the

10 time of the November 10th interview?

11     A.   Yes.

12     Q.   And point 4 shown on Exhibit 8, is that

13 where Jim Gibbons indicated that the gate was?

14     A.   Yes.

15     Q.   And when you asked, How did you enter the

16 hotel and he pointed out the gate at point 4, was it

17 your understanding at the time that that is how he

18 entered the hotel?

19          MS. LUNDVALL: Objection. That is not

20 what his statement was then, quite obviously, from

21 this transcription.

22          MR. CANNON: I will join the objection.

23          But you can answer it.

24          THE WITNESS: And could you repeat the

25 question again?

```
 1                    REPORTER'S DECLARATION
 2   STATE OF NEVADA      )
                          ) ss.
 3   COUNTY OF CLARK      )
 4              I, CAMEO L. KAYSER, CCR No. 569,
     declare as follows:
 5
               That I reported the taking of the
 6   deposition of the witness, MICHAEL HNATUICK,
     VOLUME I commencing on Thursday, May 6, 2010, at
 7   10:05 a.m.
 8              That prior to being examined, the
     witness was by me duly sworn to testify to the
 9   truth, the whole truth, and nothing but the truth;
     that, before the proceedings' completion, the
10   reading and signing of the deposition has been
     requested by the deponent or a party.
11
               That I thereafter transcribed my said
12   shorthand notes into typewriting and that the
     typewritten transcript of said deposition is a
13   complete, true, and accurate transcription of said
     shorthand notes taken down at said time.
14
               I further declare that I am not a
15   relative or employee of any party involved in said
     action, nor a person financially interested in the
16   action.
17             Dated at Las Vegas, Nevada this 12th
     day of May, 2010.
18
19
20
21
22
23          _____
24          CAMEO L. KAYSER, RPR, CCR No. 569
25
```

CAMEO KAYSER & ASSOCIATES (702) 655-5092

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SOUTHERN DIVISION

* * * * *

CHRISSY ISRAEL MAZZEO,           )
                                 )
          Plaintiff,             )   Case No.
                                 )   2:08-CV-01387
     vs.                         )   -R.H.-PAL
                                 )
JAMES ARTHUR "JIM" GIBBONS;      )
SIGMUND "SIG" ROGICH; LAS        )
VEGAS METROPOLITAN POLICE        )
DEPARTMENT; BILL YOUNG;          )
DONALD J. CAMPBELL; PENNIE       )
MOSSETT-PUHEK; and DOES          )
1-20,                            )
                                 )
          Defendants.            )
_____  )


DEPOSITION OF MICHAEL HNATUICK
VOLUME II
Taken on Tuesday, May 11, 2010
At 10:05 A.M.

At Kossack Law Offices
4535 West Sahara Avenue
Suite 101
Las Vegas, Nevada


Reported by:  CAMEO KAYSER, RPR, CCR No. 569

1       Q.   Did she describe another woman who had
2   come into the lobby -- that came into the lobby out
3   of breath?   And looking at page 8.
4       A.   Okay.
5       Q.   It says, the question:
6            "Now, you first noticed these two people
7   when?   What time?
8            "Answer:   I would say around 10:30.
9            "Question:   Okay.   Now, the woman who
10  comes in who appears to be out of breath?
11           "Answer:   Uh-huh.
12           "Is that the same women or a different
13  woman?"
14           She says, "No, that is a totally
15  different woman."
16           Do you see that?
17      A.   Yes.
18      Q.   Do you recall her testifying to that?
19      A.   Yes.
20      Q.   And do you recall her describing that
21  woman as dressed nicely, a blouse with a skirt?
22      A.   Yes.
23      Q.   With shoulder-length, wavy hair?
24      A.   Yes.
25      Q.   And perhaps a dark blonde over on the

1    next page, on page 9?

2         A.   Okay.

3         Q.   Would what be yes, you recall her saying

4    that?

5         A.   Yes.

6         Q.   And that this woman stood five-eight to

7    five-nine or a foot taller than Kimberly?

8         A.   Yes.

9         Q.   Can that woman be seen on the LaQuinta

10   video?

11        A.   I don't recall seeing her on the video.

12        Q.   But Kimberly described that woman as

13   coming up to the front desk, didn't she?

14        A.   I don't see where it says she came to the

15   front desk.

16        Q.   Let me see if we can find where she first

17   mentions her.

18             Going back to page 4, she is answering,

19   "So he was holding her and she was already out by

20   the time I looked out there, and she was swinging

21   her hands and -- in his face and she was wearing,

22   like, I don't know what color it was.  I think it

23   was a darker color, a dress suit, and he had on a

24   dark -- dark pants dress suit and a suit tie."

25        A.   Do I see that, yes.

1      Q.   Did Chrissy ever describe to you that she

2  had shook her finger in Gibbons' face outside the

3  LaQuinta Inn?

4      A.   I don't recall that off the top of my

5  head.

6      Q.   Well, here it is, page 5.  Up at the top,

7  She is looking outside.  She says, "I'm looking at

8  the whole lobby.  He was to my left and I go, 'Wow.

9  Tonight is living up to Friday, the 13th.'  He is

10  like, yeah."  Her talking to her -- other desk

11  clerk.  "And the flight attendant had come up and

12  asked me to change her room, so by the time I looked

13  out, they were gone."

14      A.   Okay.

15      Q.   Do you recall her saying that?

16      A.   I do.

17      Q.   So her observation of the two outside was

18  interrupted by the flight attendant coming up?

19      A.   I believe so.

20      Q.   And then looking at the bottom of page 5,

21  she says at the bottom, "A lady did come in and ask

22  if they could use the phone or asked if we had a pay

23  phone.  I said no, but that happens like every

24  night, you know."

25           And then she goes on, "And she didn't

1    look familiar to me."  And talks about a local call.

2                "And she looked like she was out of

3    breath, so I asked her if she was okay and she said,

4    'Yeah.  I just want to get home and get this over

5    with.'"

6                Do you recall her describing that woman

7    as entering?

8         A.    Yes.

9         Q.    And then on page 8, you return to

10   questioning her about the woman that came in out of

11   breath?  Do you recall that?

12        A.    Okay.

13        Q.    So previously she describes that woman as

14   coming up to the front desk and asking if she could

15   use the phone; correct?

16               MR. CANNON:  I will object to that.  That

17   mischaracterizes what that statement says.

18               Go ahead.

19               THE WITNESS:  She comes in and asks to

20   use the phone.  I don't think it ever says to the

21   front desk.

22   BY MR. KOSSACK:

23        Q.    Well, if you look at page 9, the fifth

24   question, did you ask Kimberly and did she answer:

25               "So when this woman comes up to ask you

```
 1                    REPORTER'S DECLARATION
 2    STATE OF NEVADA      )
                           ) ss.
 3    COUNTY OF CLARK      )
 4              I, CAMEO L. KAYSER, CCR No. 569,
      declare as follows:
 5
                That I reported the taking of the
 6    deposition of the witness, MICHAEL HNATUICK,
      VOLUME II, commencing on Tuesday, May 11, 2010, at
 7    10:05 a.m.
 8              That prior to being examined, the
      witness was by me duly sworn to testify to the
 9    truth, the whole truth, and nothing but the truth;
      that, before the proceedings' completion, the
10    reading and signing of the deposition has been
      requested by the deponent or a party.
11
                That I thereafter transcribed my said
12    shorthand notes into typewriting and that the
      typewritten transcript of said deposition is a
13    complete, true, and accurate transcription of said
      shorthand notes taken down at said time.
14
                I further declare that I am not a
15    relative or employee of any party involved in said
      action, nor a person financially interested in the
16    action.
17              Dated at Las Vegas, Nevada this 20th
      day of May, 2010.
18
19
20
21
22
23              _____
                CAMEO L. KAYSER, RPR, CCR No. 569
24
25
```

CAMEO KAYSER & ASSOCIATES (702) 655-5092

# EXHIBIT 'G'

# EXHIBIT 'G'

**AFFIDAVIT OF WALTER R. CANNON**

STATE OF NEVADA   )
                                )  ss:
COUNTY OF CLARK  )

WALTER R. CANNON, being first duly sworn, deposes and says:

1.   That Affiant is an attorney-at-law, duly licensed to practice before all of the Courts in the State of Nevada.

2.   That Affiant is a member of the Law Firm of Olson, Cannon, Gormley & Desruisseaux, the attorneys retained to represent the interests of Defendants Bill Young and the Las Vegas Metropolitan Police Department in conjunction with the litigation styled *"Mazzeo v. Bill Young, et al"*.

3.   That Affiant was in attendance at the deposition of Bill Young taken by Plaintiff's counsel on May 14, 2010.

4.   That during the course of Mr. Young's deposition, a videotape of a news conference conducted by Bill Young was used as an exhibit by Plaintiff's counsel; prior to the playing of the videotape, Mr. Young admitted that he had held a news conference and that the videotape was an accurate representation of the statements he made during that conference; that notwithstanding Mr. Young's representations, Plaintiff's attorney then proceeded to query Mr. Young on most, if not all, of the statements Mr. Young made at the news conference; in each instance, the only questions asked of Mr. Young was whether the tape was an accurate representation of the statements made by Mr. Young; on numerous occasions, Mr. Young indicated to Plaintiff's attorney that there was no need for him to go paragraph by paragraph through the videotape because he (Mr. Young) had already stated that the videotape was an accurate representation of the statements that had been made during the conference.

. . .

. . .

. . .

. . .

. . .

5.   Further Affiant sayeth naught.



WALTER R. CANNON

SUBSCRIBED AND SWORN TO before me
this 27th day of May, 2010.

NOTARY PUBLIC in and for said
County and State

NOTARY PUBLIC
County of Clark-State of Nevada
PEGGY E. SCHULTZ
No. 96-3409-1
My Appointment Expires July 20, 2012

OLSON, CANNON, GORMLEY & DESRUISSEAUX
Law Offices of
A Professional Corporation
9950 West Cheyenne Avenue
Las Vegas, Nevada 89129
(702) 384-4012   Telecopier (702) 383-0701