1  **ROBERT J. KOSSACK, ESQ.**
   Nevada Bar No. 2734
2  **KOSSACK LAW OFFICES**
   4535 W. Sahara Avenue, Suite 101
3  Las Vegas, Nevada 89102
   Ph. (702) 253-7068
4  Fx. (702) 368-0471
   Email rjkossack@cox.net
5  *Attorney for Plaintiff Chrissy Israel Mazzeo*

6

7              **UNITED STATES DISTRICT COURT**

8                  **DISTRICT OF NEVADA**

9                  **SOUTHERN DIVISION**

10

11 CHRISSY ISRAEL MAZZEO,                    )
                                             )
12          Plaintiff,                       )   **CASE NO.: 2:08-cv-01387-RLH-PAL**
                                             )
13 JAMES ARTHUR "JIM" GIBBONS;               )
   SIGMUND "SIG" ROGICH;                     )
14 LAS VEGAS METROPOLITAN POLICE             )
   DEPARTMENT; BILL YOUNG                    )
15 DONALD J. CAMPBELL;                       )
   PENNIE MOSSETT-PUHEK;                     )
16 DOES 1-20,                                )
                                             )
17          Defendants.                      )
   _____)

18

19

20              **MAZZEO'S REPLY TO OPPOSITION TO**
        **PLAINTIFF'S EMERGENCY MOTION RE: SPEAKING OBJECTIONS AT**
21                        **DEPOSITIONS**

22     **COMES NOW,** Plaintiff, CHRISSY ISRAEL MAZZEO ("Mazzeo"), by and through her

23 attorney, ROBERT J. KOSSACK, ESQ., of KOSSACK LAW OFFICES, and herein replies to

24 Opposition to Plaitniff's Emergency Motion re: Speaking Objections at Depositions and based on

25 Walter R. Cannon's behavior at depositions moves for sanctions.

26 . . . .

27 . . . .

28 . . . .

1   This reply is made pursuant to FRCP 30(c), LR 26-7, the Points and Authorities and

2   Exhibits attached hereto and any oral argument given at time of hearing.

3       **Dated** this 30th day of May, 2010.

4                                   KOSSACK LAW OFFICES

5

6                       By _____/s/_____

7                          ROBERT J. KOSSACK, ESQ.
                           Nevada Bar No. 2734
                           4535 W. Sahara Avenue, Suite 101
8                          Las Vegas, Nevada  89102
                           Ph. (702) 253-7068
9                          Fx. (702) 368-0471
                           Email  rjkossack@cox.net
10                         *Attorney for Plaintiff Chrissy Israel Mazzeo*

11   . . . .

12   . . . .

13   . . . .

14   . . . .

15   . . . .

16   . . . .

17   . . . .

18   . . . .

19   . . . .

20   . . . .

21   . . . .

22   . . . .

23   . . . .

24   . . . .

25   . . . .

26   . . . .

27   . . . .

28   . . . .

**POINTS AND AUTHORITIES**

Plaintiff's motion was originally brought as an emergency motion to forbid attorney Walter R. Cannon from making improper objections at depositions and for sanctions and was originally entitled, "Mazzeo's Emergency Motion to Forbid Attorney Walter R. Cannon From Making Improper Objections at Depositions and for Sanctions." Because of Mr. Cannon's egregious conduct as will be further specified herein, sanctions are clearly warranted.

Mr. Cannon's responsive argument is essentially no more than an argument that because Plaintiff's counsel made some wrongful objections himself, that Mr. Cannon should get some credit toward the sanctions he so rightfully deserves, such as five percent off. Included in his opposition are deposition pages in which this counsel did not even speak or in which no objections were ever made. In Plaintiff's initial moving papers, Plaintiff pointed out twenty-five instances where Mr. Cannon made improper objections during the four hours it took to take Greg McCurdy's deposition, and another fifty-two improper objections are included herein from transcripts of depositions which have since become available. (Bill Young's deposition has not yet been received.) During the more than 14 hours Plaintiff was deposed, Mr. Cannon points out 10 objections he apparently feels were improper, of which maybe five would qualify for review. A slew of pages attached to Mr. Cannon's response have no apparent bearing on the matter including this counsel requiring the verification of statements made by Jim Gibbons and including Mr. Cannon's affidavit wherein he apparently did not like Bill Young being made to admit to statements he made during a press conference, and then questioned regarding those statements, even though Young's deposition only took about four hours out of the seven allowed.

One potentially improper comment which was made by this counsel was when Plaintiff was presented with a photo lineup in which the picture of Officer Ortega came from either the world's worst printer or was photoshopped and altered in color to the point that Ortega's skin was more yellow than a Mongolian dying from jaundice. Mr. Cannon also points out that while he likes to drink coffee, this counsel likes to drink Mountain Dew on ice, and other such nonsense, in Mr. Cannon's attempt to divert this Court's attention from his own misconduct

3

1   Mr. Cannon's main excuse for his misconduct was that he was frustrated over the manner

2   in which this counsel conducted his depositions as if this counsel's manner of conducting a

3   deposition is in issue and not Mr. Cannon's wrongful objections.  So without further ado, here

4   are fifty-two more wrongful objections made by Mr. Cannon for which he should be sanctioned:

5   **From the Deposition of Timothy Barker taken May 3, 2010, Exhibit 1, attached hereto:**

6    Q.    Now, we left off September, 1991.  Is that when you entered or graduated
        from the academy?

7

8    Mr. Cannon:  He has already said that is when he graduated.

    The Witness:  That's when I graduated.  I entered the academy the end of
9            February, beginning of March of 1991.  *See,* Exhibit 1, p. 7.

10    * * * *

11    Q.    And how old are you now?

12    Mr. Cannon:  I was going to say you preserve well.

13    The Witness:  46.  *See,* Exhibit 1, p. 8.

14    * * * *

15    Q.    But the – being assigned the misdemeanor batteries, that occurred after
        October 13th, 2006?
16

17    Mr. Cannon:  He just said he cannot tell you when.  It's asked and answered.

        Go ahead, you can answer it again.  *See,* Exhibit 1, p. 10.
18

19    * * * *

20    Q.    ...you made mention that a gal named Julie Vick, a waitress, she wrote out
        a statement, a guy named Creasey –

21    Mr. Cannon:  Just so we are clear, he did not mention the names.  He described a
            waitress.  *See,* Exhibit 1, p. 16.
22

23    * * * *

24    Q.    What had changed between the time that you were comfortable
        interviewing people at the hotel room or wherever and the second set of
25        interviews where you had them come down to the Oakey facility?

26    Mr. Cannon:  Wait a minute.  I am going to object to that question.  He is only
            talking about one person for an interview.  You are using the word
27            "people" in both contexts.  I think that mischaracterizes what he
            testified to.
28

        But you can go ahead and answer the question.  *See,* Exhibit 1, p. 19-20.

4

1       * * * *

2       Q.      And then after being shown that his story didn't necessary match the room
                key log, didn't he then change his story and say that he had lost his key
3               and then walked to the front of the McCormick & Schmick's, and then
                walked back looking for his key, then found his key, then went through the
4               gate directly to his hotel room?

5       Mr. Cannon:   I will object to that. That calls for this witness to read Governor
                      Gibbons' mind. He has no way of knowing why the story was
6                     changed.

7               But go ahead, you can answer that. *See,* Exhibit 1, p. 22.

8       * * * *

9       Q.      If it was an issue, if you were told that she thinks that he stole her keys so
                that he would have an excuse to be with her or walk her into the garage or
10              whatever, wouldn't you – if you had that information, wouldn't standard
                operating procedure be to try to get a search warrant for his hotel room to
11              search for those keys to see if you could find some tangible physical
                evidence that a crime had been committed?

12
        Mr. Cannon:   The crime of taking her keys? Is that what you are asking, to get a
13                    search warrant?

14      Mr. Kossack:  That crime, that crime, but it leads to other things, doesn't it?

15      Mr. Cannon:   Okay. Let me make sure I got your question.

16      Mr. Kossack:  I will not re-explain it to you, Walt.

17      Mr. Cannon:   All right. I will object to it on the basis it is vague and ambiguous.
                      You have switched topics. Do you mean a search warrant to get
18                    her keys? Is that it? For the crime of stealing her keys?

19              Go ahead. You can answer it, if you can.

20      The Witness:  No. That wouldn't have been something that we would have
                      considered at that point... *See,* Exhibit 1, p. 25-26.
21
        * * * *
22

23      Q.      But you would agree, would you not, that as of the time that you were
                interviewing Gibbons, you knew that she had made an allegation that
24              somebody at the table may have picked up her keys?

25      Mr. Cannon:   I will object to that. There is no testimony that he knew that she
                      made it. He hasn't talked to her.
26              Go ahead. *See,* Exhibit 1, p. 27.

27      * * * *

28      . . . .

5

Q.     But at any rate, your understanding was that she was claiming to be –
       having suffered some physical injury during the event and that
       photographs were taken to document the injuries she was claiming?

Mr. Cannon:   I think that misconstrues. He just said photographs were taken of
              her. *See,* Exhibit 1, p. 29.

* * * *

Q.     And then pictures were taken of red marks to her upper arms and a scratch
       to her back; right?

Mr. Cannon:   Wait a minute, wait a minute. That's not what he said, Bob. He
              said her shoulder. He never said anything about her upper back.
              Mischaracterizes.

       Go ahead. You can answer that question. *See,* Exhibit 1, p. 30.

* * * *

Q.     Why did you refer to Mr. Wright's press conference as grandstanding?

A.     I'm not sure.

Mr. Cannon:   Because it probably was. *See,* Exhibit 1, p. 39.

* * * *

Q.     If Anna had told you and Detective Hnatuick that, would you have
       considered that to have been an important statement, that he actually said,
       "I'm going to rape you?"

Mr. Cannon:   If Anna had said it or if Chrissy had said it? *See,* Exhibit 1, p. 43.

* * * *

Q.     ....If that's, in fact, the case that appears four different times in her
       voluntary statement, is that the kind of thing that you would have thought
       important to put in the summary of that statement?

A.     I would have thought that the information was important, but then again,
       we interviewed a lot of different people, and even some of the people she
       spoke to that night didn't say that specific phrase. If that came up and
       Anna is the one that said it, then she's the only one that said it.

Mr. Cannon:   Chrissy didn't say it.

The Witness:   Chrissy didn't say it... *See,* Exhibit 1, p. 44.

* * * *

Q.     Have y ever previously interviewed anyone in your job, working up to this
       point, who claimed that they were the victim of an attempted sexual
       assault?

6

1   Mr. Cannon:  I will object to that. That is irrelevant to this case. She doesn't make that claim. *See,* Exhibit 1, pp. 44-45.

2

\* \* \* \*

3

4   Q.    And sometimes those statements come into evidence as excited utterances and present sense impressions or prior inconsistent statements?

5   Mr. Cannon:  You want his lecture on the law now? *See,* Exhibit 1, p. 46.

6

\* \* \* \*

7   Q.    Was that because she had to think about the answer or didn't want to tell you the answer or how did you read that?

8

9   Mr. Cannon:  It's asked and answered. He just said she was evasive.

Go ahead. *See,* Exhibit 1, p. 48.

10

\* \* \* \*

11

12   Q.    And coming to your decision, wasn't part of the decision based on the fact that, Well, we need a little more here than just her testimony because, after all, he is running for office. He might even win. Five out of ten voters apparently think he is a better guy for the job or whatever, and it was going to be more difficult to make out a case against a politician than it would be against some average Joe?

13

14

15   Mr. Cannon:  To which I am going to object. It is compound, complex, argumentative. It is a plain crap question.

16

But go ahead. *See,* Exhibit 1, p. 52.

17

\* \* \* \*

18

19   Q.    Well, you did have pictures; right? I mean, that was some additional –

Mr. Cannon:  Pictures of what?

20

Mr. Kossack:  Redness to her arms. There is a scratch to her back and so forth.

21

22   Mr. Cannon:  We went through this. There was no scratch to her back. Okay? There is no testimony to that fact.

23   Mr. Kossack:  I can show him the pictures.

24   Mr. Cannon:  Well, the witness has denied it twice. All right?

25   Mr. Kossack:  No, it is not all right. I would prefer you not to interrupt my depo –

26   Mr. Cannon:  Well, I would prefer you to ask a straight question.

27   Mr. Kossack:  – except to make short succinct objections.

28  . . . .

1    Mr. Cannon:  No. You make a short succinct question, and I will make a short
2              succinct objection. When you ask a compound question and you
            misstate what this witness has said, I will object in any way I like.
3              If you don't like it, call the magistrate. *See,* Exhibit 1, p. 53.

\* \* \* \*

4  Q.     What about what happened outside the La Quinta?

5  A.     What about what?

6  Mr. Cannon:  What are you asking? It is vague and ambiguous. Ask a straight
7              question, will you. *See,* Exhibit 1, p. 56.

\* \* \* \*

9  Q.     Did you have – have you had any opportunity to read any of the filings in
        this case?

10 A.     No.

11 Mr. Cannon:  Don't flatter yourself, Bob. *See,* Exhibit 1, p. 57.

\* \* \* \*

13 Q.     What is your estimate of Jim Gibbons' height?

14 A.     How tall, but I –

15 Q.     About six foot?

16 Mr. Cannon:  He has already answered the question. You are asking him to
17             guess.

18 The Witness:  Yes. He is taller than me. *See,* Exhibit 1, p. 58.

\* \* \* \*

20 Q.     So you don't recall that she described her as white, 5 – 5 feet 7, 115, 125
        pounds, long dark hair, pretty in appearance? You don't recall that?

21 A.     What was her height again?

22 Q.     Well, she says 5, 5 foot 7 inches?

23 A.     So anywhere from 5 foot to 5 foot 7?

24 Q.     Yeah. That is quite a –

25 A.     That is quite a stretch.

26 Q.     – quite a stretch.

27 Mr. Cannon: And she said pretty?

8

1   By Mr. Kossack:

2   Q.   She described her appearance as pretty.  Do you recall that?

3   A.   No, I don't remember that specifically.  *See,* Exhibit 1, p. 59.

4   * * * *

5   Q.   Will, didn't she answer, If I had like a side profile maybe, but – because I
         saw him, I think I was looking at his left side, his left profile, and it just –
6        it kind of just doesn't look like it, but previously she said, It – it could be,
         but I really – I don't know.  It just doesn't look like it to me?

7
    Mr. Cannon:   Wait a minute.  If I get it, they showed her photographs and she
8                 said it wasn't her, and now you are trying to ask him for a different
                  answer.
9
    By Mr. Kossack:
10
    Q.   If you understand the question, you may answer it.  If not, I will repeat it.
11
    A.   When she – when we showed her photographs and – it was our
12       understanding after that, that she wasn't able to tell us if that was Chrissy
         Mazzeo and Jim Gibbons.
13
    Q.   Right.  But she was not able to exclude them, either.  Would that be
14       correct?

15  A.   That wasn't our understanding.

16  Mr. Cannon:   Nor normal people's based on that.  *See,* Exhibit 1, p. 60.

17  * * * *

18  Q.   These are some excerpts from Hartnett's statement –

19  A.   Page 5 and then to page 19.

20  Mr. Cannon:   Okay.  I am going to instruct you not to answer any questions with
                  regard to this statement unless you are given the entire statement
21                based on your previous testimony.  *See,* Exhibit 1, p. 64.

22  * * * *

23  Q.   Okay.  So if we look at page 32 where she says, "It could be, but I really –
         I don't know," is there anything in there that you consider where she
24       excludes Gibbons?

25  Mr. Cannon:   All right.  I will instruct you not to answer that question on the
                  basis you don't have the entire statement.
26
    By Mr. Kossack:
27
    Q.  You may answer.
28

9

A.     After –

Mr. Cannon:   Don't answer the question.

By Mr. Kossack:

Q.     So he can only instruct you not to answer on the ground of privilege, otherwise, you have to answer,

Mr. Cannon:   I will – no, he doesn't.  I'm instructing him not to answer.  We will go to the magistrate if you don't like it and we will figure it out.  I am instructing him not to answer.

Don't answer that question. *See,* Exhibit 1, p. 66-67.

* * * *

Q.     Well, it would certainly be a much more important reason for her to drop it than because it was a three-ring circus, wouldn't it?

Mr. Cannon:   More important to who?  Her, him, who?

By Mr. Kossack:

Q.     More important to vindicate Gibbons and bring this case to a close.  In other words, if someone says, I don't want to prosecute because it is a three-ring circus, it is still leaving out there the fact that it might have occurred.  She just doesn't –

Mr. Cannon:   That is assuming they were doing their investigations to vindicate Gibbons, and he's never testified to that fact. *See,* Exhibit 1, p. 101.

**From the Deposition of Mark Colon taken May 3, 2010, Exhibit 2, attached hereto:**

Q.     Was anyone – was anyone interested in making that connection that evening?

Mr. Cannon:   Objection; foundation.

If you know, go ahead.  If you know if anybody else was interested in talking with Mr. Gibbons that evening, that's his question.

A.     I don't know. *See,* Exhibit 2, p. 23.

* * * *

Q.     Did you read his voluntary statement before writing this summary?

A.     You know what, on both of these – or – okay, at least on this one, on the interview by Detective Gillis, I could have either written the statement, or taken it from –

Mr. Cannon:   You mean read the statement?

1    The Witness:  I'm sorry.  Read the statement that he wrote... *See,* Exhibit 2,
2                          p. 25.

     * * * *

3
4    Q.    If she had told you something like that, is that something that should have
            been – you would have considered important enough to put into your
5            summary?

6    Mr. Cannon:  To which I'm going to object.  Why don't you let him review the
                          statement he took from her, and then he can answer the question.

7    Mr. Kossack:  I'm not going to allow that at the present time.  *See,* Exhibit 2,
8                          p. 26.  *See,* Exhibit –, p. 26.

     * * * *

9
10   Q.    Do you know whether or not the taped statement was transcribed at the
            time that you wrote this summary in Exhibit 1?

11   Mr. Cannon:  Objection; asked and answered.

12   By Mr. Kossack:

13   Q.    – or were you working from memory?

14   Mr. Cannon:  Go ahead.  If you understand the question, go ahead.

15   The Witness:  Are you asking me –

16   Mr. Cannon:  Is this transcribed at the time that you wrote 1.

17   The Witness:  No.

18   Mr. Cannon:  Okay.  That's the answer.

19   By Mr. Kossack:

20   Q.    So you were basically working from your memory of what she had told
            you the night before?
21
22   A.    Yes.

     Mr. Cannon:  Objection; that assumes facts in issue, he didn't take notes.
23
            Go ahead sir.
24
25   The Witness:  Yes.  I take – I have a notebook that I write.  *See,* Exhibit 2, pp. 29-
                          30.
26
     * * * *

27   Q.    And was that presented as a way of making it more difficult for a criminal
28          defense attorney to pick apart your testimony?

11

1    A.    No.

2    Mr. Cannon:   Objection; that is argumentative.

3         Go ahead.

4    The Witness:   The idea on it was just so in the files you can have the actual
                    transcription of the interviews and your officer's report.  And if
5                   there is any other, like, official document reports, like crime
                    reports, you keep those.

6

7    Mr. Cannon:   And just so the record is clear, to go back to your previous
                   hypothetical statement, Bob, there is nothing in here about her
                   losing her keys.

8

9    Mr. Kossack:  Well, I will move to strike as argumentative.

10   Mr. Cannon:   I move to strike on the basis that you knew that when you asked
                   him the question, and it was an inappropriate question and it was
11                 an incomplete hypothetical at the time you asked it, and you knew
                   it. *See,* Exhibit 2, p. 31-32.

12   * * * *

13   Q.    So you don't see that as a potential case of coercion?

14   Mr. Cannon:   On those facts, answer his question.

15   The Witness:   No.  *See,* Exhibit 2, p. 34.

16   * * * *

17   Q.    Well, when he says, You can try to leave, at the same time that he is
           holding onto both of her arms with his hands –

18

19   Mr. Cannon:   That doesn't say that.  That misquotes what that is.  You don't
                   have any idea where he was holding, if he was even holding her at
                   the time he said this.

20

21   By Mr. Kossack:

22   Q.    Well, don't let your counsel try to coach you.

23   Mr. Cannon:   I'm not trying to coach you.  I'm objecting to the form of the
                   question.  *See,* Exhibit 2, pp. 34-35.

24   * * * *

25   Q.    Do you see any significance in using the word "try," you can try to leave?

26   Mr. Cannon:   If you can change any of your earlier answer, go ahead and be free
                   to modify it.  You don't have to answer the question twice.  You
27                 have answered it once.

28   By Mr. Kossack:

1    Q.    Actually, you do.

2    Mr. Cannon:    No you don't. If you want to add anything to your previous
answer, go ahead. *See,* Exhibit 2, p. 36.

3

   * * * *

4

5    Q.    First she describes – looking at page 6 – that he is playing footsies with
her; right?

6    Mr. Cannon:    Are you asking him if that's what the statement says? *See,*
Exhibit 2, p. 37.

7

   * * * *

8

9    Q.    Do you recall her telling you that he said at the time, I wish I could have
that kind of affection from her?

10    A.    Yes.

11    Mr. Cannon:    You forgot the laughter part at the end of that. *See,* Exhibit 2,
p. 37.

12

   * * * *

13

14    Q.    And there is a Marriott Residence Inn right next to the McCormick &
Schmick's, is there not?

15    A.    Yes. I mean, I don't know firsthand.

16    Mr. Cannon:    If you don't know, don't guess. Either you –

17    The Witness:    I don't know, sir.

18    Mr. Cannon:    All right. *See,* Exhibit 2, p. 38.

19    * * * *

20

21    Q.    ...If he had grabbed her arms and had physically forced her to move a
distance toward the wall, does that qualify as any crime that you are
familiar with?

22    Mr. Cannon:    I will object. It is an incomplete hypothetical. It is vague and

23    ambiguous with regard to distance. What is a short distance? Feet,
inches –

24    By Mr. Kossack:

25    Q.    Any distance.

26    Mr. Cannon:    – millimeters?

27    By Mr. Kossack:

28    Q.    Doses that fit the criteria of any crime of which you are familiar?

13

1    Mr. Cannon:   If you can answer that, go ahead.

2    The Witness:  Battery. *See,* Exhibit 2, pp. 39-40.

3    * * * *

4    Q.    Does kidnapping require one to be moved out of the structure?

5    Mr. Cannon:   I will object. It is argumentative and it is incomplete, both in terms of the facts that you have provided him.

6

        Go ahead, sir.

7    The Witness:  How does this pertain to me and my role in this case?

8    By Mr. Kossack:

9
10    Q.    Well, I am just kind of relating this to your report, but again, my question was does this fit the criteria of kidnapping if it involved an involuntary movement of the victim?

11
12    Mr. Cannon:   He has already answered that question. He said no. *See,* Exhibit 2, pp. 40-41.

13    * * * *

14
15    Q.    Well, wasn't the key word there the word "try" where she corrected, you said, And one was where you could leave and she answered, One, where you could try to leave?  Wasn't the key –

16    Mr. Cannon:   I will object. He just answered your question.

17    By Mr. Kossack:

18    Q.    Wasn't the key word there "try"?

19    Mr. Cannon:   Objection; asked and answered.

20        Go ahead, sir, you can anser again if you want to change your other answer. *See,* Exhibit 2, pp. 44-45.

21    * * * *

22
23    Q.    Other than your attorney, have you discussed this, your investigation in this case with anybody?

24    A.    No.

25    Mr. Cannon:   Except for the night when he talked with the other detectives, you mean? *See,* Exhibit 2, p. 50.

26
    * * * *

27 . . . .

28 . . . .

14

1  **From the Deposition of Michael Hnatuick, Volume I, taken May 6, 2010, Exhibit 3, attached hereto:**

2

3    Q.     Under normal conditions, if these were just – if this did not involve a [sitting] congressman, if he was just a Joe Blow, would you normally have been assigned this sort of case to investigate?

4

5    Mr. Cannon:  On the same basis as battery?  It is vague and ambiguous.  Is that your question, a simple battery not involving –

6    Mr. Kossack:  You may answer the question as posed.

7    Mr. Cannon:  If you understand it, you can answer it.

8    Mr. Kossack:  All right.  Look, we got into a little tiff last time and the time before.  Now, Walt, if you continue to make coaching objections, speaking objections, illegal objections, I will put an end to the deposition and file a motion with the magistrate and ask for sanctions.

9

10

11   Mr. Cannon:  That's your right.  Go ahead.  Rather than editorialize, just call the magistrate and set an appointment.

12

                            * * * *

13

           Again, if you understand the question, go ahead and answer it.  *See,* Exhibit 3, pp. 7-8.

14

15   * * * *

16   Q.     Okay.  Well, I just happen to have a six-page officers's report right her.

17   Mr. Kossack:  If you can mark that first in order.

18   Mr. Cannon:  Very gifted of you, Bob.  *See,* Exhibit 3, p. 13.

19   * * * *

20   Q.     But Colon's officer report is not dated until noontime or thereafter, isn't it.

21   Mr. Cannon:  It is dated 0900, isn't it – maybe not – 1230.  *See,* Exhibit 3, p. 18.

22   * * * *

23   Q.     All right.  As you developed information in the case, took voluntary statements, got them transcribed, so forth, was the case ever resubmitted to Sergeant Cricket to see if she fit the criteria of the sexual assault case?

24

25   Mr. Cannon:  To which I will object.  There is no testimony that it was ever submitted to her.  *See,* Exhibit 3, p. 20.

26   * * * *

27

28   Q.     Okay.  And that she was forced to move that distance?

1   A.    That is correct.

2   Q.    And that he then held her for a period of time?

3   Mr. Cannon:  Objection.  There is nothing in the statement to that.

4         Go ahead.

5   Mr. Kossack:  Objection.  Again, that is a –

6   Mr. Cannon:  Well, you can take it to the magistrate Bob.  I need it on the record.  I'm paying for the record.  I don't need your editorial comments.

7         Go ahead.

8

9   The Witness:  Okay.  I'm sorry.  What was the follow-up to that?  *See,* Exhibit 3, pp. 34-35.

10   * * * *

11   Q.    And looking on page 14....is that the questions that you asked and the answers that Jim Gibbons gave on October 14, 2006?

12

13   Mr. Cannon:  Who is asking these questions?

14   The Witness:  I believe it was me.  *See,* Exhibit 3, p. 46.

   * * * *

15

16   Q.    And then if we look at page 20.

17   A.    If you could hold on just a second so –

18   Mr. Cannon:  We're not sure who is asking the questions.  He was there, but we're not sure – your question is, did he ask those questions?  *See,* Exhibit 3, pp. 46-47.

19

   * * * *

20

21   Q.    Do you see on the color photograph it looks like a pen arrow pointing to – let me move around to your side of the table.  This arrow right there, is the arrow pointing to the back of the building where Jim Gibbons said that he entered the back of the hotel?

22

23   Mr. Cannon:  To which I will object.

24   Ms. Lundvall: I will object to your question.

25   Mr. Cannon:  There is no indication that that is an arrow.  It could simply be a black spot on the building.

26

27   Ms. Lundvall: And number two, Governor Gibbons does not indicate that he entered in this particular statement the back door of the hotel.

28   Mr. Cannon:  Go ahead.  You can answer.

16

Mr. Kossack:  So that's two for you Pat, and three for you, Walt, of improper objections.

The Witness:  It's my – it's my recollection that the diagram ended with the number 4 circle. I'm seeing what you're pointing to as a possible arrow to the back of the building. I don't believe that that is an arrow. I don't believe that was drawn on there. I think that's part of the image.

By Mr. Kossack:

Q.    Is that where he tried to draw before the government pen kicked out?

A.    I don't know that he ever tried to draw beyond the number 4.

Q.    Well, when you asked him on page 11, Can you tell from here, was it a back door that you entered, how would you get into the hotel from that point?"

       "Answer: Well, this gate goes to the back door that is right here. Right here. (Scribbling with pen) You need a new pen?"

Mr. Cannon:   Wait a minute. There's no question. What's the question?

By Mr. Kossack:

Q.    The question is, did Jim Gibbons indicate that he had entered the back door of the hotel, based on the question and answer?

A.    I believe he indicated that is the way he went. *See,* Exhibit 3, pp. 55-56.

* * * *

Q.    And did he also discuss with you that his key card also worked the back gate, and I refer you to page 17.

A.    Okay.

Mr. Cannon:   Where are you at, please, on page 17? I don't see it. You will have to correct your opposition, Bob. *See,* Exhibit 3, p. 62.

* * * *

Q.    And then if we look at page 18, did he then change his statement where he answered – well, the question was, uh, unfortunately, that does not record the time, referring to the gate.

       "Answer: Well, uhm, I do know that when I first tried the gate, the gate wouldn't open for me."

       Is that what he then told you?

Mr. Cannon:   Well, that's argumentative as to what he then told him. That suggests something else.

1      But go ahead. *See,* Exhibit 3, pp. 63-64.

2      * * * *

3      Q.     Okay.  Would it surprise you to learn that at deposition Gibbons said that
       he didn't enter the back gate, he went around to the front, couldn't find his
4      car, went back to the gate, found his card, but then went back to the front
       and entered through the front door?

5
       Mr. Lundvall: I will object.  It is one of the most impermissible questions to ask
6                    one witness as to opine as to the credibility of another witness.

7      Mr. Cannon:   I will also object.  I don't recall exactly what Governor Gibbons
                     said as far as that is concerned, and you are now asking him to
8                    speculate and express surprise, which is irrelevant.

9          But go ahead.

10     The Witness:  Yes.  Yes.

11     Mr. Cannon:   Oh, shoot.  Don't I get another mark.  *See,* Exhibit 3, pp. 66-67.

12     * * * *

13     Q.     Do you recall that Anna told you that Chrissy said that he had her pinned
       against the wall in the parking garage?

14
       Mr. Cannon:   Okay.  This is Anna telling the 911 operator what Chrissy said?  Is
15                   that your – *See,* Exhibit 3, p. 72.

16     * * * *

17     Q.     I guess my question is as a reason not to go forward, being on one hand
       intoxicated, misunderstanding, and on the other hand, just didn't want to
18     go up against Jim Gibbons and be involved in a three-ring circus, which of
       those two reasons for not wanting to go forward would be most significant
19     to the case, in your opinion?

20     Mr. Cannon:   Objection.  Asked and answered.  He just answered that twice.

21            Go ahead.  If you can modify your earlier answer, feel free to do so.
       *See,* Exhibit 3, p. 97.
22

23     **Legal argument**

24         Mr. Cannon has made a mockery of the deposition process which is suppose to go much

25     like an examination would take place in a court of law during a trial.  Counsel should state the

26     basis of the objection and nothing more. *McDonough v. Keniston,* 188, F.R.D. 22, 24 (D.N.H.

27     1998).  Speaking objections and coaching objections are simply not permitted in depositions. *Id.*

28     This counsel was entitled to have the witness, and the witness alone answer his questions. *Hall*

1  *v. Clifton Precision,* 150 F.R.D. 525, 525-526 (E.D.Pa. 1993).  The record shows constant and

2  continuous objections made in an argumentative and suggestive manner and, sometimes, merely

3  to provoke and/or insult this counsel.  Mr. Cannon instructed his clients not to answer questions

4  not based on preserving any privilege, and he sought to impede, delay and, especially, to frustrate

5  this counsel getting at the truth.  Sanctions in the form of attorney's fees should be awarded for

6  Plaintiff needing to bring her motion in her attempt to stem Mr. Cannon's behavior prior to Bill

7  Young's deposition as such sanctions are appropriate.  Additional sanctions as this Court deems

8  just, equitable and proper under the circumstances should also be imposed pursuant to FRCP

9  30(d)(2).  Mr. Cannon should not be able to slip out of his just deserts simply because this Court

10  could not hear Plaintiff's motion on an emergency basis.

11  **Conclusion**

12  In conclusion, Mazzeo's Emergency Motion to Forbid Attorney Walter R. Cannon From

13  Making Improper Objections at Depositions and for Sanctions should be granted in its entirety,

14  and Plaintiff's counsel should be invited to submit an attorney fee bill for needing to file

15  Plaintiff's motion and this reply.

16  **Dated** this 30th day of May, 2010.

17  KOSSACK LAW OFFICES

18

19  By      /s/
          ROBERT J. KOSSACK, ESQ.
20        Nevada Bar No. 2734
          4535 W. Sahara Avenue, Suite 101
21        Las Vegas, Nevada  89102
          Ph. (702) 253-7068
22        Fx. (702) 368-0471
          Email  rjkossack@cox.net
23        *Attorney for Plaintiff Chrissy Israel Mazzeo*

24  . . . .

25  . . . .

26  . . . .

27  . . . .

28  . . . .

19

**NOTICE OF ELECTRONIC FILING PURSUANT TO LOCAL RULE 5-3**
**AND SERVICE PURSUANT TO LOCAL RULE 5-4**

I hereby certify under penalty of perjury, that I am an employee of Kossack Law Offices, and pursuant to the Local Rules of Practice of the United States District Court District of Nevada ("LR"), Rule 5-3, on the 30th day of May, 2010, I caused to be electronically filed with the Clerk of the Court a true and correct copy of the foregoing MAZZEO'S REPLY TO OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION RE: SPEAKING OBJECTIONS AT DEPOSITIONS using the CM/ECF system and, thereby, pursuant to LR 5-4 such Notice of Electronic Filing constitutes service of the filed document upon each party in the case who is registered as an electronic case filing user with the Clerk of the Court of which such parties' attorneys of record are on the following list:

Robert J. Kossack, Esq.
KOSSACK LAW OFFICES
4535 West Sahara Avenue, Suite 101
Las Vegas, Nevada 89102
rjkossack@cox.net
*Attorney for Plaintiff Chrissy Israel Mazzeo*

Patricia K. Lundvall, Esq.
Carla B.  Higginbotham, Esq.
McDONALD CARANO WILSON LLP
2300 West Sahara Avenue, Suite 1000
Las Vegas, Nevada 89102
lundvall@mcdonaldcarano.com
emuhlebach@mcdonaldcarano.com
mmonson@mcdonaldcarano.com
chigginbotham@mcdonaldcarano.com
carhiggy@sbcgobal.net
kryd@mcdonaldcarano.com
*Attorneys for Defendant James Arthur "Jim" Gibbons*

Walter R. Cannon, Esq.
Thomas D Dillard, Esq.
OLSON, CANNON, GORMLEY & DESRUISSEAUX
9950 West Cheyenne Avenue
Las Vegas, Nevada 89129
nlangenderfer@rocgd.com
mburgener@rocgd.com
*Attorneys for Defendants Las Vegas Metropolitan Police Department and Bill Young*

. . . .

. . . .

. . . .

20

1   **NOTICE OF ELECTRONIC FILING PURSUANT TO LOCAL RULE 5-3**
    **AND SERVICE PURSUANT TO LOCAL RULE 5-4, SERVICE LIST CONTINUED:**
2

3       C. Stanley Hunterton, Esq.
        HUNTERTON & ASSOCIATES
4       333 South Sixth Street
        Las Vegas, Nevada  89101
5       shunterton@huntertonlaw.com
        janallen@huntertonlaw.com
6       *Attorneys for Defendant Sigmund "Sig" Rogich*

7

8                                           _____/s/_____
9                                           ROBERT J. KOSSACK, ESQ.
                                            An employee of Kossack Law Offices
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    21

# EXHIBIT 1

# EXHIBIT 1

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF NEVADA
 3                  SOUTHERN DIVISION
 4                     * * * * *
    CHRISSY ISRAEL MAZZEO,      )
 5                              )
         Plaintiff,   )  Case No.
 6                              )  2:08-CV-01387
         vs.          )  -R.H.-PAL
 7                              )
    JAMES ARTHUR "JIM" GIBBONS; )
 8  SIGMUND "SIG" ROGICH; LAS   )
    VEGAS METROPOLITAN POLICE   )
 9  DEPARTMENT; BILL YOUNG;     )
    DONALD J. CAMPBELL; PENNIE  )
10  MOSSETT-PUHEK; and DOES     )
    1-20,                       )
11                              )
         Defendants.   )
12  _____  )
13
14
15
16          DEPOSITION OF TIMOTHY BARKER
17
18          Taken on Monday, May 3, 2010
               At 3:40 P.M.
19
20           At Kossack Law Offices
            4535 West Sahara Avenue
21                Suite 101
              Las Vegas, Nevada
22
23
24
25
    Reported by:  CAMEO KAYSER, RPR, CCR No. 569
```

Page 2

```
 1  APPEARANCES:
 2
    For the Plaintiff:
 3      ROBERT J. KOSSACK, ESQ.
        Kossack Law Offices
 4      4535 West Sahara Avenue
        Suite 101
 5      Las Vegas, Nevada 89102
 6
 7  For the Defendants Las Vegas Metropolitan Police
    Department and Bill Young:
 8      WALTER R. CANNON, ESQ.
        Olson, Cannon, Gormley & Desruisseaux
 9      9950 West Cheyenne Avenue
        Las Vegas, Nevada 89129
10
11               I N D E X
    WITNESS                         PAGE
    TIMOTHY BARKER
12
    EXAMINATION BY MR. KOSSACK         3
13
14          E X H I B I T S
15  EXHIBITS                        PAGE
16  EXH. NO. 1   Officer's Report      15
17  EXH. NO. 2   Voluntary Statement      16
                 Chrissy Mazzeo
18
    EXH. NO. 3   Voluntary Statement      21
19               James Gibbons
20  EXH. NO. 4   Voluntary Statement      38
                 Stefanie Damelio
21
    EXH. NO. 5   Voluntary Statement      64
22               Kimberly Hartnett - Partial
23  EXH. NO. 6   Voluntary Statement      68
24
25
```

Page 3

```
 1          (Thereupon, Rule 30(b)(4) was waived
 2      prior to the commencement of the
 3      deposition proceedings.)
 4  Thereupon --
 5          TIMOTHY BARKER
 6  was called as a witness by the Plaintiff, and having
 7  been first duly sworn, testified as follows:
 8          EXAMINATION
 9  BY MR. KOSSACK:
10      Q.  Would you please state your full name for
11  the record and spell it.
12      A.  Timothy John Barker, T-i-m-o-t-h-y,
13  J-o-h-n, B-a-r-k-e-r.
14      Q.  What is your position?
15      A.  I'm a patrol sergeant assigned to
16  Southeast Area Command for the Las Vegas
17  Metropolitan Police Department.
18      Q.  Was that your job position on
19  October 13th, 2006?
20      A.  No.  On October 13th, 2006, I was a
21  detective assigned to the Violent Crimes section.
22          MR. CANNON:  Congratulations on your
23  promotion.
24          THE WITNESS:  Thank you.
25  BY MR. KOSSACK:
```

Page 4

```
 1      Q.  All right.  So let us get some of your
 2  brief history here.  You graduated from high school?
 3      A.  Yes.
 4      Q.  Where was that?
 5      A.  Emmaus High School in Emmaus,
 6  Pennsylvania.
 7      Q.  And then what did you do after high
 8  school?
 9      A.  I attended Penn State University,
10  graduated with a bachelor of science degree in
11  criminal justice.
12      Q.  And from there?
13      A.  Joined the United States Marine Corps.  I
14  was an officer in the Marines for approximately four
15  years.
16      Q.  What years were those?
17      A.  1986 to 1990.
18      Q.  And you were a sergeant, an officer?
19      A.  I was an officer, first lieutenant.
20      Q.  Did you go to officer training school or
21  did you go through ROTC?
22      A.  I went through what is called the platoon
23  leaders class.  It is an officer candidate school.
24  I did all of my training in Quantico, Virginia.
25      Q.  And so you got out of the Marine Corps in
```

Page 5

1  1990?
2      A.  Correct.
3      Q.  And what did you do after that?
4      A.  Just part-time job until February of 1991
5  when I joined the Las Vegas Metro Police.
6      Q.  When did you first apply to enter the
7  academy?
8      A.  While I was still in the Marines,
9  approximately six months before I joined the
10  department.
11      Q.  And what kind of part-time jobs did you
12  hold in the meantime?
13      A.  Loss prevention at a Hess' Department
14  Store.
15      Q.  Basically catching shoplifters?
16      A.  Correct.
17      Q.  So when did you graduate from the
18  academy?
19      A.  I graduated from the academy around
20  September of 1991.
21      Q.  Before I get too much further, I should
22  have done this at the beginning.
23      Have you had your deposition taken
24  before?
25      A.  Not that I can recall, no.

Page 6

1      Q.  Never?
2      A.  No.
3      Q.  Never sued anybody, never been sued by
4  anybody?
5      A.  No.
6      Q.  And the oath that you took is the same
7  oath that you would take in a court of law.
8      A.  Yes.
9      Q.  At the end of the deposition, the court
10  reporter will transcribe everything that is said
11  here on the record.  You will receive this in a
12  booklet form, which you will be able to review.  If
13  you believe that the court reporter has
14  mistranscribed anything that was said, you will be
15  able to make changes to the transcript.
16      But if any of those changes make a major
17  alteration of your testimony -- let us say this is
18  an auto accident and you testified the light was
19  red, and then you changed your answer and put green,
20  that would be a big enough of a change that any
21  attorney would be able to comment on that at the
22  time of trial in order to impeach you.
23      Do you understand that?
24      A.  I do.
25      Q.  Of course, your answers have to be

Page 7

1  audible for the court reporter.  If I have asked a
2  question, I am going to assume that you understood
3  the question if you go ahead and answer the
4  question.  If you do not understand the question,
5  tell me that you do not understand it, ask me to
6  repeat it or rephrase it, because otherwise, I will
7  assume that you understood the question before
8  giving your answer.  Okay?
9      A.  Yes.
10      Q.  And is there any reason that your
11  deposition cannot go forward today, such as lack of
12  sleep or under some sort of medication or anything
13  like that?
14      A.  No.
15      Q.  Now, we left off September 1991.  Is that
16  when you entered or graduated from the academy?
17      MR. CANNON:  He has already said that is
18  when he graduated.
19      THE WITNESS:  That's when I graduated.  I
20  entered the academy the end of February, beginning
21  of March of 1991.
22  BY MR. KOSSACK:
23      Q.  And then you first worked as a patrol
24  officer?
25      A.  Correct.

Page 8

1      Q.  And how many years did you work as a
2  patrol officer?
3      A.  Oh, I worked, I believe, about one and a
4  half years as a patrol officer up in Las Vegas, and
5  then I transferred down to the Laughlin substation
6  where I worked an additional couple of years as a
7  patrol officer in Laughlin before transferring to a
8  plainclothes assignment in Laughlin.
9      Q.  And what was that plainclothes
10  assignment?
11      A.  It was called the utility squad.  It was
12  kind of like a problem-solving unit.
13      Q.  I think I have to ask this.  You have a
14  bit of an accent.  Where is that from?
15      A.  From England.  I'm originally English.  I
16  emigrated in 1979.
17      Q.  And how old were you then?
18      A.  16.
19      MR. CANNON:  60?
20      THE WITNESS:  16.
21  BY MR. KOSSACK:
22      Q.  And how old are you now?
23      MR. CANNON:  I was going to say you
24  preserve well.
25      THE WITNESS:  46.

BY MR. KOSSACK:

Q. When was it that you first learned that there was some sort of incident at the McCormick & Schmick's on October 13th, 2006?

A. Approximately 9:00, 9:30 the morning of the 14th.

Q. And who informed you?

A. Captain Dillon.

Q. What did he tell you at that time?

A. I don't remember the exact words other than that there was an accusation that a woman had been beaten by Jim Gibbons, who was a gubernatorial candidate.

Q. Was it your understanding that that is why you were assigned the case?

A. Yes.

Q. Would you normally have been assigned that kind of a case if it was just a battery involving two people?

A. No.

Q. Would you have been assigned the case if there was an allegation of sexual assault?

A. No.

Q. So what kind of cases would you normally be assigned?

A. When Violent Crimes was first created, we were assigned felony cases, assault with deadly weapons, battery with a deadly weapon, battery on an officer. At some point, we were also assigned misdemeanor battery cases, but I'm not exactly sure when that transition took place because that was initially being handled by another unit.

Q. But the -- being assigned the misdemeanor batteries, that occurred after October 13th, 2006?

MR. CANNON: He just said he cannot tell you when. It's asked and answered.

Go ahead, you can answer it again.

THE WITNESS: Like I said, I can't -- in terms of being called and sent out to the field to investigate a battery, we probably would never have done that. In terms of doing some follow-up on a misdemeanor battery case, at some point, yes, we would have done that, but I don't know at which date we would have done that.

I can't remember whether by October 14th of 2006 if the unit Violent Crimes was handling and following up on misdemeanors at that point. I know that at some point we started -- it was a new unit. We had started doing felony cases only, and General Investigations were handling the misdemeanor battery

cases. And then at some point General Investigations was dissolved, and we took on handling misdemeanor cases. But I do not know what date that was or whether at that point we were already doing those.

BY MR. KOSSACK:

Q. Was that a general reshuffling of the department and what units were going to handle what?

A. Correct.

Q. Did that result in some sort of written directive?

A. I'm sure it did. I'm sure there would have been some type of directive that was put out, procedural or et cetera.

Q. You would no longer have that directive?

A. No.

Q. So when you arrived at work around 9:00 o'clock, and that is when you first learned about this?

A. I would have arrived around about 6:00 o'clock in the morning at work. It was sometime around 9:00 o'clock that we were informed of the incident.

Q. And how did that come about?

A. I believe -- I worked with -- my partner

at the time was Detective Hnatuick. Detective Hnatuick received a phone call from the captain asking to meet with him, and that's when we were informed.

Q. And you and Hnatuick were partners?

A. Myself and Hnatuick worked the same shift, same days off, and yes, we could be considered partners, but we had our own separate case loads.

Q. Did you have your own separate cars?

A. Yes.

Q. When you handled this case, did you go in separate cars or in one car?

A. One car.

Q. So did -- and what is Captain Dillard's (sic) first name?

A. Jim, James.

Q. So when Captain Dillard called you --

A. It is Dillon.

MR. CANNON: Dillon.

MR. KOSSACK: Dillon.

THE WITNESS: D-i-l-l-o-n.

BY MR. KOSSACK:

Q. And Captain Dillon, he called you into his office?

Page 13

1    A.  Yes.
2    Q.  And who was all in attendance, if you
3  recall?
4    A.  It was myself, Detective Hnatuick at the
5  time -- he is now Sergeant Hnatuick --
6  Captain Dillon, and I believe Sergeant Nagle was
7  there.  He's the graveyard Major Crimes sergeant.
8  Detective Marc Colon, and Detective Matt Gillis.
9  I'm not sure whether our lieutenant was there or not
10  at that time.
11    Q.  Sergeant Nagle, would he normally be off
12  shift at that time?
13    A.  Yes.
14    Q.  Same with Colon?
15    A.  Correct.
16    Q.  And the same with Gillis?
17    A.  Yes.
18    Q.  Do you know whether they were called back
19  or whether they had stayed?
20    A.  I'm not sure about Sergeant Nagle.  I
21  know that Detectives Colon and Gillis had secured
22  and they were called back.
23    Q.  So you come into that meeting, and I
24  guess you are saying, What's up, and what were you
25  told at that meeting?

Page 14

1    A.  Again, I don't believe any specific notes
2  were taken about the meeting.  It was a long time
3  ago.  I don't specifically remember what was said at
4  the meeting, but what we were told was that there
5  had been an incident the previous night, that a
6  woman was claiming that she was beaten by
7  Jim Gibbons and that Jim Gibbons was currently a
8  congressman and running for governor of Nevada.
9    Q.  So did that give the case a higher
10  priority?
11    A.  Yes.
12    Q.  You kind of wanted to resolve the issues
13  and find out what happened as soon as possible?
14    A.  I wouldn't say that we wanted to find out
15  what happened as soon as possible, but we wanted to
16  investigate the incident.
17    Q.  Was there any input that you learned of
18  from Sheriff Young at that time?
19    A.  No.
20    Q.  And what written documentation did you
21  review at that time that you took with you from that
22  meeting?
23    A.  We didn't take anything from the meeting
24  in terms of written documentation at that time, I
25  don't believe.

Page 15

1    Q.  Had you written -- had you read over any
2  of the written documentation before you interviewed
3  Gibbons later that afternoon?
4    A.  Yes.
5    Q.  What had you reviewed?
6    A.  I believe we had collected the crime
7  report that had been completed, and at some point
8  during the morning, I know that Detective Colon, who
9  conducted a taped interview with the victim, and
10  that was in the process of being transcribed, so at
11  some point during that initial meeting, I believe
12  that we -- that we read over that.  There may have
13  been some other statements that had been taken by a
14  waitress that night at McCormick & Schmick's that we
15  also reviewed.
16    MR. KOSSACK:  So I am going to mark as
17  Plaintiff's 1 to the depo.
18    (Whereupon, Exhibit No. 1 was
19    marked for identification.)
20  BY MR. KOSSACK:
21    Q.  Let me show you Plaintiff's 1.  This was
22  Detective Colon's report.  Is that one of the
23  documents that you received?
24    A.  Yes.
25    MR. KOSSACK:  And this, let me mark this

Page 16

1  as 2.
2    (Whereupon, Exhibit No. 2 was
3    marked for identification.)
4  BY MR. KOSSACK:
5    Q.  Exhibit 2, is that a copy of the
6  transcribed statement that you had received?
7    A.  Yes, this appears to be.
8    Q.  And then you would have received
9  Chrissy's original voluntary statement that she
10  wrote out?
11    A.  Yes.  Although I don't -- I don't
12  remember that she had done one, but yes, we would
13  have.
14    Q.  And I am going to take a real quick break
15  and make a copy of that as soon as we get to a
16  break.
17    So other than the documents in front of
18  you and her one-page statement, and then you said --
19  you made mention that a gal named Julie Vick, a
20  waitress, she wrote out a statement, a guy named
21  Creasey --
22    MR. CANNON:  Just so we are clear, he did
23  not mention the names.  He described a waitress.
24  BY MR. KOSSACK:
25    Q.  Do you recall that as the name of the

Page 17

1  waitress that wrote out a statement?
2      A.  I recall that Julie Vick was the
3  waitress, correct.
4      Q.  Do you recall a Christopher Creasey?
5      A.  I do recall the name, yes.
6      Q.  And do you recall he was in the valet
7  area working an auction or something and he wrote a
8  statement?
9      A.  I don't remember reviewing it at that
10  time.
11      Q.  Other than the statements, did you have
12  any other information available to you prior to
13  interviewing Jim Gibbons later that afternoon?
14      A.  Not that I'm aware.
15      Q.  Did anyone tell you that there was an
16  issue about whether or not Gibbons had stolen
17  Chrissy Mazzeo's keys?
18      A.  No.
19      Q.  Do you recall questioning Gibbons about
20  missing keys?
21      A.  I -- not in the initial interview.  I
22  think we -- I think in the follow-up interview that
23  we did with him, the second interview, I believe we
24  questioned him about keys at that point.  But
25  initially, I had no information about missing keys,

Page 18

1  and I don't believe it was a question that we asked
2  him at that time.
3      Q.  How was it arranged for you to meet and
4  interview Gibbons?
5      A.  Earlier -- early in the afternoon of the
6  14th, we were told that an interview had been
7  arranged and that we were to meet him at the
8  Residence Inn.  I believe the interview was set for
9  3:00 o'clock in the afternoon.
10      Q.  And who told you that?
11      A.  I honestly don't know exactly who.  It
12  would have been either -- more than likely, it would
13  have been either -- it could have been
14  Captain Dillon, it could have been Sergeant
15  Matt McCarthy.  I'm not exactly sure who told us.
16      Q.  Who is Matt McCarthy?
17      A.  Matt McCarthy was the sergeant in
18  Violent Crimes at the time.
19      Q.  Were you instructed that you were to
20  interview him at the Residence Inn?
21      A.  We weren't instructed.  We were told
22  that's where he was, the interview had been set up.
23      Q.  When you normally interview a suspect, do
24  you generally cart him off downtown before
25  interviewing him?

Page 19

1      MR. CANNON:  I will object to the form of
2  the question.  It is vague and ambiguous as to the
3  kind of crime, the circumstances, et cetera.
4      But go ahead, you can answer it if you
5  understand it the way it is being given to you.
6      THE WITNESS:  No.  It's -- we don't
7  normally cart off people anywhere to interview them.
8  BY MR. KOSSACK:
9      Q.  So your standard operating procedure
10  would be to interview them when you find them?
11      A.  Initially.  Initially, if we find them in
12  the field, that would be a standard practice.
13      Q.  Now, later on when this case was
14  reopened, you had everyone come down to the Oakey
15  facility, didn't you?
16      A.  Correct.
17      Q.  What had changed between the time that
18  you were comfortable interviewing people at the
19  hotel room or wherever and the second set of
20  interviews where you had them come down to the Oakey
21  facility?
22      MR. CANNON:  Wait a minute.  I am going
23  to object to that question.  He is only talking
24  about one person for an interview.  You are using
25  the word "people" in both contexts.  I think that

Page 20

1  mischaracterizes what he testified to.
2      But you can go ahead and answer the
3  question.
4      THE WITNESS:  We were in the middle of an
5  investigation.  We had done a lot more work at that
6  point.  At that point we wanted to interview people
7  on our terms.  In the initial investigation with
8  limited information, we saw no problem with going
9  into the field and interviewing him.  But for a
10  secondary interview, we wanted him at our location.
11  BY MR. KOSSACK:
12      Q.  Is that because it is less likely the
13  person is going to feel comfortable and more likely
14  that they are going to trip up in their testimony or
15  were there strategic reasons for that?
16      A.  Yes.
17      Q.  What would those strategic reasons be?
18      A.  You want to take a potential suspect out
19  of their environment where they feel most
20  comfortable.  You want to take them out of that
21  environment, put them in your cold, sterile
22  environment, and hopefully have more of an upper
23  hand when it comes to the interview.
24      Q.  But that did not apply the first time
25  that you interviewed Gibbons?

Page 21

1     A.  No.
2         (Whereupon, Exhibit No. 3 was
3         marked for identification.)
4  BY MR. KOSSACK:
5     Q.  I am handing you what has been marked as
6  Plaintiff's Exhibit 3 to this deposition and ask if
7  you can identify that document.
8     A.  This is a transcribed statement of the
9  interview that myself and Detective Hnatuick
10  conducted with James Gibbons the morning after the
11  incident, and this was conducted at his room at the
12  Residence Marriott Inn.
13     Q.  And what time of the day was that
14  conducted?
15     A.  The interview started at 1455 hours.
16     Q.  So in layman's terms, what time of day
17  was that?
18     A.  2:55 in the afternoon.
19     Q.  And then you later on interviewed Gibbons
20  a second time; is that correct?
21     A.  That is correct.
22     Q.  And were there discrepancies between the
23  testimony he gave the first time and the testimony
24  he gave the second time that you recall as you sit
25  here right now?

Page 22

1     A.  No.
2     Q.  Did you recall at the time of the second
3  interview confronting him with a log showing when
4  his key card had been used to enter and exit his
5  hotel room?
6     A.  Yes, I do.
7     Q.  And didn't he first tell you, this
8  interview on October 14, that he had gone from the
9  McCormick & Schmick's to the back gate of the hotel,
10  and then through the back gate and up directly to
11  his hotel room?
12     A.  Yes.
13     Q.  And then after being shown that his story
14  didn't necessarily match the room key log, didn't he
15  then change his story and say that he had lost his
16  key and then walked to the front of the McCormick &
17  Schmick's, and then walked back looking for his key,
18  then found his key, then went through the gate
19  directly to his hotel room?
20     MR. CANNON:  I will object to that.  That
21  calls for this witness to read Governor Gibbons'
22  mind.  He has no way of knowing why the story was
23  changed.
24     But go ahead, you can answer that.
25     THE WITNESS:  I do remember him saying

Page 23

1  that in his second statement, yes.
2  BY MR. KOSSACK:
3     Q.  Did you consider that a material change
4  of his testimony?
5     A.  No.
6     Q.  Then why did you confront him with a key
7  card log?
8     A.  Initially when we interviewed him, we
9  didn't have that information.  We had no reason to
10  believe that his -- his story had changed.  We
11  didn't have -- we weren't having a direct question.
12  It was a general question.  We didn't have that
13  information in the initial interview.  When we were
14  speaking or interviewing him initially, it was
15  generalized questions.  We weren't really being
16  specific.  We weren't necessarily looking for a
17  specific answer.
18        In the second interview we had that
19  information, so we were more direct and more
20  specific, and that required a more specific answer
21  from Jim Gibbons.
22     Q.  And do you recall that under either
23  answer, he testified that he went through the back
24  gate at that time and directly up to his hotel room
25  once he finally got through the back gate?

Page 24

1     A.  Could you rephrase that.  I'm -- I
2  misunderstand.
3     Q.  Regardless of how many trips he took to
4  the front of the hotel, was it your understanding by
5  the time that you had completed the second interview
6  with him, that the way he had gotten into the hotel
7  was to go through the back gate and through the back
8  door and then directly up to his room?
9     A.  Yes.
10     Q.  Now, looking at exhibit -- this
11  statement, what is that?  3?
12     A.  3.
13     Q.  Looking at Exhibit 3, and if you turn to
14  page 18, you might recall before I asked you whether
15  there was any discussion about her keys, and you
16  said you did not recall any, but here you are asking
17  at the first full paragraph up from the bottom where
18  you are asking it says, One of the other things she
19  had said is that at some point she had lost her
20  keys.  She doesn't know -- doesn't know where
21  they -- somebody at the table may have picked up her
22  keys.
23        Do you see that statement?
24     A.  I do, yes.
25     Q.  So does that refresh your memory that at

1  the time that you interviewed Gibbons, the afternoon
2  after the incident, that you had information that
3  she had reported that she had lost her keys?
4      A.  Yes.
5      Q.  Now, where did you receive that
6  information?
7      A.  I have no idea.
8      Q.  Now, I'm going to represent to you that
9  it is not in Colon's report --
10     MR. CANNON:  Colon's, please.
11  BY MR. KOSSACK:
12     Q.  Colon.  And it is not in her statement
13  given at 1:30 that morning.  So do you think this
14  was something that was told to you at that
15  9:00 o'clock meeting?
16     A.  It could have been, but I wouldn't
17  remember, honestly.
18     Q.  If it was an issue, if you were told that
19  she thinks that he stole her keys so that he would
20  have an excuse to be with her or walk her into the
21  garage or whatever, wouldn't you -- if you had that
22  information, wouldn't standard operating procedure
23  be to try to get a search warrant for his hotel room
24  to search for those keys to see if you could find
25  some tangible physical evidence that a crime had

1  been committed?
2      MR. CANNON:  The crime of taking her
3  keys?  Is that what you are asking, to get a search
4  warrant?
5      MR. KOSSACK:  That crime, that crime, but
6  it leads to other things, doesn't it?
7      MR. CANNON:  Okay.  Let me make sure I
8  got your question.
9      MR. KOSSACK:  I will not re-explain it to
10  you, Walt.
11     MR. CANNON:  All right.  I will object to
12  it on the basis it is vague and ambiguous.  You have
13  switched topics.  Do you mean a search warrant to
14  get her keys?  Is that it?  For the crime of
15  stealing her keys?
16     Go ahead.  You can answer it, if you can.
17     THE WITNESS:  No.  That wouldn't have
18  been something that we would have considered at that
19  point.  We had no evidence that he had taken his
20  [sic] keys.  We had no evidence of a location of the
21  keys.  We had very, very limited information, and
22  again, I'm not sure exactly where I got that
23  information, but we wouldn't have had enough
24  information or enough evidence to document in order
25  to get a judge to sign off on a search warrant to

1  look for some keys.
2  BY MR. KOSSACK:
3      Q.  You could have asked him to voluntarily
4  allow you to search his hotel room, couldn't you?
5      A.  I could have, but again, without -- like
6  I said, I don't know whether this was a flippant
7  remark that was made.  I don't know if this was a
8  specific information that was given to me from
9  somebody.  I don't know where we initially got
10  information that her keys were missing.  I don't
11  know who that came from or who told me that.
12     Q.  Well, do you recall receiving information
13  that she thought that somebody at the table had
14  picked up her keys?
15     A.  No.  Again, I don't know where the
16  initial information on the keys came from.
17     Q.  But you would agree, would you not, that
18  as of the time that you were interviewing Gibbons,
19  you knew that she had made an allegation that
20  somebody at the table may have picked up her keys?
21     MR. CANNON:  I will object to that.
22  There is no testimony that he knew that she made it.
23  He hasn't talked to her.
24     Go ahead.
25     THE WITNESS:  Again, I don't know.  It

1  appears to me, from looking at this voluntary
2  statement, that I know that her keys were missing,
3  but whether she lost them at the table, somebody
4  picked them up, she lost them walking into the place
5  to begin with, I have no idea where or how she lost
6  her keys.
7  BY MR. KOSSACK:
8      Q.  Was it your understanding that she felt
9  that somebody at the table may have picked up her
10  keys?
11     MR. CANNON:  Asked and answered,
12  objection.
13     Go ahead, sir.
14     THE WITNESS:  Again, well, I mean, in my
15  question here, I -- mentions somebody may have
16  picked up her keys, but again, I hadn't even talked
17  to her at that point, so I'm not sure where that
18  information came from.
19  BY MR. KOSSACK:
20     Q.  Was it your understanding that she had
21  been photographed the evening before?
22     A.  Yes.
23     Q.  And what was the purpose of those
24  photographs then, to your knowledge?
25     A.  To document the clothing that she was

1 wearing at the time and any injuries she may have
2 sustained or that she claims she had.
3     Q.  And were there claimed injuries?
4     A.  Yes.
5     Q.  And what were those claimed injuries?
6     A.  She had some -- a redness around her
7 neck, an injury on one of her shoulders, or a
8 scratch, I believe, on the shoulder.
9     Q.  Was she -- was it also photographed to
10 document red marks around her upper arms?
11     A.  I don't remember -- I don't necessarily
12 remember that.
13     Q.  But at any rate, your understanding was
14 that she was claiming to be -- having suffered some
15 physical injury during the event and that
16 photographs were taken to document the injuries she
17 was claiming?
18        MR. CANNON:  I think that misconstrues.
19 He just said photographs were taken of her.
20 BY MR. KOSSACK:
21     Q.  You may answer.
22        MR. CANNON:  Go ahead.
23        THE WITNESS:  I don't remember whether
24 she specifically said that the injuries were a
25 result of an event that had occurred that night.

1 I -- I thought at one point she might have stated
2 somewhere that she didn't know where she got the
3 injuries from or how they had occurred, so --
4 BY MR. KOSSACK:
5     Q.  Well, she had described him as having
6 grabbed her upper arms forcefully, hadn't she?
7     A.  Correct.
8     Q.  And she had described him pushing her
9 into a wall; right?
10     A.  Yes.
11     Q.  And then pictures were taken of red marks
12 to her upper arms and a scratch to her back; right?
13     A.  Pictures --
14        MR. CANNON:  Wait a minute, wait a
15 minute.  That's not what he said, Bob.  He said her
16 shoulder.  He never said anything about her upper
17 back.  Mischaracterizes.
18        Go ahead.  You can answer that question.
19        THE WITNESS:  Pictures were taken of a
20 scratch on her shoulder.  Pictures were taken of a
21 redness around her neck, and I believe there were
22 some pictures that were taken of her arm, but I
23 don't remember seeing any -- in those pictures I
24 don't remember seeing any redness, any marks that
25 were distinguishable in those photographs.

1 BY MR. KOSSACK:
2     Q.  Did the ID technician report redness to
3 the upper arms?
4     A.  I can't remember without reviewing his
5 report.
6     Q.  Would that be an Officer McGhee,
7 M-c-G-h-e-e?
8     A.  It could possibly be, yes.
9     Q.  Did Jim Gibbons explain to your
10 satisfaction the delay in the log showing when his
11 key card was used to enter -- to open his door to
12 his hotel room?
13        MR. CANNON:  At which interview?  Vague
14 and ambiguous.
15        Go ahead and answer.
16 BY MR. KOSSACK:
17     Q.  It was presented at the second interview;
18 right?  You gave him that -- or you told him that
19 the key card log had shown that he had not entered
20 until like 10:45; right?
21     A.  Right.
22     Q.  And did he ever explain to your
23 satisfaction how those extra minutes were used up?
24     A.  I wouldn't say that I was satisfied.
25     Q.  And what did you do, if anything, to

1 follow up on that?
2     A.  I didn't.  I mean, in terms of -- in
3 terms of interviewing Jim Gibbons at that time, we
4 asked the question hoping for an answer, but there
5 was no -- there was no way to follow up.  He had
6 given us an answer.  And there wasn't any way to
7 follow up with that line of questioning.  There was
8 nowhere to go with it.  We had no ammunition.  There
9 was nothing that we could throw at him to say ah-ha,
10 you know.
11        Whenever you interview, you want to
12 have -- to be able to have some backup information
13 that you could move on, that you could show that you
14 could question him about his answer.  He had given
15 us an answer, and we didn't have anything to say
16 that that answer was false.  We had no way of
17 proceeding or going anywhere else with that line of
18 questioning.
19     Q.  Now, did you go through a separate
20 walk-through with Creasey, Christopher Creasey?
21     A.  Yes.
22     Q.  We have asked for a copy of a tape of
23 that, and they say they cannot find it anymore.  Do
24 you know what happened to that tape?
25     A.  I have no idea.

8 (Pages 29 to 32)

1    A.  I believe so.
2    Q.  Did you check to see if they were reading
3  the right time of day?
4    A.  I can't recall.
5    Q.  Did you make the assumption that they
6  were at the right time of day?
7    A.  I can't recall if we made the assumption
8  or if we actually verified by looking at the current
9  time to see what the times were on the recorders.
10   Q.  All right.
11   A.  Nor would that have told us necessarily
12  whether the -- those times were the same time on
13  that day either.  We watched those videotapes at a
14  later date.  We would have -- even if we verified at
15  that time that those times were accurate now, we
16  wouldn't be able to know whether that was the same a
17  few weeks earlier.
18   Q.  Well, at least they would have given you
19  a little more information?
20   A.  And again, I don't remember specifically
21  whether we did at that point view those tapes and --
22  or view those cameras and see what the time was at
23  that point.
24   Q.  Do you recall any conversation with
25  Mr. Clavier whether or not those cameras were set at

1  the right time?
2    A.  I don't.
3    Q.  In interviewing witnesses in this case,
4  have you ever stated your opinion that there is no
5  way that those tapes could have been altered?
6    A.  I don't remember if, in interviewing
7  anybody, whether I made those specific statements or
8  not, no.
9      MR. KOSSACK:  I am going to mark this
10  next in order.
11     (Whereupon, Exhibit No. 4 was
12     marked for identification.)
13     MR. CANNON:  So you are going to give
14  only a few pages of a statement?
15     MR. KOSSACK:  Yes.  I don't want to make
16  copies of it right now.
17  BY MR. KOSSACK:
18   Q.  If you look at page 29, this is a partial
19  transcription of the statement that you took from
20  Stefanie Damelio.
21     Do you remember Stefanie?
22   A.  Stefanie Damelio?
23   Q.  Yes.
24   A.  Yes.
25   Q.  And if we look at page 29, first large

1  paragraph where you are talking, you say, quote, One
2  of the things that she has been absolutely adamant
3  about is that -- and Mr. Wright has brought this up
4  in his press conferences and his grandstanding and
5  everything else.  But that it happened the way she
6  says it happened, and therefore she must be on video
7  in the parking garage because she puts herself right
8  in front of that camera, unquote.
9      Do you recall saying that during
10  Damelio's deposition (sic)?
11   A.  Yes, I do.
12   Q.  Why did you refer to Mr. Wright's press
13  conference as grandstanding?
14   A.  I'm not sure.
15     MR. CANNON:  Because it probably was.
16  BY MR. KOSSACK:
17   Q.  Looking at the last paragraph on that
18  page you say, quote, And she hasn't changed her
19  story.  But the fact of the matter is that
20  regardless of what Mr. Wright says, there is no --
21  there has been no doctoring of any videotapes.  It
22  would be too hard to even attempt to do on a
23  multiplex system, unquote.
24     MR. CANNON:  Attempt to do it on the
25  multiplex system.

1  BY MR. KOSSACK:
2    Q.  Yes.  It would be too hard to even
3  attempt to do it on a multiplex system, unquote.
4      Do you recall saying that during
5  Damelio's statement?
6    A.  Yes, I do.
7    Q.  Now, do you have any particular expertise
8  on the multiplex system?
9    A.  No, I don't.
10   Q.  So do you have any understanding of how
11  hard or easy it would be to modify a tape on the
12  multiplex system?
13   A.  Other than what I have been told, no.
14   Q.  Were you trying to get Damelio in any way
15  to change what she was telling you by telling her
16  that?
17   A.  That would have been the reason for me
18  bringing that up during this interview, would have
19  been to see if she would change her story by telling
20  her something to the effect that there, you know --
21  that the tapes hadn't been doctored and she wasn't
22  anywhere on the video where she claimed to be.  But
23  that would have been the reason for using that line
24  of questioning, to attempt to see if she wanted to
25  stick with her story or change it.

Page 41

1    Q.  Well, Damelio was not an eyewitness to
2  the event; correct?
3    A.  No.
4    Q.  She was a girlfriend of Chrissy's that
5  Chrissy had called first from the LaQuinta Inn.  Is
6  that your understanding?
7    A.  Yes.
8    Q.  And she called Damelio when she was still
9  in a fairly excited state.  Is that how it was
10  described to you?
11    A.  I believe so, yes.
12    Q.  And so you were interested, were you not,
13  in what Chrissy said to Stefanie that evening when
14  she was still in that excited hysterical sort of
15  state.  Would that be correct?
16    A.  Correct.
17    Q.  And what Stefanie told you basically was
18  consistent with everything else that Chrissy had
19  been saying.  Would that be correct?
20    A.  Yes.
21    Q.  And when you interviewed Anna, her
22  sister, again -- well, her sister was actually there
23  the night of the incident, but she did not actually
24  witness the event; correct?
25    A.  Right.

Page 42

1    Q.  Again, you were interested in what the
2  sister said that Chrissy said at the time over the
3  phone when she was in an excited hysterical state;
4  correct?
5    A.  Yes.
6    Q.  And again, you are looking to see whether
7  Chrissy's prior statements were consistent or
8  inconsistent with the statements that she later gave
9  the police.  Would that be correct?
10    A.  Yes.
11    Q.  And did you find any inconsistency
12  between what Stefanie was telling you that Chrissy
13  said and what Anna was telling you that Chrissy said
14  and what Chrissy later reported to the police?
15    A.  Not that I can remember.
16    Q.  And do you recall Anna telling you and
17  Detective Hnatuick that Chrissy had said that words
18  out of his mouth at one point were, quote, I'm not
19  going to fuck you.  I'm going to rape you, unquote?
20    A.  I don't -- without looking at that
21  statement, I don't specifically remember that those
22  were the words that she told me.  I know that there
23  have been several different ways that that
24  conversation supposedly went.  There are some
25  differences in different interviews.  But I, without

Page 43

1  looking at that statement, I can't specifically
2  remember.
3        We interviewed so many people over -- and
4  those occurred a long time ago and -- I can't
5  remember specifically who said what and at what time
6  without reviewing all of the statements that had
7  been -- that we had gone through.
8    Q.  If Anna had told you and
9  Detective Hnatuick that, would you have considered
10  that to have been an important statement, that he
11  actually said, "I'm going to rape you"?
12        MR. CANNON:  If Anna had said it or if
13  Chrissy had said it?
14  BY MR. KOSSACK:
15    Q.  If Anna had said that Chrissy had said
16  during the time that she's in an excited state
17  talking to her over the phone the night of the
18  incident, is that an important statement, that he is
19  actually saying, "I'm going to rape you"?
20    A.  It's important -- you used the word
21  "fucked" earlier.  Now you are saying "rape."  And I
22  can't remember whether it was "I'm going to fuck
23  you" or "You're fucked," which has two different
24  connotations.
25    Q.  Well -- and I can pull up the statement

Page 44

1  if you want -- but I believe in Anna's transcribed
2  statement, on four different occasions, she says
3  that Chrissy told her that Gibbons, I'm not
4  going to fuck you.  I'm going to rape you.  If
5  that's, in fact, the case that appears four
6  different times in her voluntary statement, is that
7  the kind of thing that you would have thought
8  important to put in the summary of that statement?
9    A.  I would have thought that the information
10  was important, but then again, we interviewed a lot
11  of different people, and even some of the people she
12  spoke to that night didn't say that specific phrase.
13  If that came up and Anna is the one that said it,
14  then she's the only one that said it.
15        MR. CANNON:  Chrissy didn't say it.
16        THE WITNESS:  Chrissy didn't say it.  I
17  don't believe Stefanie said that that's what Chrissy
18  told her.  There were several people that didn't --
19  didn't say that specifically.  So that was a change
20  in what she had told somebody as opposed to us or to
21  other friends of hers.
22  BY MR. KOSSACK:
23    Q.  Have you ever previously interviewed
24  anyone in your job, working up to this point, who
25  claimed that they were the victim of an attempted

11 (Pages 41 to 44)

Page 45

1 sexual assault?

2 MR. CANNON: I will object to that. That
3 is irrelevant to this case. She doesn't make that
4 claim.

5 Go ahead.

6 THE WITNESS: Yes, I do -- I have
7 interviewed sexual assault victims or who have
8 claimed to be sexually assaulted.

9 BY MR. KOSSACK:

10 Q. And have you interviewed them close or
11 near the time of the incident itself?

12 A. Yes.

13 Q. And have any of those victims been
14 hysterical at the time that they were discussing the
15 incident with you?

16 A. Some, yes.

17 Q. And those that have been hysterical, what
18 is the longest period of time from the time of the
19 incident to the time that you would still consider
20 them to be hysterical as a result of the incident?

21 A. I don't understand the question.

22 Q. Well, have you ever interviewed someone
23 about an attempted sexual assault two hours after
24 the incident where they are still hysterical over
25 it?

Page 46

1 A. There is no way for me to tell you that.
2 I -- I can't remember specific times or how long it
3 took us to get to the hospital and interview the
4 person. I can't remember -- I can tell you that I
5 have interviewed people that are hysterical, but I
6 can't tell you if that was -- it took us two hours
7 for them to get to the hospital and have an exam and
8 we got to interview them. There is no way for me to
9 be able to tell you that.

10 Q. What is the reason that you would be
11 interested in interviewing other people that the
12 alleged victim spoke to that evening?

13 A. To try and find out what information was
14 provided to them, to see if there is a difference in
15 what Chrissy was telling us as opposed to what she
16 was telling other people.

17 Q. And sometimes those statements come into
18 evidence as excited utterances and present sense
19 impressions or prior inconsistent statements?

20 MR. CANNON: You want his lecture on the
21 law now?

22 MR. KOSSACK: No, just his understanding
23 of it.

24 MR. CANNON: I will object unless he has
25 legal training. There has been no foundation.

Page 47

1 BY MR. KOSSACK:

2 Q. You may answer.

3 A. Excited utterance to me would be somebody
4 telling me -- again, I don't know the law. So we're
5 talking about somebody that got on the phone and
6 talked to several different people, including
7 multiple calls to 911. And those excited utterances
8 to the dispatcher were inconsistent and different.
9 It told the dispatcher three different things, told
10 different people different things.

11 So if she had made statements to the
12 police initially, maybe I would have considered
13 those excitable utterances. But we had different
14 stories being told to different people, including
15 different stories to the 911 dispatchers.

16 Q. Well, in interviewing the people that she
17 spoke to the night of the incident, were you looking
18 for evidence to support her story or only evidence
19 to refute her story?

20 A. Both. We wanted -- we wanted to find out
21 exactly what had happened, and we were trying to
22 gather evidence to do either/or.

23 Q. Was Stefanie Damelio evasive in her
24 interview with you?

25 A. I believe there were times there were

Page 48

1 questions where it was hard to get answers from her.
2 Yes, I would characterize it as evasive.

3 Q. Was that because she had to think about
4 the answer or didn't want to tell you the answer or
5 how did you read that?

6 MR. CANNON: It's asked and answered. He
7 just said she was evasive.

8 Go ahead.

9 THE WITNESS: She wasn't willing to
10 provide information. When we would ask her
11 questions, she didn't seem willing.

12 BY MR. KOSSACK:

13 Q. Can you recall a specific question she
14 was not willing?

15 A. Not without going through her statement
16 in detail, which I have not done.

17 Q. Did you have any part in the writing of
18 Hnatuick's final 25-page report?

19 A. No. Other than -- other than maybe, you
20 know, he might have asked some questions at some
21 point, but again, not specifically. He was the one
22 that did the documentation. He was the one that
23 wrote the reports.

24 Q. Now, as the detectives, do you merely
25 report the facts as you have found them and then

12 (Pages 45 to 48)

Page 49

1  someone else decides whether or not to turn it over
2  to the District Attorney's Office for possible
3  prosecution, or do you make that recommendation
4  yourself?
5      A.  The detectives who investigate the cases
6  would normally determine whether there was
7  sufficient evidence that they thought to send the
8  case to the DA's office for prosecution.  So it
9  would be the detective's call.
10     Q.  And did you make such a call in this
11  case?
12     A.  Actually, in this case it was both my
13  determination, after an extensive investigation, and
14  Detective Hnatuick's belief that there wasn't a case
15  to submit to the DA's office.  However, we were
16  directed to send the case to the DA's office anyway.
17     Q.  Do you recall Hnatuick putting it in his
18  report that he did not feel that there was a case?
19     A.  I believe he did summarize at the end of
20  the second officer's report that we both felt that
21  there wasn't a case.
22     Q.  And why did you feel there was not a
23  case?
24     A.  Because at the end of the day, after an
25  extensive investigation, after talking to several

Page 50

1  different people, canvassing areas, looking at
2  videotapes, contacting multiple people, we had
3  nothing other than a he said, she said case, where
4  she was claiming one thing, he was claiming
5  something completely different, and we had no
6  evidence, no outside witnesses, no videotape,
7  nothing, to be able to substantiate the case.
8      Q.  How much of a reliance did you put on the
9  fact that you could not find him captured on
10  videotape in coming to your conclusion?
11     A.  It was part of it, but I wouldn't say
12  that was a total.  I mean, we had no independent
13  witnesses.  We had nothing.  We had nobody that we
14  could -- no evidence that we could back up.  We had
15  several different places she had told us she was
16  that we couldn't verify.  We couldn't put credence
17  in her story.  She was disoriented and confused
18  during a walk-through we did.  So there was a whole
19  bunch of things that went into our decision.  The
20  videotape, yes, that was part of it.
21     Q.  Did you come to the conclusion that
22  something had happened?  I mean, here they were
23  eating dinner, drinking, everything seems fine.  He
24  describes her as a very nice lady.  And the next
25  thing you know, she is hysterical over the phone

Page 51

1  calling 911.  Did you come to the conclusion
2  something happened, you just could not determine
3  what it was?
4      A.  We came to a conclusion that something
5  happened or something might have happened, but it
6  was our job to investigate the criminal aspect.  I
7  don't believe and neither -- I won't speak for
8  Sergeant Hnatuick -- but I don't believe personally
9  that anything criminal occurred.  Could there have
10  been something else of a moral value, maybe.  But it
11  was our job to investigate the criminal side of it.
12  And I personally, from investigating this whole
13  thing, from doing this whole investigation, don't
14  believe that anything criminal occurred.
15     Q.  Aren't cases prosecuted all the time
16  based on a he said, she said?  I mean, if a little
17  old lady gets knocked over the head or harmed at
18  gunpoint and she is the only one that can identify
19  the guy and you pull her in and do a lineup and she
20  identifies the guy, don't cases go to trial on that
21  sort of evidence all the time where there is just
22  one witness?
23     A.  With the witness being the victim?
24     Q.  Yes.
25     A.  They might.  But then again, cases are

Page 52

1  usually backed up with some type of, you know --
2  depends upon the degree of the case and whether we
3  are talking about a misdemeanor crime or a felony
4  crime.  There is normally something else other than
5  one person's word against another's, but that's what
6  occurred.  To -- courts all the time rely on
7  evidence.  Cases are thrown out all the time where
8  it is he said, she said.  Ultimately, this was the
9  DA's decision after we submitted the case to him.
10     Q.  And coming to your decision, wasn't part
11  of the decision based on the fact that, Well, we
12  need a little more here than just her testimony
13  because, after all, he is running for office.  He
14  might even win.  Five out of ten voters apparently
15  think he is a better guy for the job or whatever,
16  and it was going to be more difficult to make out a
17  case against a politician than it would be against
18  some average Joe?
19         MR. CANNON:  To which I am going to
20  object.  It is compound, complex, argumentative.  It
21  is a plain crap question.
22         But go ahead.
23         THE WITNESS:  The fact that he was
24  running for office had nothing, absolutely nothing
25  to do with our ultimate decision in this case.

13 (Pages 49 to 52)

1  BY MR. KOSSACK:
2      Q.  Well, you did have pictures; right?  I
3  mean, that was some additional --
4          MR. CANNON:  Pictures of what?
5          MR. KOSSACK:  Redness to her arms.  There
6  is a scratch to her back and so forth.
7          MR. CANNON:  We went through this.  There
8  was no scratch to her back.  Okay?  There is no
9  testimony to that fact.
10         MR. KOSSACK:  I can show him pictures.
11         MR. CANNON:  Well, the witness has denied
12  it twice.  All right?
13         MR. KOSSACK:  No, it is not all right.  I
14  would prefer you not to interrupt my depo --
15         MR. CANNON:  Well, I would prefer you to
16  ask a straight question.
17         MR. KOSSACK:  -- except to make short
18  succinct objections.
19         MR. CANNON:  No.  You make a short
20  succinct question, and I will make a short succinct
21  objection.  When you ask a compound question and you
22  misstate what this witness has said, I will object
23  in any way I like.  If you don't like it, call the
24  magistrate.
25  BY MR. KOSSACK:

1      Q.  We had her testimony; right?  We had
2  Chrissy's testimony?
3          MR. CANNON:  Is that a question?
4  BY MR. KOSSACK:
5      Q.  That is she -- I am just going through
6  the evidence that you had available.
7      A.  At which time?
8      Q.  You had Chrissy's statements and her
9  testimony about what happened in the garage; right?
10     A.  And her walk-through.
11     Q.  Okay.  You had pictures taken of redness
12  to the arms and so forth; correct?
13     A.  We had pictures taken of her arms, but I
14  have already mentioned, I believe, that I didn't see
15  any redness in those pictures.
16     Q.  Do you recall Pennie telling you that
17  Chrissy told her at the time that he
18  has his ankle wrapped around mine and that she moved
19  closer to Pennie?  Do you recall Pennie telling you
20  that?
21     A.  I remember that, but then I also remember
22  receiving an explanation for that.
23     Q.  What explanation do you recall receiving?
24     A.  The fact that they were in very close
25  quarters sitting at the table, and it was normal

1  that they might be touching or bumping legs because
2  they were so close together seated.
3      Q.  But Chrissy's statement to Pennie at the
4  time was that he was wrapping his ankle around her
5  ankle, wasn't it?
6      A.  Again, without specifically reviewing
7  that statement, I don't remember that specifically.
8      Q.  But you do recall Pennie reporting that
9  Chrissy at the time made some mention and moved
10  closer to Pennie.  Would that be correct?
11     A.  If you say it's in the statement, then I
12  will believe it.  But again, I don't specifically
13  remember that right now.
14     Q.  Then you also have the missing of keys
15  that -- was a search made for those keys on the
16  evening in question?
17     A.  I do remember that we kind of looked
18  around the shrubbery where her car was parked on the
19  south side of the restaurant where she had initially
20  parked her car.  I do remember that we kind of
21  cursory looked around the parking lot and in the
22  bushes there and, you know, just to see if she might
23  have dropped them in that area to help her out.
24     Q.  And was it your understanding that the
25  initial detective that arrived at the scene also

1  went into the McCormick & Schmick's and looked for
2  the keys as well?
3      A.  I don't remember that.
4      Q.  At any rate, the keys were never found,
5  to your knowledge; correct?
6      A.  To my knowledge, no.
7      Q.  What about what happened outside the
8  LaQuinta?
9      A.  What about what?
10         MR. CANNON:  What are you asking?  It is
11  vague and ambiguous.  Ask a straight question, will
12  you.
13  BY MR. KOSSACK:
14     Q.  You had received information from
15  Chrissy, did you not, that when she was in the
16  LaQuinta, she saw Gibbons come up to the LaQuinta.
17  Do you recall receiving that information?
18     A.  I remember Chrissy saying that she
19  thought she saw Jim Gibbons when she was at
20  LaQuinta.
21     Q.  And then you interviewed one of the front
22  desk clerks, the night auditor at LaQuinta,
23  Kimberly Hartnett, I believe?
24     A.  Okay.
25     Q.  Do you recall that?

Page 57

1    A.  Yes.  I recall interviewing her.
2    Q.  And do you recall her giving a
3  description of a man and a woman in some sort of
4  argument or dispute very briefly outside her front
5  door at around the same time that shortly after
6  Chrissy called 911?
7    A.  I remember that she did say that there
8  was a couple that was involved in a dispute outside
9  the door, yes.
10    Q.  And in her description of that couple --
11  hold on just a second.
12    (Off the record.)
13  BY MR. KOSSACK:
14    Q.  Did you have any opportunity to read my
15  response in this case?
16    A.  Say that again.
17    Q.  Did you have any opportunity --
18    (Off the record.)
19  BY MR. KOSSACK:
20    Q.  Did you have -- have you had any
21  opportunity to read any of the filings in this case?
22    A.  No.
23    MR. CANNON:  Don't flatter yourself, Bob.
24    THE WITNESS:  No, none.
25  BY MR. KOSSACK:

Page 58

1    Q.  Okay.  What is your estimate of
2  Jim Gibbons' height?
3    A.  He's tall, but I --
4    Q.  About six foot?
5    MR. CANNON:  He has already answered the
6  question.  You are asking him to guess.
7    THE WITNESS:  Yes.  He is taller than me.
8  BY MR. KOSSACK:
9    Q.  Do you recall Hartnett describing the man
10  as six foot?
11    A.  I don't specifically remember that.  I
12  haven't read over the testimony, so I don't remember
13  what her description was.
14    Q.  Do you recall her describing the man as
15  white or Hispanic?
16    A.  Yes, I believe so.
17    Q.  Do you recall her describing the man as
18  being in good shape?
19    A.  I don't specifically remember that, no.
20    Q.  Do you recall her describing the man as
21  having no facial hair, no glasses?
22    A.  I don't -- again, I don't remember that
23  long ago, but --
24    Q.  Do you recall her describing the man as
25  having a white dress shirt and dark dress pants?

Page 59

1    A.  I don't remember specifically.
2    Q.  Do you recall her description of the
3  woman?
4    A.  No.
5    Q.  So you don't recall that she described
6  her as white, 5 -- 5 feet 7, 115, 125 pounds, long
7  dark hair, pretty in appearance?  You don't recall
8  that?
9    A.  What was her height again?
10    Q.  Well, she says 5, 5 foot 7 inches?
11    A.  So anywhere from 5 foot to 5 foot 7?
12    Q.  Yeah.  That is quite a --
13    A.  That is quite a stretch.
14    Q.  -- quite a stretch.
15    MR. CANNON:  And she said pretty?
16  BY MR. KOSSACK:
17    Q.  She described her appearance as pretty.
18  Do you recall that?
19    A.  No, I don't remember that specifically.
20    Q.  Well, do you recall in the report saying
21  that Hartnett had excluded Gibbons and Chrissy as
22  being the couple that were outside of the
23  LaQuinta Inn that evening?
24    A.  I do remember that.
25    Q.  But she really didn't exclude them, did

Page 60

1  she?
2    A.  What do you mean?
3    Q.  Well, didn't she answer, If I had like a
4  side profile maybe, but -- because I saw him, I
5  think I was looking at his left side, his left
6  profile, and it just -- it kind of just doesn't look
7  like it, but previously she said, It -- it could be,
8  but I really -- I don't know.  It just doesn't look
9  like it to me?
10    MR. CANNON:  Wait a minute.  If I get it,
11  they showed her photographs and she said it wasn't
12  her, and now you are trying to ask him for a
13  different answer?
14  BY MR. KOSSACK:
15    Q.  If you understand the question, you may
16  answer it.  If not, I will repeat it.
17    A.  When she -- when we showed her
18  photographs and -- it was our understanding after
19  that, that she wasn't able to tell us if that was
20  Chrissy Mazzeo and Jim Gibbons.
21    Q.  Right.  But she was not able to exclude
22  them, either.  Would that be correct?
23    A.  That wasn't our understanding.
24    MR. CANNON:  Nor normal people's based on
25  that.

Page 61

1  BY MR. KOSSACK:
2     Q.  So when she said, It could be, but I
3  really -- I don't know --
4        MR. CANNON:  Wait a minute.  Read the
5  whole statement.
6  BY MR. KOSSACK:
7     Q.  How did you take that statement?
8     A.  Again, you have -- you've given me one
9  line out of context, so I would have to review the
10  whole statement to remember exactly what our
11  impressions were after she gave us the statement she
12  gave.
13     Q.  Let me give you a little more of the
14  statement.
15        MR. CANNON:  Why don't you just give him
16  the statement itself.
17  BY MR. KOSSACK:
18     Q.  "Question:  Now, understand that the
19  photograph you are looking at -- first off, the
20  photograph that you are looking at is a photograph
21  of Congressman Jim Gibbons.
22        "Answer:  Right.
23        "Question:  But it is also a black and
24  white photograph.
25        "Answer:  Yeah.

Page 62

1        "Question:  Uhm --
2        "Answer:  You know, it -- it could be,
3  but I really -- I don't know.  It just doesn't look
4  like it to me.
5        "Question:  Okay.  Let me show you a
6  second --
7        "Answer:  If I had like a side profile,
8  maybe, but because I saw him -- I think I was
9  looking at his left side, his left profile.  And it
10  kind of just doesn't look like it."
11        Does that refresh your memory as to the
12  conversation that you had with Kimberly Hartnett?
13     A.  Well, if you say that was the
14  conversation we had, but again, it was a lot of
15  years ago.
16        MR. CANNON:  And also a part of that
17  conversation has been left out.
18  BY MR. KOSSACK:
19     Q.  So she -- so based on what I have just
20  read to you, she didn't exclude Chrissy and Gibbons
21  as being the couple, she just could not positively
22  identify them as the couple, wouldn't you agree?
23        MR. CANNON:  I will object; that
24  mischaracterizes.
25        Go ahead.

Page 63

1        THE WITNESS:  I don't feel comfortable
2  answering one way or the other on that without
3  seeing the complete statement to know exactly what
4  context that is put in.  I don't know if there is
5  questions and answers that have been left out in
6  between that to know whether that is the only
7  statement that she made or if there was others where
8  she specifically said, No it's not them, or she
9  ruled out Chrissy as being the other woman.
10  BY MR. KOSSACK:
11     Q.  Was it raining that evening, the evening
12  of the incident?
13     A.  Yes.
14     Q.  And does rain usually darken gray hair,
15  in your opinion?
16     A.  I don't know that I've ever studied that
17  or made that observation.
18     Q.  So when you get out of the shower in the
19  morning and comb your hair, you don't notice that it
20  is a shade darker than it is after it dries?
21     A.  Again, even with myself, I've never made
22  that observation.
23        MR. KOSSACK:  I will make a copy of this
24  and be right back.
25        (Off the record.)

Page 64

1        (Whereupon, Exhibit No. 5 was
2        marked for identification.)
3  BY MR. KOSSACK:
4     Q.  I will hand you what has been marked as
5  Exhibit 5.  These are some excerpts --
6        MR. CANNON:  Wait a minute, no, no, no.
7  Give him the whole statement, not excerpts.  The
8  whole statement is what he asked for.
9  BY MR. KOSSACK:
10     Q.  These are some excerpts from Hartnett's
11  statement --
12     A.  Page 5 and then to page 19.
13        MR. CANNON:  Okay.  I am going to
14  instruct you not to answer any questions with regard
15  to this statement unless you are given the entire
16  statement based on your previous testimony.
17  BY MR. KOSSACK:
18     Q.  My question is I want to refer you to
19  page 32.  Actually it starts on page 31 with the
20  blank line, Show you a couple of photographs that we
21  have, okay -- and you may recognize these from
22  either the news or from pictures that were shown by
23  Sam Skolnik.
24        Now, who is your understanding of who
25  Sam Skolnik is?

1      MR. CANNON:  You can answer that.
2      THE WITNESS:  Actually, I have no idea
3  who Sam Skolnik is.
4  BY MR. KOSSACK:
5      Q.  Is he a reporter for the Sun that
6  reported that she had identified Gibbons?
7      A.  Could be, yes.
8      Q.  She says, "Mm-hmm."
9      He said, "But I'm going to show you a
10  picture of the gentleman."
11      "Okay."
12      "And just tell me whether that
13  resembled -- or that if you think that is the person
14  that was outside involved in an argument."
15      "Answer:  Well, in this picture -- see,
16  this man's hair is a lot more gray than I remember."
17      And you said, "Understand that the
18  photograph that you are looking at -- first off, the
19  photograph that you're looking at is a photograph of
20  Congressman Jim Gibbons."
21      "Right."
22      "But it is also a black and white
23  photograph."
24      "Yeah."
25      And she says, "You know, it could be, but

1  I really -- I don't know.  It just didn't look like
2  it to me."
3      "Okay.  Let me show you a second --"
4      And the answer, "If I had like a side
5  profile maybe, but -- because I saw him, I think I
6  was looking at his left side, his left profile.  And
7  it kind of just doesn't look like it."
8      And then, "Okay.  Let me show you a
9  second photograph.  And this is a photograph of the
10  accused -- of the accuser that has been in the news
11  reports and in the papers.  It is Chrissy Mazzeo.  I
12  just wanted you to look at her again."
13      Now, the picture that you are showing of
14  Chrissy Mazzeo, is that one of the pictures that was
15  taken the evening after the incident, or was that a
16  picture of her taken at the Richard Wright news
17  conference?
18      MR. CANNON:  Go ahead.  You can answer.
19      THE WITNESS:  I don't remember.  I don't
20  know what photograph it was that we showed to her.
21  BY MR. KOSSACK:
22      Q.  Okay.  So if we look at page 32 where she
23  says, "It could be, but I really -- I don't know,"
24  is there anything in there that you consider where
25  she excludes Gibbons?

1      MR. CANNON:  All right.  I will instruct
2  you not to answer that question on the basis you
3  don't have the entire statement.
4  BY MR. KOSSACK:
5      Q.  You may answer.
6      A.  After --
7      MR. CANNON:  Don't answer the question.
8  BY MR. KOSSACK:
9      Q.  So he can only instruct you not to answer
10  on the ground of privilege, otherwise, you have to
11  answer.
12      MR. CANNON:  I will -- no, he doesn't.
13  I'm instructing him not to answer.  We will go to
14  the magistrate if you don't like it and we will
15  figure it out.  I am instructing him not to answer.
16      Don't answer that question.
17      THE WITNESS:  Okay.
18  BY MR. KOSSACK:
19      Q.  Well, do you think that if you had the
20  entire statement to read, that it could improve your
21  answer or improve your ability to answer?
22      MR. CANNON:  You can answer that.
23      THE WITNESS:  Yes.
24  BY MR. KOSSACK:
25      Q.  All right.  Well, I will run you off the

1  entire statement.
2      (Off the record.)
3      (Whereupon, Exhibit No. 6 was
4      marked for identification.)
5  BY MR. KOSSACK:
6      Q.  Detective Barker, have you had time to
7  review Kimberly Hartnett's statement?
8      A.  Yes.
9      Q.  And in particular, were you looking
10  for -- I noticed you were underlining things.  What
11  in particular were you looking for?
12      A.  I was just looking for statements that
13  she made that seemed to rule out the possibility
14  that the couple outside were Jim Gibbons and
15  Chrissy Mazzeo.
16      Q.  What did you find?
17      A.  Based on the statements that she made in
18  here over the course of the entire interview, as
19  well as conversation or statements she had made to
20  Sam Skolnik, and taking a totalitarian view of the
21  whole interview from beginning to end, it is my
22  opinion that she ruled out the possibility -- or at
23  the end of this, we ruled out the possibility that
24  the couple outside involved in whatever altercation
25  was occurring outside was either Chrissy Mazzeo or

Page 101

1    Q.  Had she said those words, would you
2  expect it to be stated in Exhibit 7 there about why
3  the investigation was first dropped?
4    A.  I mean, there were a bunch of statements
5  made, so could it have been something that he could
6  have put in here, yes.  Could it have been --
7    Q.  Well, it would certainly be a much more
8  important reason for her to drop it then because it
9  was this three-ring circus, wouldn't it?
10    MR. CANNON:  More important to who?  Her,
11  him, who?
12  BY MR. KOSSACK:
13    Q.  More important to vindicate Gibbons and
14  bring this case to a close.  In other words, if
15  someone says, I don't want to prosecute because it
16  is a three-ring circus, it is still leaving out
17  there the fact that it might have occurred.  She
18  just doesn't --
19    MR. CANNON:  That is assuming they were
20  doing their investigations to vindicate Gibbons, and
21  he's never testified to that fact.
22  BY MR. KOSSACK:
23    Q.  No.  But, I mean, had she called Hnatuick
24  after you interviewed her and got her to sign that
25  no prosecution form, if she had, in fact, called

Page 102

1  Hnatuick back and said, Oh, you got to add in that I
2  was intoxicated and it was a misunderstanding, that
3  would actually do more to explain why the
4  prosecution should not go forward than the other
5  reasons given, wouldn't it?
6    A.  I wouldn't say that it would.  I mean, we
7  had -- she had given us the reasons.  We had had her
8  sign a no prosecution form.  We had asked her on
9  numerous occasions to make sure that she wasn't
10  being influenced in any way, et cetera, et cetera,
11  et cetera, et cetera.  So at that point, we had
12  enough just with this to say, Okay, you don't want
13  to proceed.  Case is closed.
14    Q.  Well, this Exhibit 7 was written two days
15  later; right?
16    A.  Well --
17    Q.  Can we rely on that date and time?
18    A.  We can rely on the date and time as to
19  this is the final draft.  Now, initially what
20  happens in officer's reports is he might have taken
21  a couple of days to work on this, but by the time it
22  was done, it would have been done on -- I mean, he
23  might have started this on October 15th.  I'm not
24  sure.  But it was completed and ready to go 10/16,
25  0900 hours.

Page 103

1    MR. KOSSACK:  Okay.  I do not have any
2  more questions.
3    MR. CANNON:  No questions.  We're out of
4  here.
5    (Thereupon the taking of the deposition
6  concluded at 6:35 p.m.)
7          * * * * *

Page 104

1         CERTIFICATE OF DEPONENT
2
3  PAGE     LINE CHANGE     REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15         * * * * * *
16       DECLARATION OF DEPONENT
17    I, TIMOTHY BARKER, deponent herein, do hereby
   certify and declare the within and foregoing
18  transcription to be my deposition in said action;
   that I have read, corrected, and do hereby affix my
19  signature to said deposition this _____ day of
   _____, 2010.
20
21
22  _____
   TIMOTHY BARKER
23
24
25

**REPORTER'S DECLARATION**

STATE OF NEVADA      )
                     )  ss.
COUNTY OF CLARK      )

        I, CAMEO L. KAYSER, CCR No. 569, declare as follows:

        That I reported the taking of the deposition of the witness, TIMOTHY BARKER, commencing on Monday, May 3, 2010, at 3:40 p.m.

        That prior to being examined, the witness was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth; that, before the proceedings' completion, the reading and signing of the deposition has been requested by the deponent or a party.

        That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true, and accurate transcription of said shorthand notes taken down at said time.

        I further declare that I am not a relative or employee of any party involved in said action, nor a person financially interested in the action.

        Dated at Las Vegas, Nevada this 13th day of May, 2010.




_____
CAMEO L. KAYSER, RPR, CCR No. 569

# EXHIBIT 2

# EXHIBIT 2

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2           DISTRICT OF NEVADA
 3            SOUTHERN DIVISION
 4             * * * * *
   CHRISSY ISRAEL MAZZEO,      )
 5                             )
        Plaintiff,      )  Case No.
 6                             )  2:08-CV-01387
        vs.             )  -R.H.-PAL
 7                             )
   JAMES ARTHUR "JIM" GIBBONS; )
 8 SIGMUND "SIG" ROGICH; LAS   )
   VEGAS METROPOLITAN POLICE   )
 9 DEPARTMENT; BILL YOUNG;     )
   DONALD J. CAMPBELL; PENNIE  )
10 MOSSETT-PUHEK; and DOES     )
   1-20,                       )
11                             )
        Defendants.     )
12 _____     )
13
14
15
16       DEPOSITION OF MARC COLON
17
18      Taken on Monday, May 3, 2010
            At 2:10 P.M.
19
20       At Kossack Law Offices
         4535 West Sahara Avenue
21            Suite 101
          Las Vegas, Nevada
22
23
24
25
   Reported by: CAMEO KAYSER, RPR, CCR No. 569
```

Page 2

```
 1 APPEARANCES:
 2
   For the Plaintiff:
 3     ROBERT J. KOSSACK, ESQ.
       Kossack Law Offices
 4     4535 West Sahara Avenue
       Suite 101
 5     Las Vegas, Nevada 89102
 6
 7 For the Defendants Las Vegas Metropolitan Police
   Department and Bill Young:
 8     WALTER R. CANNON, ESQ.
       Olson, Cannon, Gormley & Desruisseaux
 9     9950 West Cheyenne Avenue
       Las Vegas, Nevada 89129
10
```

```
11          I N D E X
   WITNESS                        PAGE
   MARC COLON
12
   EXAMINATION BY MR. KOSSACK          3
13 EXAMINATION BY MR. CANNON          51
   FURTHER EXAMINATION BY MR. KOSSACK  52
14
          E X H I B I T S
15
   EXHIBITS                       PAGE
16
   EXH. NO. 1   Officer's Report    12
17
   EXH. NO. 2   Voluntary Statement 13
18              James Gibbons
19 EXH. NO. 3   Voluntary Statement 14
                Chrissy Mazzeo
20
21
22
23
24
25
```

Page 3

```
 1       (Thereupon, Rule 30(b)(4) was waived
 2        prior to the commencement of the
 3        deposition proceedings.)
 4    Thereupon --
 5            MARC COLON
 6 was called as a witness by the Plaintiff, and having
 7 been first duly sworn, testified as follows:
 8            EXAMINATION
 9 BY MR. KOSSACK:
10    Q.  Could you please state your full name for
11 the record.
12    A.  Marc Colon.
13    Q.  And what is your position?
14    A.  Detective.
15    Q.  With the Las Vegas Metropolitan Police
16 Department?
17    A.  Yes, Major Crimes Squad.
18    Q.  Have you always worked for the Major
19 Crimes Squad?
20    A.  For the last four years.
21    Q.  So what is your history?  Let us say,
22 when were you first hired?
23    A.  2002.  So it's been approximately eight
24 years in the department.  Two years in patrol, two
25 years in plainclothes problem-solving unit, and then
```

Page 4

```
 1 the last four years, Major Crimes, which is in the
 2 robbery-homicide section.
 3    Q.  So two years in patrol, two years
 4 problem-solving unit.  And what does the
 5 problem-solving unit do?
 6    A.  It's just a plainclothes unit out of the
 7 patrol substations that -- it's kind of a stepping
 8 stone to detective.  You get experience doing search
 9 warrants and stuff like that.
10    Q.  Now, prior to joining the department,
11 what was your education?
12    A.  I graduated high school and two years of
13 junior college and emergency medical technician
14 certificate.
15    Q.  Where did you complete the two years of
16 junior college?
17    A.  Los Angeles Valley College, which is
18 in --
19        MR. CANNON:  I know that place.
20        THE WITNESS:  -- Los Angeles, California.
21 BY MR. KOSSACK:
22    Q.  Are you from Los Angeles?
23    A.  Yes.
24    Q.  And what made you decide to move out to
25 Las Vegas?
```

1    Q.  Did you ever talk with Deputy Chief
2  Joseph yourself?
3    A.  No.
4    Q.  Did you ever talk to Lieutenant McGrath
5  yourself?
6    A.  I might have because he was on the scene,
7  but -- because he's the one that notified
8  Deputy Chief Joseph.  So I'm sure I did talk to
9  Lieutenant McGrath because he was on the scene, but
10  I don't -- I don't remember what I told him.
11    Q.  Other than Detective Gillis, did you
12  summarize Chrissy's voluntary statement that you had
13  reported to anybody else that evening at the scene?
14    A.  I just remember advising
15  Detective Gillis.
16    Q.  So if Sergeant Cricket received any
17  information about what Chrissy Mazzeo had said in
18  her voluntary statement -- which when transcribed is
19  13 pages -- that information would have come first
20  from your summary, then to Detective Gillis, and
21  Detective Gillis further relaying that information?
22    A.  Yes.
23    Q.  But no one then came up to you and said
24  is it true that she said this or she said that or
25  anything like that?

1    A.  That night?
2    Q.  Yes.
3    A.  I don't understand the question.
4    Q.  Do you know who Detective Gillis spoke --
5  let me back up a little bit.
6      Do you know who Detective Gillis spoke to
7  after you told Detective Gillis a summary of what
8  Chrissy Mazzeo told you?
9    A.  No.
10    Q.  Did you see Detective Gillis have any
11  conversations with any other Metro officer in front
12  of you?
13    A.  Yes.
14    Q.  Who did you see Detective Gillis speak
15  to?
16    A.  Everyone who was on that call.  I mean,
17  just conversations.  I saw him conversing all night
18  with patrol officers and sergeants and watch
19  commanders.  We instruct patrol, did you check this,
20  did you do this, can you interview her, can you put
21  tape up, so --
22    Q.  Was a determination made where
23  Jim Gibbons was staying where he could be
24  interviewed that evening?
25    A.  I don't recall.  I remember she said that

1  he said they could crawl there.  And I believe she
2  might have said a name or two of hotels around
3  there, but we weren't going to make contact.  That's
4  not what we do.  We just do the preliminary.  We
5  kind of triage the call, and then we call the
6  appropriate units.
7    Q.  Who would you later, then, expect to make
8  contact?
9    A.  Either the Intel, Criminal Intelligence,
10  or Violent Crimes.
11    Q.  Was anyone -- was anyone interested in
12  making that connection that evening?
13      MR. CANNON:  Objection; foundation.
14      If you know, go ahead.  If you know if
15  anybody else was interested in talking with
16  Mr. Gibbons that evening, that's his question.
17      THE WITNESS:  I don't know.
18  BY MR. KOSSACK:
19    Q.  So there were no discussions in front of
20  you, "Well, we better go find him and see what his
21  side of the story is" or anything like that?
22    A.  No.  Our squad, the Major Crimes Squad,
23  just does the preliminary.  If the suspect of any
24  call and it was a violent felony and we think they
25  are a threat to the public and we don't know who

1  they are or they don't have a permanent address, we
2  may try to establish where they are.
3      But for every other call, we just -- if
4  it's a person that's easily found, either the victim
5  knows him at work or a family member, and we know a
6  work address and a home address, we do not make
7  contact with suspects.  We let the detail that is
8  handling the case do that.
9    Q.  Okay.  Now, you put in here that there
10  was an interview of Julie Vick -- and that was
11  apparently performed by Officer Baca -- do you --
12  did you read through her transcription before
13  writing this summary?
14      MR. CANNON:  What transcription are you
15  talking about?
16  BY MR. KOSSACK:
17    Q.  Well, did you read her statement before
18  writing this summary?
19      MR. CANNON:  You mean her voluntary?
20      MR. KOSSACK:  Yes.
21      THE WITNESS:  I believe so.
22  BY MR. KOSSACK:
23    Q.  And witness No. 2, you say this
24  Christopher Creasey?
25      MR. CANNON:  The page before that.

Page 25

1  BY MR. KOSSACK:
2      Q.  Did you read his voluntary statement
3  before writing this summary?
4      A.  You know what, on both of these -- or --
5  okay, at least on this one, on the interview by
6  Detective Gillis, I could have either written the
7  statement or taken it from --
8          MR. CANNON:  You mean read the statement?
9          THE WITNESS:  I'm sorry.  Read the
10 statement that he wrote or been advised by
11 Detective Gillis.  Because if they are written
12 statements, they should have been attached with the
13 report, not my report.
14 BY MR. KOSSACK:
15     Q.  And this interview summary of
16 Chrissy Mazzeo, is that your summary of her --
17     A.  Of my --
18     Q.  -- taped voluntary statement?
19     A.  Yes.  That's my summary of the interview
20 that I conducted on her.
21     Q.  Now, did Chrissy tell you when you took
22 her taped statement that she had noticed that her
23 keys were missing and that she thought Gibbons had
24 taken them?
25     A.  I don't remember.

Page 26

1      Q.  If she had told you something like that,
2  is that something that should have been -- you would
3  have considered important enough to put into your
4  summary?
5          MR. CANNON:  To which I'm going to
6  object.  Why don't you let him review the statement
7  he took from her, and then he can answer the
8  question.
9          MR. KOSSACK:  I am not going to allow
10 that at the present time.
11 BY MR. KOSSACK:
12     Q.  I am just asking you, had she said
13 something like that, that she thought he had stolen
14 her keys?  Is that the kind of factual statement
15 being made by a victim that you would have normally
16 put into your summary?
17         MR. CANNON:  To which I will object that
18 is an incomplete hypothetical.
19         Go ahead, sir.  You can answer the
20 question.
21         THE WITNESS:  Yes.  I mean, I'm -- I
22 don't understand the question.
23 BY MR. KOSSACK:
24     Q.  Well, I guess the point I am making --
25         MR. CANNON:  He is asking you a

Page 27

1  hypothetical question.
2  BY MR. KOSSACK:
3      Q.  Do you see anywhere in your summary here
4  where you make any mention that she said that her
5  keys were missing?
6      A.  Even before reviewing my summary, this is
7  like what you said, a summary, and the detectives
8  that would get the case would have the full
9  transcript.  So I still don't understand the
10 question.  But if I personally conducted a taped
11 interview of somebody, and I am also responsible for
12 the officer's report, I know that they are getting
13 the complete interview in the transcription, and
14 this is just a summary of it.
15     Q.  Do you know if they read her full
16 transcription before interviewing Gibbons?
17     A.  There is no way for me to know that.
18     Q.  How long does it usually take those
19 transcriptions to be transcribed?
20     A.  The next day.  On this case, I can
21 personally say that the next morning the
22 transcriptionists were in there transcribing.
23     Q.  This report here is dated 12:30 in the
24 afternoon the next day; is that correct?  Based on
25 the -- first page there?

Page 28

1          MR. CANNON:  Which report are you talking
2  about?
3          MR. KOSSACK:  Exhibit 1.
4          MR. CANNON:  Exhibit 1?
5          MR. KOSSACK:  Where it says date, time of
6  report, 10/14/06 at 1230 hours.
7          THE WITNESS:  Okay, that was the --
8  probably the final draft.  I see right here.
9          MR. CANNON:  Okay.
10 BY MR. KOSSACK:
11     Q.  So when did your workday start the day
12 before?
13     A.  My workdays start at 2000 hours,
14 8:00 p.m., and goes to 0600 hours.
15     Q.  And then you worked overtime on this?
16     A.  Yes.  Actually we went home.  We went
17 home at 6:00, or I assume at 6:00, our regular time,
18 and we were called back in 7:00 or 8:00 o'clock a.m.
19     Q.  Do you recall who called you back in?
20     A.  It was my sergeant at the time,
21 Sergeant Nagle.
22     Q.  Did he say why he was calling you back
23 in?
24     A.  Yes.  Because day shift was in the office
25 and wanted to be briefed on this case along with our

7 (Pages 25 to 28)

Page 29

1  captain. We have a different captain now, so -- oh,
2  Captain Dillon was there, so -- and Matt --
3  Detective Gillis also was called back; so we all
4  went back to the office.
5      Q. Now, you would not have expected that
6  sort of concern had it not involved a sitting
7  Congressman, would that be a correct statement?
8      A. Yes.
9      Q. Do you know whether or not the taped
10 statement was transcribed at the time that you wrote
11 this summary in Exhibit 1 --
12     MR. CANNON: Objection; asked and
13 answered.
14 BY MR. KOSSACK:
15     Q. -- or were you working from memory?
16     MR. CANNON: Go ahead. If you understand
17 the question, go ahead.
18     THE WITNESS: Are you asking me --
19     MR. CANNON: Is this transcribed at the
20 time that you wrote it?
21     THE WITNESS: No.
22     MR. CANNON: Okay. That's the answer.
23 BY MR. KOSSACK:
24     Q. So you were basically working from your
25 memory of what she had told you the night before?

Page 30

1      A. Yes.
2      MR. CANNON: Objection; that assumes
3  facts in issue, he didn't take notes.
4      Go ahead, sir.
5      THE WITNESS: Yes. I take -- I have a
6  notebook that I write.
7  BY MR. KOSSACK:
8      Q. Are those notes still in existence?
9      A. No. Once the officer's report is given
10 back with stamps, we destroy our notes.
11     Q. Is that standard operating procedure?
12     A. Yes.
13     Q. Are you instructed to do that by the
14 department?
15     MR. CANNON: Instructed to do what by the
16 department?
17 BY MR. KOSSACK:
18     Q. Destroy your notes once the report is
19 completed?
20     MR. CANNON: Go ahead and answer that
21 question.
22     THE WITNESS: I have never been
23 instructed to do that.
24 BY MR. KOSSACK:
25     Q. Is that the common procedure?

Page 31

1      A. Yes.
2      Q. Has that procedure ever been discussed
3  with you by anyone above you in authority?
4      A. In general or --
5      Q. In general.
6      A. Other detectives have said, hey -- like
7  when I first got to the detective bureau, I can't
8  tell you who, but it was just talking like how once
9  you get your officer's report back, you can destroy
10 your notes, so --
11     Q. And was that presented as a way of making
12 it more difficult for a criminal defense attorney to
13 pick apart your testimony?
14     A. No --
15     MR. CANNON: Objection; that is
16 argumentative.
17     Go ahead.
18     THE WITNESS: The idea on it was just so
19 in the files you can have the actual transcription
20 of the interviews and your officer's report. And if
21 there is any other, like, official document reports,
22 like crime reports, you keep those.
23     MR. CANNON: And just so the record is
24 clear, to go back to your previous hypothetical
25 statement, Bob, there is nothing in here about her

Page 32

1  losing her keys.
2      MR. KOSSACK: Well, I will move to strike
3  as argumentative.
4      MR. CANNON: I move to strike on the
5  basis that you knew that when you asked him the
6  question, and it was an inappropriate question and
7  it was an incomplete hypothetical at the time you
8  asked it, and you knew it.
9  BY MR. KOSSACK:
10     Q. Let me ask you this: When Chrissy said
11 to you that Gibbons was grabbing her arms and had
12 said to her you have two choices to which she
13 replied, quote, Are you really going to rape me
14 right now, unquote, and then she says that Gibbons
15 said, quote, You have two choices. You can try to
16 leave or you can do what I say, unquote, did you
17 take that report from Chrissy Mazzeo as a threat by
18 Gibbons to cause her physical harm or further
19 restrain her if she did not do what he said for her
20 to do?
21     A. Can you repeat the quote or tell me what
22 page it is on?
23     Q. It's on page 5 of your report. Let me
24 read it for the record here. Looking up about eight
25 lines, ten lines from the bottom of the second full

Page 33

1 paragraph, it states, Mazzeo states that Gibbons
2 grabbed her with both hands at the top of her arms
3 and said, quote, You have two choices, unquote, to
4 which she replied, quote, Are you really going to
5 rape me right now, unquote.  Mazzeo states that
6 Gibbons said, quote, You have two choices.  You can
7 try to leave or you can do what I say, unquote."
8       Now, that was your memory of how Chrissy
9 related the conversation to you, would that be
10 correct?
11     A.  Yes.
12     Q.  And based on that account, did you
13 develop the impression that Gibbons was being
14 accused of -- that he was going to continue to hold
15 her there, grabbing her arms, if she didn't do what
16 he told her to do?
17     A.  No.  Because the next line, she ran off,
18 so she wasn't being held.
19     Q.  Well, did Chrissy tell you that because
20 of the three people walking by, that Gibbons was
21 startled and relaxed his grasp?
22     A.  I don't know.  I don't remember she said
23 that, but he just -- when that little exchange
24 happened, she saw some people and she said, Go fuck
25 yourself and ran off.

Page 34

1     Q.  So you don't see that as a potential case
2 of coercion?
3       MR. CANNON:  On those facts, answer his
4 question.
5       THE WITNESS:  No.
6 BY MR. KOSSACK:
7     Q.  Well, what is your definition -- what is
8 your understanding of the definition of "coercion"?
9     A.  Using the -- use or threat of force to
10 get something that you want.
11     Q.  Or to stop someone from doing something
12 they want to do?
13     A.  (Witness nods head.)
14       MR. CANNON:  You have to answer out loud,
15 Marc.
16       THE WITNESS:  What is the question?  Do
17 I -- I still -- no, I don't think this is coercion.
18 BY MR. KOSSACK:
19     Q.  So your definition of "coercion," then,
20 is using force to get somebody to do something that
21 they don't want to do or to keep them from doing
22 something they do want to do.  Would that be
23 correct?
24     A.  That's correct.
25     Q.  Well, when he says, You can try to leave,

Page 35

1 at the same time that he is holding onto both of her
2 arms with his hands --
3       MR. CANNON:  That doesn't say that.  That
4 misquotes what that is.  You don't have any idea
5 where he was holding, if he was even holding her at
6 the time he said this.
7 BY MR. KOSSACK:
8     Q.  Well, don't let your counsel try to coach
9 you.
10       MR. CANNON:  I'm not trying to coach you.
11 I'm objecting to the form of the question.
12 BY MR. KOSSACK:
13     Q.  I will reask the question.  It says,
14 Mazzeo states that Gibbons grabbed her with both
15 hands at the top of her arms and said, You have two
16 choices.  You can try to leave, or you can do what I
17 say.
18       How do you interpret the words "try to
19 leave"?
20     A.  She had the option to leave or do what he
21 said, so she left.
22     Q.  So you don't take that to mean you can
23 try to struggle your way out of this, in other
24 words, you can try to leave as opposed to you can
25 leave or let this happen, or you can try to leave?

Page 36

1       Do you see any --
2       MR. CANNON:  I will object to the form of
3 the question, one; and two, it has been asked and
4 answered.
5 BY MR. KOSSACK:
6     Q.  Do you see any significance in using the
7 word "try," you can try to leave?
8       MR. CANNON:  If you can change any of
9 your earlier answer, go ahead and be free to modify
10 it.  You don't have to the answer the question
11 twice.  You have answered it once.
12 BY MR. KOSSACK:
13     Q.  Actually, you do.
14       MR. CANNON:  No, you don't.  If you want
15 to add anything to your previous answer, go ahead.
16       THE WITNESS:  I just -- she left, so she
17 was -- right after he said that, she was able to
18 leave.
19 BY MR. KOSSACK:
20     Q.  Is it your understanding she was able to
21 leave or she was able to escape?
22     A.  I just -- she left.  He said, You can try
23 to leave or you can do what I say.  So she said, you
24 know, they had a little exchange there with the
25 "lucky you," and she said go fuck yourself and left.

Page 37

1    Q.  Well, let us look at her statement, which
2  is Exhibit 3.
3         MR. CANNON:  3.  What page?
4  BY MR. KOSSACK:
5    Q.  First she describes -- looking at
6  page 6 -- that he is playing footsies with her;
7  right?
8         MR. CANNON:  Are you asking him if that's
9  what the statement says?
10  BY MR. KOSSACK:
11    Q.  Yes.  She says -- she tells you at that
12  time, He started playing like footsies with like,
13  with me.  And then Pennie noticed it and the same --
14  some of the witnesses noticed it, and so I started
15  hugging Pennie and I started telling everyone at the
16  table that Pennie was my best friend.  I was -- what
17  I was trying to do was actually move away from him.
18         Do you recall her telling you that?
19    A.  Yes.
20    Q.  Do you recall her telling you that he
21  said at the time, I wish I could have that kind of
22  affection from her?
23    A.  Yes.
24         MR. CANNON:  You forgot the laughter part
25  at the end of that.

Page 38

1  BY MR. KOSSACK:
2    Q.  Now, she also told you during that
3  interview, and I'm looking at page 8, that "Said
4  that he wanted to leave and he told me that he was
5  staying at the Resi -- Residence Inn, and then he
6  said that we could basically crawl back to his hotel
7  room."
8         Do you recall her telling you that at the
9  time?
10    A.  Yes.
11    Q.  And there is a Marriott Residence Inn
12  right next to the McCormick & Schmick's, is there
13  not?
14    A.  Yes.  I mean, I don't know firsthand.
15         MR. CANNON:  If you don't know, don't
16  guess.  Either you --
17         THE WITNESS:  I don't know, sir.
18         MR. CANNON:  All right.
19  BY MR. KOSSACK:
20    Q.  While you were at the scene, did you
21  identify any hotels as being within a short walking
22  distance of the McCormick & Schmick's?
23    A.  I remember observing that there were two
24  or three close by, but I don't know offhand what
25  they were.

Page 39

1    Q.  Did any of them, other than the
2  Residence Inn have a name similar to Residence Inn?
3    A.  I don't know.
4    Q.  Did you later tell Hnatuick or Barker
5  that she had said that her keys were missing and
6  that she had thought that Gibbons -- Jim Gibbons had
7  taken them?
8    A.  I don't remember.  I know they would have
9  gotten a copy of this and the voluntary statement
10  and the officer's report, but I don't remember what
11  I told them.
12    Q.  Now, looking at page 10, she says, Then
13  that's when he grabbed my arms, the top of my arms,
14  and she described both hands, both arms, "And he
15  pushed me against the wall."
16         If he had grabbed her arms and had
17  physically forced her to move a distance toward the
18  wall, does that qualify as any crime that you are
19  familiar with?
20         MR. CANNON:  I will object.  It is an
21  incomplete hypothetical.  It is vague and ambiguous
22  with regard to distance.  What is a short distance?
23  Feet, inches --
24  BY MR. KOSSACK:
25    Q.  Any distance.

Page 40

1         MR. CANNON:  -- millimeters?
2  BY MR. KOSSACK:
3    Q.  Does that fit the criteria of any crime
4  of which you are familiar?
5         MR. CANNON:  If you can answer that, go
6  ahead.
7         THE WITNESS:  Battery.
8  BY MR. KOSSACK:
9    Q.  Would it also qualify -- what is
10  kidnapping?  What are the elements of kidnapping?
11    A.  She wasn't moved.
12    Q.  She wasn't moved?
13    A.  According to when she told me, she
14  said -- it says that grabbed by the top of the arms
15  and pushed her --
16    Q.  And pushed her against the wall?
17    A.  Correct.
18    Q.  So when you interviewed her, you came
19  away with the impression that when she was pushed
20  against the wall, she did not move?
21    A.  She was not moved out of the parking
22  structure.
23    Q.  Does kidnapping require one to be moved
24  out of the structure?
25         MR. CANNON:  I will object.  It is

10 (Pages 37 to 40)

Page 41

1   argumentative and it is incomplete, both in terms of
2   the facts that you have provided him.
3          Go ahead, sir.
4          THE WITNESS: How does this pertain to me
5   and my role in this case?
6   BY MR. KOSSACK:
7      Q. Well, I am just kind of relating this to
8   your report, but again, my question was does this
9   fit the criteria of kidnapping if it involved an
10  involuntary movement of the victim?
11         MR. CANNON: He has already answered that
12  question. He said no.
13  BY MR. KOSSACK:
14     Q. Is that still your answer?
15     A. Yes, that is still my answer. It was a
16  use of force on one person to another is what I
17  interpreted it at the time, which is battery. But
18  just like every other case that I respond on, the
19  detectives handling the case can come up with their
20  own charges.
21     Q. Now, you didn't even ask her how far he
22  pushed her against the wall, did you?
23     A. I don't remember.
24     Q. If it does not appear --
25     A. If it does not appear, then no, I didn't

Page 42

1   ask her how far.
2      Q. So do you think that would have been
3   relevant to whether or not there would have been a
4   kidnapping charge? For instance, if he had moved
5   her 10 feet, 20 feet, at some point would that
6   qualify as a kidnapping, in your opinion?
7      A. Once again, the detectives handling the
8   case, which are going to make actual arrests, they
9   are the ones that are going to -- that doesn't
10  affect my report or the questions I ask the victim.
11     Q. So you would expect the follow-up
12  detectives to ask her how far she was pushed?
13     A. No. They would come up with the charges
14  they thought were appropriate, and they reinterview
15  both the victim and witnesses on most cases. This
16  is just for a preliminary story so they can start
17  their investigation.
18     Q. Looking at page 11, she says, And I said,
19  quote, Are you really, you know, rape me at this
20  time, unquote. And he said, quote, You have two
21  choices right now, unquote. And I said, quote, What
22  are my choices, unquote. And he just said,
23  Basically, you can -- and I said, What? And he
24  goes, basically, you have one choice. You can leave
25  or you can do the other choice. And I said, No way.

Page 43

1   I said, I've survived cancer and then you are going
2   to turn around and do this, unquote. And then
3   that's when he said -- I said that I thought I saw
4   three people running across the parking. And then
5   you say, Okay. I need to just back up a little bit.
6   He said, You have two choices.
7          Answer: Um.
8          Question: And one was you could leave.
9          Answer: One, where you could try to
10  leave --
11         Question: Uh-huh.
12         Answer: -- and the other one, or you can
13  just do what he says.
14         Question: So he, he actually said that?
15         Answer: Yes.
16         Now, at the time that you interviewed
17  Chrissy at 1:30 a.m. on October 14th, you thought
18  that something she had said was important enough
19  that you said, "So he actually said that"?
20     A. Yes. Because it didn't make sense to me
21  because there were the two choices. The only
22  person -- I was -- the only person who brought up
23  rape was her. He said, You have two choices. And
24  she said, Are you going to rape me? So that's what
25  didn't make sense, that the two choices were the

Page 44

1   same choice, and it kind of changed in that big --
2   in that long paragraph.
3      Q. When you said, "So he actually said
4   that," what phrase that she said he said were you
5   interested in?
6      A. Was you can try to leave or just do what
7   he says, because earlier -- that is why I backed her
8   up, because that long paragraph that you read, it
9   didn't make sense to me. So that's why I was saying
10  did he actually say that, because earlier she just
11  went through this whole "I survived cancer and are
12  you really going to rape me at this time," which
13  he never said that. She did. So that's why I was
14  confused by her.
15     Q. Well, wasn't the key word there the word
16  "try" where she corrected, you said, And one was
17  where you could leave and she answered, One, where
18  you could try to leave? Wasn't the key --
19         MR. CANNON: I will object. He just
20  answered your question.
21  BY MR. KOSSACK:
22     Q. Wasn't the key word there "try"?
23         MR. CANNON: Objection; asked and
24  answered.
25         Go ahead, sir, you can answer again if

11 (Pages 41 to 44)

1  you want to change your other answer.
2      THE WITNESS: Once again, I was trying to
3  clarify what she said. I didn't understand the long
4  answer she had just given me, so I was trying to
5  back her up.
6  BY MR. KOSSACK:
7      Q. Do you think you conducted a thorough
8  enough examination of Chrissy Mazzeo that evening?
9      A. For the preliminary, yes.
10     Q. Now, did you stay with the investigation?
11     A. No.
12     Q. Was the drafting of this report the last
13  connection you had with the investigation?
14     A. Yes.
15     Q. Did you make any attempt to call
16  Pennie Puhek?
17     A. That night. Not after that. That night,
18  you know, or that morning, I should say. But I
19  believe she never called back. So that was the end
20  of --
21     Q. So you called and you left a message and
22  she didn't call you back?
23     A. Correct, she didn't call me.
24     Q. So what detectives took up this
25  investigation after you?

1      A. I know Detective Hnatuick and
2  Detective Barker were two of the detectives, but
3  other than that, I work graveyard, they work day
4  shift. So I get off at 6:00. They come in at 6:00;
5  so I don't see --
6      Q. Did you talk to either of them about this
7  case?
8      A. The morning I came back in, yes, when I
9  was called back in because they were there and the
10  captain and my Sergeant Nagle, yes.
11     Q. And what was discussed at that time?
12     A. Just the details, where it occurred, what
13  had we done so far.
14     Q. Did anyone -- so who was all in the room
15  there?
16     A. Sergeant Nagle, Barker, Hnatuick, me,
17  Matt Gillis, and I believe Captain Dillon.
18     Q. Now, what part did Detective Gillis play
19  in this?
20     A. We both responded to the McCormick &
21  Schmick's.
22     Q. Gillis was not with you when you
23  interviewed Chrissy?
24     A. No. He was inside of the restaurant.
25     Q. He interviewed Vick?

1      A. Yeah, yes.
2      Q. And so other than through you, based
3  on -- well, we have her handwritten statement that
4  Ortega took, and then we have the taped interview
5  that you took of Chrissy, and other than those two
6  statements, was any other information given to
7  Barker or Hnatuick before they interviewed
8  Jim Gibbons at 2:20 later that afternoon?
9      MR. CANNON: Objection; lacks foundation.
10     Go ahead.
11     THE WITNESS: I don't know.
12  BY MR. KOSSACK:
13     Q. At any rate, at that one meeting that you
14  went to, was there any information given to them
15  other than what appears in your report and in the
16  taped statement?
17     A. No, that's all I have. The answer is
18  that's all I gave them is what you have now.
19     Q. Was there any discussion at that time
20  that Chrissy was alleging that Gibbons had taken her
21  keys?
22     A. I don't remember.
23     Q. To your knowledge, did Hnatuick or Barker
24  talk to anyone else or receive any other information
25  prior to the time they interviewed Gibbons?

1      A. I don't know. Right after that meeting I
2  left and I went home.
3      Q. What time in the morning was that?
4      A. It was probably -- I don't remember. I
5  just -- I had been up since 8:00 o'clock the night
6  before, so I didn't do any follow-up with them. I
7  didn't -- I didn't know they were going to talk
8  to -- I don't know who they were going to talk to.
9  I was just -- I was going to go home.
10     Q. Did you make any effort to determine that
11  evening if the McCormick & Schmick's camera had
12  caught any of the party on tape?
13     A. That's what Detective Gillis was doing
14  while he was inside the restaurant. And I don't
15  know -- I know at the time we had no video. He
16  checked with the parking garage and the restaurant,
17  and he was told by, I don't know who, that there was
18  no tape or it wasn't recording. I don't know. Or
19  the person couldn't -- you know what, my answer is I
20  don't know.
21     I just remember we didn't have access to
22  it because so many calls that we go on with the
23  video surveillance, it's always the person who is
24  there can't utilize it. So I don't remember what
25  answer I got that night, but I just know we didn't

Page 49

1  have access to it.
2      Q.  Did you speak with Officer Ortega that
3  night?
4      A.  I or Matt did.  I don't remember.
5      Q.  This report that's Exhibit 1, was this
6  report completed before the conference between
7  Sergeant Nagle and Baxter -- I mean Nagle, Barker,
8  Hnatuick, Gillis, Dillon, and yourself?
9      MR. CANNON:  Was it completed or was it
10 typed up?
11 BY MR. KOSSACK:
12     Q.  Well, I guess you can explain that, if
13 there is a difference in your mind.
14     A.  The draft was completed.
15     Q.  And were you telling them what your draft
16 said?  Were you working from your notes --
17     A.  They were probably reading it.
18     Q.  So they had your draft to read that was
19 later on made into this report?
20     A.  Yes.
21     Q.  And had the statement that you had taken
22 from Chrissy earlier that day at 1:30 in the
23 morning, had that yet been transcribed for review?
24     A.  When I was talking to them, it was
25 probably being transcribed at that time.

Page 50

1      Q.  And did they indicate to you at that time
2  what they planned to do?
3      A.  No.
4      Q.  So they just basically found out what you
5  knew and took it from there?
6      A.  Yes.
7      Q.  And is that standard operating procedure?
8      A.  Yes.
9      Q.  When this suit was filed, was there any
10 discussion around Metro as to -- you know, did
11 anyone come up to you and say, Hey, weren't you
12 involved in that, or anything when this case got
13 filed?
14     A.  I don't know.  It's been on the news for
15 so many different reasons that -- no.  Maybe the
16 first night it was on the news, they showed this
17 report on TV, I got all the jokes like my name is on
18 TV, but since --
19     Q.  Other than your attorney, have you
20 discussed this, your investigation in this case with
21 anybody?
22     A.  No.
23     MR. CANNON:  Except for the night when he
24 talked with the other detectives, you mean?
25 BY MR. KOSSACK:

Page 51

1      Q.  Right.  So, well, it was in the morning
2  that you spoke with these other detectives?
3      MR. CANNON:  Whenever it was.
4      THE WITNESS:  Yes.
5  BY MR. KOSSACK:
6      Q.  It would have been before this final
7  report was finished at 12:30?
8      A.  Yes.
9      Q.  And so other than that discussion with
10 those five people, you do not recall having any
11 other discussion with anybody about this case other
12 than your attorney?
13     A.  No.
14     Q.  All right.  I don't have any more
15 questions.
16
17          EXAMINATION
18 BY MR. CANNON:
19     Q.  Let me ask you this question so I am
20 clear.
21     You have been asked about keys and
22 whether this woman told you that she had a set of
23 missing keys.  If it is not in her statement,
24 recorded statement that you took, you could not have
25 had any such conversation; correct?

Page 52

1      A.  Correct.
2      Q.  And there is not anything in this
3  statement concerning keys; so you could not have had
4  it; right?
5      A.  Correct.
6      MR. CANNON:  I have nothing further.
7      MR. KOSSACK:  Let me follow up.
8
9          FURTHER EXAMINATION
10 BY MR. KOSSACK:
11     Q.  Prior to turning on the tape recorder,
12 you did not have any sort of conversation with
13 Chrissy Mazzeo?
14     A.  The most would have been name, date of
15 birth, that kind of stuff, to fill in this top part.
16     Q.  Is it standard operating procedure to
17 completely fill out the top part?
18     A.  It is verbal.  It is -- you know, someone
19 sits in my car and I will say, what's your name,
20 spell that, date of birth, Social, do you know how
21 tall you are, do you know how much you weigh,
22 address, phone number, that's what I do.
23     Q.  Is that usually filled out regardless of
24 who the suspect would be --
25     A.  Yes.  It is for the transcription girls

13 (Pages 49 to 52)

1          **REPORTER'S DECLARATION**

2     STATE OF NEVADA      )
                           ) ss.
3     COUNTY OF CLARK      )

4                I, CAMEO L. KAYSER, CCR No. 569,
      declare as follows:
5
                     That I reported the taking of the
6     deposition of the witness, MARC COLON, commencing on
      Monday, May 3, 2010, at 2:10 p.m.
7
                     That prior to being examined, the
8     witness was by me duly sworn to testify to the
      truth, the whole truth, and nothing but the truth;
9     that, before the proceedings' completion, the
      reading and signing of the deposition has been
10    requested by the deponent or a party.

11                   That I thereafter transcribed my said
      shorthand notes into typewriting and that the
12    typewritten transcript of said deposition is a
      complete, true, and accurate transcription of said
13    shorthand notes taken down at said time.

14                   I further declare that I am not a
      relative or employee of any party involved in said
15    action, nor a person financially interested in the
      action.
16
                     Dated at Las Vegas, Nevada this 13th
17    day of May, 2010.

18

19

20

21

22

23    _____
      CAMEO L. KAYSER, RPR, CCR No. 569
24

25

CAMEO KAYSER & ASSOCIATES  (702) 655-5092

# EXHIBIT 3

# EXHIBIT 3

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2              DISTRICT OF NEVADA
 3               SOUTHERN DIVISION
 4                 * * * * *
   CHRISSY ISRAEL MAZZEO,      )
 5                             )
        Plaintiff,   ) Case No.
 6                   ) 2:08-CV-01387
      vs.            ) -R.H.-PAL
 7                             )
   JAMES ARTHUR "JIM" GIBBONS; )
 8  SIGMUND "SIG" ROGICH; LAS  )
   VEGAS METROPOLITAN POLICE   )
 9  DEPARTMENT; BILL YOUNG;    )
   DONALD J. CAMPBELL; PENNIE  )
10  MOSSETT-PUHEK; and DOES    )
   1-20,                       )
11                             )
        Defendants.   )
12  _____    )
13
14
15
16
17      DEPOSITION OF MICHAEL HNATUICK
           VOLUME I
18    Taken on Thursday, May 6, 2010
          At 10:05 A.M.
19
20      At Kossack Law Offices
         4535 West Sahara Avenue
21            Suite 101
          Las Vegas, Nevada
22
23
24
25
   Reported by:  CAMEO KAYSER, RPR, CCR No. 569
```

Page 2

```
 1  APPEARANCES:
 2
 3  For the Plaintiff:
         ROBERT J. KOSSACK, ESQ.
 4       Kossack Law Offices
         4535 West Sahara Avenue
 5       Suite 101
         Las Vegas, Nevada 89102
 6
 7
 8  For the Defendants Las Vegas Metropolitan Police
   Department and Bill Young:
 9       WALTER R. CANNON, ESQ.
         Olson, Cannon, Gormley & Desruisseaux
10       9950 West Cheyenne Avenue
         Las Vegas, Nevada 89129
11
12
   For the Defendant James Arthur "Jim" Gibbons:
13       PATRICIA K. LUNDVALL, ESQ.
         McDonald, Carano, Wilson
14       2300 West Sahara Avenue
         Suite 1000
15       Las Vegas, Nevada 89102
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  WITNESS                        PAGE
   MICHAEL HNATUICK
 3
   EXAMINATION BY MR. KOSSACK            4
 4
 5         E X H I B I T S
 6  EXHIBITS                       PAGE
 7  EXH. NO. 1   Officer's Report      13
 8  EXH. NO. 2   Officer's Report      17
              (Detective Colon's)
 9
10  EXH. NO. 3   Incident Report       17
11  EXH. NO. 4   Voluntary Statement   22
12  EXH. NO. 5   Residence Inn - Statement   37
13  EXH. NO. 6   Aerial Map            38
              (Black and White)
14  EXH. NO. 7   Aerial Map            40
              (Marked with points)
15
   EXH. NO. 8   Aerial Map            40
16            (Colored photograph)
17  EXH. NO. 9   Voluntary Statement   42
              (James Gibbons Bates No. 2841-2862)
18
   EXH. NO. 10  Voluntary Statement   43
19            (James Gibbons Bates No. 2818-2840)
20
21
22
23
24
25
```

Page 4

```
 1       (Thereupon, Rule 30(b)(4) was waived
 2        prior to the commencement of the
 3        deposition proceedings.)
 4    Thereupon --
 5            MICHAEL HNATUICK
 6  was called as a witness by the Plaintiff, and having
 7  been first duly sworn, testified as follows:
 8            EXAMINATION
 9  BY MR. KOSSACK:
10      Q.  Could you please state your name for the
11  record.
12      A.  Michael Hnatuick, last name is
13  H-n-a-t-u-i-c-k.
14      Q.  Have you ever had your deposition taken
15  before?
16      A.  Yes.
17      Q.  How many different times?
18      A.  Related to the department once and in
19  reference to a traffic accident once, so I guess I
20  have been deposed twice.
21      Q.  When was the last time?
22      A.  Traffic accident was probably three years
23  ago and the issue for the department was 20 years
24  ago.
25      Q.  Well, let me go through the ground rules
```

Page 5

1 again to refresh your memory. The oath that you
2 just took is the same oath that you would take in a
3 court of law. It carries the same solemnity to tell
4 the truth and carries the same penalties of
5 punishment or perjury if you don't tell the truth.
6     Do you understand?
7     A. Yes, sir.
8     Q. As we speak, if you can let me complete a
9 question before you answer and complete your answer,
10 I will let you complete your answer before I ask
11 another question. If I ask a question and you
12 answered the question, I will assume that you
13 understand the question. If you don't understand
14 the question, ask me to repeat or rephrase. Okay?
15     A. Okay.
16     Q. At the end of the deposition, the court
17 reporter will transcribe everything that is said on
18 the record here today and put it into a booklet form
19 which you will have an opportunity to review. If
20 you believe that the court reporter has
21 mistranscribed something and -- you know, put in a
22 different word than what you said or what was said,
23 you will be able to make corrections to the
24 transcript; however, if any of those corrections
25 substantially alter your testimony such as if this

Page 6

1 was an auto accident, and you testified in
2 deposition that the light was red and you changed
3 that answer to green, it is a substantial change in
4 your testimony and any attorney at the time of trial
5 would be able to comment on that in order to attempt
6 to impeach you. Okay?
7     A. Okay.
8     Q. Is there any reason that you can't give
9 full and truthful testimony today such as lack of
10 sleep or under the influence of any sort of drugs or
11 medication?
12     A. No, sir.
13     Q. What is your position with the Las Vegas
14 Metropolitan Police Department?
15     A. I am currently a patrol sergeant assigned
16 to central patrol division, northwest area of
17 command, graveyard, squad northwest 11.
18     Q. I didn't quite catch all of that. Patrol
19 sergeant, central patrol division --
20     A. Northwest area of command.
21     Q. Northwest area of command.
22     A. I work graveyard assigned to the squad
23 northwest 11.
24     Q. Were you recently or since the time of
25 this investigation involving Gibbons, were you

Page 7

1 promoted to sergeant?
2     A. Yes. I was promoted to sergeant on
3 November 29th, 2008.
4     Q. So you no longer work as a detective?
5     A. No.
6     Q. And what was your position with the
7 department on October 13th, 2006?
8     A. I was a detective assigned to the
9 robbery/homicide section, violent crimes bureau.
10     Q. And what kind of cases would you normally
11 investigate?
12     A. Violent crimes section got a variety of
13 violent crime cases basically from misdemeanor
14 batteries all the way up to attempt murder cases.
15     Q. Under normal conditions, if these were
16 just -- if this did not involve a city congressman,
17 if he was just a Joe Blow, would you normally have
18 been assigned this sort of case to investigate?
19     MR. CANNON: On the same basis as
20 battery? It is vague and ambiguous. Is that your
21 question, a simple battery not involving --
22     MR. KOSSACK: You may answer the question
23 as posed.
24     MR. CANNON: If you understand it, you
25 can answer it.

Page 8

1     MR. KOSSACK: All right. Look, we got
2 into a little tiff last time and the time before.
3 Now, Walt, if you continue to make coaching
4 objections, speaking objections, illegal objections,
5 I will put an end to the deposition and file a
6 motion with the magistrate and ask for sanctions.
7     MR. CANNON: That's your right. Go
8 ahead. Rather than editorialize, just call the
9 magistrate and set an appointment.
10     MS. LUNDVALL: And I will also object to
11 the form, and I will also ask for a simple issue of
12 politeness. Rather than chomping on ice and kind of
13 mumbling these questions out, I would hope that you
14 might be polite to this witness and pose your
15 question without mumbling and having half of it come
16 over the top of the chomp on the ice cubes, please.
17     MR. CANNON: Again, if you understand the
18 question, go ahead and answer it.
19     THE WITNESS: Okay. His notoriety as a
20 public figure had no basis on whether or not the
21 case would be assigned to us. We would take all of
22 those cases, whether they are average citizens or
23 public figures accused of these crimes.
24 BY MR. KOSSACK:
25     Q. Okay. Was there any other division that

1  up that we could. We were waiting for some to be
2  transcribed. I believe that -- let me see. I think
3  based on that myself and -- I can't be sure. It
4  would be in my officer's report.
5      Q. Would that be the six-page officer's
6  report or the 25-page officer's report?
7      A. Initially it would be the six-page
8  officer's report.
9      Q. Okay. Well, I just happen to have a
10  six-page officer's report right here.
11      MR. KOSSACK: If you can mark that first
12  in order.
13      (Whereupon, Exhibit No. 1 was
14       marked for identification.)
15      MR. CANNON: Very gifted of you, Bob.
16      Is there a question pending?
17      MR. KOSSACK: No. I am just showing him
18  the report and I'm giving him some time to look it
19  over.
20      MR. CANNON: There is no question
21  pending?
22      MR. KOSSACK: There is no question
23  pending.
24      MR. CANNON: Okay.
25      THE WITNESS: Okay.

1  BY MR. KOSSACK:
2      Q. Before I ask some questions on this, let
3  me digress a little bit and find out a little bit
4  more about your background.
5          When and where were you born?
6      A. New Brunswick, New Jersey, November 26,
7  1966.
8      Q. And you went to high school there?
9      A. No. I went to high school here in
10  Las Vegas, Western High School, graduated in 1984.
11      Q. And when did you first move to Las Vegas?
12      A. I moved here with my parents in 1974.
13      Q. And after graduating from Western High
14  School, what did you do?
15      A. I attended UNLV where I graduated with a
16  bachelor's degree in criminal justice with a minor
17  in political science in 1988.
18      Q. And then what did you do?
19      A. My senior year in college I applied for
20  several jobs, one of them being with the Las Vegas
21  Metropolitan Police Department. I was hired by
22  Metro and started the academy in September of 1988.
23      Q. Who was the chief at that time?
24      A. 1988 I would have to say I believe it was
25  Moran.

1      Q. I think it was Keller, but at any rate --
2      MR. CANNON: Not in '88.
3      THE WITNESS: No. Keller was next.
4  BY MR. KOSSACK:
5      Q. I guess so. So you started out as a
6  patrolman?
7      A. Yes.
8      Q. And how long did you serve as a
9  patrolman?
10      A. I was a patrolman for seven years.
11      Q. And then after that?
12      A. I applied for and was assigned to the
13  detective bureau as a detective, and I served there
14  for approximately 12 years.
15      Q. Now, is that considered a promotion or
16  just a change of job?
17      A. At Metro it's not really considered a
18  promotion. You get extra pay, but there are no
19  property rights you are entitled to in that
20  position.
21      Q. So you just apply or you take a
22  competitive exam?
23      A. Well, you apply and there is an oral
24  board interview and then they rank you based on how
25  well you do and as positions become open, they move

1  down the list. And I think at that time, it was
2  actually a pool and they just selected people, but
3  now they go off of lists.
4      Q. Okay.
5      A. And as positions become available, they
6  take people off the list.
7      Q. So detective bureau 12 years, and I guess
8  that's what you were doing at the time of this
9  incident?
10      A. Correct.
11      Q. And then after the detective bureau, you
12  applied and were promoted to sergeant and became in
13  your present position?
14      A. No. The year before I was promoted to
15  sergeant. I had transferred to the Internal Affairs
16  Division where I did internal investigations from
17  November of '07 to November of '08.
18      Q. And then what was your rank when you
19  worked at Internal Affairs?
20      A. Detective.
21      Q. And then after Internal Affairs?
22      A. I was promoted from Internal Affairs from
23  the rank of sergeant and went back to the patrol
24  division.
25      Q. And that was as a result of competitive

Page 17

1  exam and oral boards and so forth?
2     A. Yes. Yes.
3     Q. Now, before we discuss Exhibit 1, I want
4  to hand you what I will have marked as Exhibit 2.
5        (Whereupon, Exhibit No. 2 was
6        marked for identification.)
7  BY MR. KOSSACK:
8     Q. Exhibit 2 is a copy of Colon --
9        MR. CANNON: Colon.
10 BY MR. KOSSACK:
11    Q. Colon's report.
12       Was this the document that you were
13 previously referring to that you had seen?
14    A. There was a crime report and then this
15 officer's report.
16    Q. Okay. So this is separate from the crime
17 report?
18    A. This is separate from the ICR, incident
19 crime report, yes, sir.
20    Q. Let me just go check something now and I
21 will be right back here.
22       (Off the record.)
23       (Whereupon, Exhibit No. 3 was
24       marked for identification.)
25 BY MR. KOSSACK:

Page 18

1     Q. I have handed you Plaintiff's Exhibit 3.
2  Is this the incident crime report that you
3  previously were referring to?
4     A. Let me see. This crime report here that
5  you have handed me was completed by me.
6     Q. That's what I thought.
7     A. Yes.
8     Q. So this is not the one that you
9  originally saw?
10    A. No. It may have just been Colon's
11 officer's report.
12    Q. But Colon's officer report is not dated
13 until noontime or thereafter, isn't it?
14       MR. CANNON: It is dated 0900, isn't
15 it -- maybe not -- 1230.
16       THE WITNESS: Yeah. 1230 hours on
17 10/14/06, which I'm assuming, and I don't want to
18 get into assumptions, but he would have -- well, I
19 don't want to --
20 BY MR. KOSSACK:
21    Q. Do you think you saw another report on
22 the same format as Plaintiff's Exhibit 3 that was
23 made out?
24    A. The incident crime report?
25    Q. Yes.

Page 19

1     A. I don't believe so.
2     Q. Okay.
3     A. Because here it says in my initial
4  officer's report --
5     Q. And you are looking at Plaintiff's
6  Exhibit --
7     A. 1.
8     Q. 1.
9     A. Page 2. It says, After a review of the
10 initial officer's report prepared by
11 Detective Colon, so I believe this is what I
12 referred to. This we completed at the end of our
13 interview with her on the 14th, so we would have a
14 record of the incident. Again, incident crime
15 report, so we would have this as well.
16    Q. Okay. So the first thing you considered,
17 the first thing you started out with was Exhibit 2,
18 Colon's report?
19    A. I believe so, yes. Amongst other
20 documents.
21    Q. Now, do you have any personal knowledge
22 of Sergeant Cricket's notification that she felt the
23 incident did not fit the criteria of sexual battery?
24    A. The night before -- the only knowledge I
25 have is what was referred to me. I was not privy to

Page 20

1  that conversation, no.
2     Q. Are you aware of the system upon which
3  Sergeant -- in other words, do you know what
4  information would have been presented to
5  Sergeant Cricket before making that determination?
6        MR. CANNON: Objection. Calls for
7  speculation.
8        Go ahead.
9        THE WITNESS: Again, I was not privy to
10 that conversation, so anything that I say would be a
11 guess. I don't know.
12 BY MR. KOSSACK:
13    Q. All right. As you developed information
14 in the case, took voluntary statements, got them
15 transcribed, so forth, was the case ever resubmitted
16 to Sergeant Cricket to see if she fit the criteria
17 of the sexual assault case?
18       MR. CANNON: To which I will object.
19 There is no testimony that it was ever submitted to
20 her.
21       Go ahead.
22       THE WITNESS: At some point during the
23 course of the investigation, after Mazzeo had said
24 she no longer wanted to prosecute, and then there
25 was the press conference with Mr. Wright and they

Page 33

1 Chrissy Mazzeo had made more than one call to 911?
2 　　MR. CANNON: At the time they interviewed
3 Gibbons?
4 　　MR. KOSSACK: Yes.
5 　　MR. CANNON: Go ahead.
6 　　THE WITNESS: I don't recall if at that
7 time I was aware that there were three calls.
8 BY MR. KOSSACK:
9 　　Q. When did you first become aware that
10 there were three calls?
11 　　A. The first time that I recollect being
12 aware that there were three calls was later on that
13 evening when we actually got the recordings of the
14 three calls.
15 　　Q. Were you aware that Chrissy's sister,
16 Anna, had called 911?
17 　　A. Prior to getting the information on the
18 911 calls, I don't recall if I knew that or not.
19 　　Q. Did you find that out when you got the
20 three 911 call information regarding Chrissy's
21 calls?
22 　　A. I believe so.
23 　　Q. So they were matched up at that time that
24 these four calls went together in some way or
25 another?

Page 34

1 　　A. I believe so because I do remember being
2 aware of that call as well. I believe later in the
3 day on the 14th.
4 　　Q. Looking at Exhibit 4, Chrissy Mazzeo's
5 single page handwritten statement.
6 　　A. Okay.
7 　　Q. She says, Walked with him. He pushed me
8 back forcing my arms against wall saying I'm fucked.
9 Three people walked by. I ran with them.
10 　　Is that your reading of the statement?
11 　　A. Yes, I see that.
12 　　Q. And --
13 　　MS. LUNDVALL: I will object. You read a
14 portion of it, not the entirety.
15 BY MR. KOSSACK:
16 　　Q. When she says, He pushed me back forcing
17 my arms against the wall, did you understand that
18 statement to mean that he had forced her to move a
19 distance against her will?
20 　　A. Well, by reading the statement, yes. It
21 would infer that she moved a distance.
22 　　Q. Okay. And that she was forced to move
23 that distance?
24 　　A. That is correct.
25 　　Q. And that he then held her for a period of

Page 35

1 time?
2 　　MR. CANNON: Objection. There is nothing
3 in the statement to that.
4 　　Go ahead.
5 　　MR. KOSSACK: Objection. Again, that is
6 a --
7 　　MR. CANNON: Well, you can take it to the
8 magistrate, Bob. I need it on the record. I'm
9 paying for the record. I don't need your editorial
10 comments.
11 　　Go ahead.
12 　　THE WITNESS: Okay. I'm sorry. What was
13 the follow-up to that?
14 　　MR. KOSSACK: The court reporter, if she
15 can please read the question.
16 　　(The requested portion of the record was
17 　　read by the court reporter.)
18 BY MR. KOSSACK:
19 　　Q. Did you understand that statement to mean
20 that she had been held there for a period of time
21 until the three people walked by?
22 　　A. It doesn't -- the statement doesn't say.
23 She doesn't say that she was held against her will,
24 so I don't know that I would have inferred that or
25 not.

Page 36

1 　　Q. Okay.
2 　　MR. CANNON: Gee, I think that was my
3 objection.
4 BY MR. KOSSACK:
5 　　Q. Now, had -- okay. So you interviewed
6 Gibbons?
7 　　A. (Witness nods head.)
8 　　Q. The first time you interviewed him, was
9 that before you had -- which I will pull out here
10 and have marked. Let me see if she made a little
11 error here.
12 　　MR. CANNON: What a surprise.
13 　　(Off the record.)
14 BY MR. KOSSACK:
15 　　Q. Did there come a time that you requested
16 of the Marriott Residence Inn a log showing when key
17 cards opened the door to Gibbons' hotel room?
18 　　A. Yes.
19 　　Q. And what was the process that you went
20 through in getting those records?
21 　　A. We had to speak to the manager of the
22 hotel.
23 　　Q. And he voluntarily turned them over?
24 　　A. I know there was a videotape and we got
25 an administrative subpoena, I believe, for the

Page 45

1  structure, parking structure -- so I said, 'Good.
2  I'm walking that way. I'll walk with you.'"
3      A. Okay.
4      Q. Is that what he told you on October 14th,
5  2006?
6      A. Yes.
7          MS. LUNDVALL: And now I need to place an
8  objection. The Exhibit 7, which is a copy of the
9  opposition to the motion for summary judgment
10 contains a material misrepresentation based upon
11 what you just pointed out.
12 BY MR. KOSSACK:
13     Q. And did he also say that it was around
14 the corner as indicated in the next to the last
15 answer, the question was, Did you ask and did he
16 answer?
17         "Question: And at some point you
18 mentioned that she tripped?
19         "Answer: She did. She did. Around the
20 corner, uh, you know, I think the surface is uneven,
21 but she tripped. I reached out to grab her. I
22 stood her up. I said, 'Are you okay?' And she --."
23         Was that the question you asked and the
24 answer Jim Gibbons gave on October 14th, 2006?
25         MS. LUNDVALL: Objection. Your question

Page 46

1  is vague and ambiguous.
2          MR. CANNON: You can answer, Mike.
3          THE WITNESS: Yes.
4  BY MR. KOSSACK:
5      Q. And looking on page 14, looking at the
6  third question, did you ask Jim Gibbons and did he
7  answer as follows?
8          "Question: Did you escort her into the
9  parking structure?
10         "Answer: It was right at the entrance of
11 that parking structure that we were at.
12         "Question: Where she tripped?
13         "Answer: Yeah."
14         Is that your understanding -- is that the
15 questions that you asked and the answers that
16 Jim Gibbons gave on October 14th, 2006?
17     A. Yes.
18         MR. CANNON: Who is asking these
19 questions?
20         THE WITNESS: I believe it was me.
21         MR. CANNON: Okay.
22 BY MR. KOSSACK:
23     Q. And then if we look at page 20.
24     A. If you could hold on just a second so --
25         MR. CANNON: We're not sure who is

Page 47

1  asking the questions. He was there, but we're not
2  sure -- your question is, did he ask those
3  questions?
4  BY MR. KOSSACK:
5      Q. It says, Persons present are myself,
6  Detective Hnatuick, Barker, Jim Gibbons, also
7  present is Sergeant McCarthy and James Denton.
8      A. Yes. I believe I was the one asking
9  those questions, yes.
10         MR. CANNON: Okay.
11 BY MR. KOSSACK:
12     Q. Now, if we turn to page 20 -- and that
13 would be page 20 of Exhibit 10, do you recall
14 Detective Barker asking Jim Gibbons and Jim Gibbons
15 giving the following answer?
16         "Okay. Were you, at the time that you
17 picked her up, were you close to any, um, a wall or
18 any part of the structure of the garage?
19         "Answer: I think there was a, like
20 the -- uh, a wall or a bench that was right there.
21 You know. I just kind of stood her up."
22         Was that the question asked and the
23 answer Jim Gibbons gave to the police on
24 October 14th, 2006?
25     A. Yes. And that question was asked by

Page 48

1  Detective Barker.
2      Q. And was the description of the location
3  where Chrissy stumbled or fell as given by Gibbons
4  on October 14th, 2006 consistent with the location
5  that he marked as 3 in the diagram that has been
6  marked as Plaintiff's Exhibit 8 to your deposition?
7      A. I believe it is the same general area,
8  yes.
9      Q. And then looking at the November 10th
10 statement, Exhibit 9.
11         MR. CANNON: Page 3, I think that's where
12 we are going.
13         THE WITNESS: Okay.
14 BY MR. KOSSACK:
15     Q. It says -- just first of all, looking at
16 page 2 it says, Persons conducting the interview are
17 myself, Detective Hnatuick, and then you mention
18 Detective Barker, also present are Jim Gibbons and
19 his attorney, Don Campbell.
20         If there's simply a question without
21 initials, was that you asking the question?
22     A. Yes. Because that would be the way it
23 would be for the person initializing the tape and
24 beginning the interview. If there was a change in
25 people asking the questions, it would be noted by

12 (Pages 45 to 48)

Page 53

1  BY MR. KOSSACK:
2      Q.  Well, the question was, How did you enter
3  the hotel?  And the answer was, There is a gate
4  right here point 4.  Was it your understanding that
5  he had entered the hotel through the gate?
6      A.  Okay.  Where -- you're on page 11.
7          MR. CANNON:  Right at the top here, Mike,
8  page 11.  Start with the question.
9          THE WITNESS:  Show us point 3; correct.
10         MR. CANNON:  Right here is what he is
11 asking about.
12         MS. LUNDVALL:  It doesn't tell you one
13 way versus another how he entered the hotel.
14         MR. KOSSACK:  That is an improper
15 objection, Pat.  Please, no more of those.
16         MR. CANNON:  That is one for her.
17         MR. KOSSACK:  Yeah, you're right.
18         THE WITNESS:  In his statement, that is
19 the way he indicated that he went.
20 BY MR. KOSSACK:
21     Q.  In fact, he went on to say, did he not,
22 you asked him the following question, "Question:
23 Okay.  Where would -- okay.  Can you tell from here,
24 was it a back door that you entered?  How would you
25 get into the hotel from that point?

Page 54

1          "Answer:  Well, this gate goes to a back
2  door that is about right here.  Right there.
3  (Scribbling with a pen)  You need a new pen.
4  (Laughing)."
5          You say, "It is a government pen."
6          "Okay."
7          "Question:  Okay.  And from there, where
8  did you go?
9          "Answer:  To my room.  Directly to my
10 room."
11         So the part where the pen started to fail
12 to write, was he indicating a back door to the
13 hotel as being where he entered the hotel?
14         MS. LUNDVALL:  Once again, I will object.
15         MR. CANNON:  That calls for speculation.
16 BY MR. KOSSACK:
17     Q.  Actually, there is a little arrow here,
18 isn't there, right at the top of this?
19         MR. CANNON:  Now we have three questions.
20 Which question do you want him to answer?
21         MR. KOSSACK:  Let's start with the
22 pending question.
23         MR. CANNON:  There are two pending
24 questions.
25         MR. KOSSACK:  Okay.

Page 55

1  BY MR. KOSSACK:
2      Q.  Do you see on the color photograph it
3  looks like a pen arrow pointing to -- let me move
4  around to your side of the table.  This arrow right
5  there, is the arrow pointing to the back of the
6  building where Jim Gibbons said that he entered the
7  back of the hotel?
8          MR. CANNON:  To which I will object.
9          MS. LUNDVALL:  I will object to your
10 question.
11         MR. CANNON:  There is no indication that
12 that is an arrow.  It could simply be a black spot
13 on the building.
14         MS. LUNDVALL:  And number two,
15 Governor Gibbons does not indicate that he entered
16 in this particular statement the back door of the
17 hotel.
18         MR. CANNON:  Go ahead.  You can answer.
19         MR. KOSSACK:  So that's two for you, Pat,
20 and three for you, Walt, of improper objections.
21         THE WITNESS:  It's my -- it's my
22 recollection that the diagram ended with the number
23 4 circle.  I'm seeing what you're pointing to as a
24 possible arrow to the back of the building.  I don't
25 believe that that is an arrow.  I don't believe that

Page 56

1  was drawn on there.  I think that's part of the
2  image.
3  BY MR. KOSSACK:
4      Q.  Is that where he tried to draw before the
5  government pen kicked out?
6      A.  I don't know that he ever tried to draw
7  beyond the number 4.
8      Q.  Well, when you asked him on page 11, Can
9  you tell from here, was it a back door that you
10 entered, how would you get into the hotel from that
11 point?"
12         "Answer:  Well, this gate goes to the
13 back door that is right here.  Right here.
14 (Scribbling with pen.)  You need a new pen?"
15         MR. CANNON:  Wait a minute.  There's no
16 question.  What's the question?
17 BY MR. KOSSACK:
18     Q.  The question is, did Jim Gibbons indicate
19 that he had entered the back door of the hotel,
20 based on that question and answer?
21     A.  I believe he indicated that is the way he
22 went.
23     Q.  And then did he tell you that he had gone
24 from there directly up to his room?
25     A.  Yes, I believe he did.

14 (Pages 53 to 56)

Page 61

1    THE WITNESS: Yes, that's right.  He said
2  that did not happen.
3  BY MR. KOSSACK:
4    Q.  Okay.  Now, he originally told you that
5  he had thought he had been back into his hotel room
6  by 10:10 p.m. and no later than 10:15 p.m. as
7  indicated on page 13.  If you look at page 13, did
8  you ask him, "Question:  Okay.  When you guys
9  separated here.
10    "Answer:  Mm-hmm.
11    "Question:  And you go back to your hotel
12  room?
13    "Answer:  Yes.
14    "Question:  You mentioned that it was
15  possibly 10 after 10:00, quarter after 10:00.
16    "Answer:  I don't even know if it was
17  that late, but I would have to guess at it."
18    Were those the questions asked of
19  Jim Gibbons and the answers that he gave at the time
20  of his November 10 statement?
21    A.  Yes.
22    Q.  And again, did you ask him, "Okay.  And
23  prior to -- uh, or once you get into the hotel, you
24  go right to the elevator?"
25    "Answer:  Right to my room.

Page 62

1    "Question:  And go upstairs?
2    "Answer:  Yes.
3    "Question:  Did you stop and talk to
4  anybody?
5    "Answer:  Not to anybody."
6    Were those the questions given and the
7  answers given by Jim Gibbons at the time of his
8  November 10th interview?
9    A.  Yes.
10    Q.  And did he also discuss with you that his
11  key card also worked the back gate, and I refer you
12  to page 17?
13    A.  Okay.
14    MR. CANNON:  Where are you at, please, on
15  page 17?  I don't see it.  You will have to correct
16  your opposition, Bob.
17  BY MR. KOSSACK:
18    Q.  Well, do you recall Detective Barker
19  asking on page 17, fourth question from bottom,
20  "Okay.  When you enter the gate here, sir, do you
21  have to use your, uh, key card?"
22    "Answer:  Yes, you do.
23    "Question:  To get through the gate?
24    "Answer:  Yes, you do."
25    Were those the questions given and the

Page 63

1  answers given by Jim Gibbons at the time of his
2  November 10 statement?
3    A.  Yes.
4    Q.  And then was he also asked, "And then you
5  walked straight back past the pool into the back
6  entrance, correct?"
7    "Answer:  You do, yes."
8    Was that the question given and the
9  answer given by Jim Gibbons at the time of his
10  November 10 statement?
11    A.  Yes.
12    Q.  And then was it again mentioned to him on
13  page 18, quote, That it appears that, uh, the key
14  that was issued to you was used to, uhm, enter your
15  room at 10:47.  We're -- we're trying to account
16  for, uhm, the time difference, especially since, uh,
17  Mr. Rogich and Georgeanne are entering the parking
18  structure.
19    Do you recall Detective Barker saying
20  that to Jim Gibbons after he had previously
21  testified or previously given you a statement of how
22  he had entered the hotel?
23    A.  Yes.
24    Q.  And then if we look at page 18, did he
25  then change his statement where he answered -- well,

Page 64

1  the question was, Uh, unfortunately, that does not
2  record the time, referring to the gate.
3    "Answer:  Well, uhm, I do know that when
4  I first tried the gate, the gate wouldn't open for
5  me."
6    Is that what he then told you?
7    MR. CANNON:  Well, that's argumentative
8  as to what he then told him.  That suggests
9  something else.
10    But go ahead.
11    THE WITNESS:  That is his statement on
12  page 18, yes, as far as in reference to
13  Detective Barker's statement.
14  BY MR. KOSSACK:
15    Q.  And then did Jim Gibbons say, "So I
16  turned and walked back here, went to here, tried to
17  go to the front door and, uh, did not have my key at
18  that point.  I turned around thinking I had dropped
19  my key along the way, walked very slowly back here
20  looking for my key.  Went back and found that I had
21  dropped the key at the gate when I had tried it the
22  first time.  I put it in my jacket, but I guess I
23  missed my pocket because I found my key laying at
24  the base of the gate."
25    The question, "Okay."

16 (Pages 61 to 64)

Page 65

1    "Answer: That's when I picked the key up
2  again, tried the key and jiggled it. And this time
3  it opened. That's when I went through the door and
4  up to my room. And I don't -- I'm not sure how long
5  it took searching this path back here, uh, to find
6  my key. But that's basically -- I went in that gate
7  and up to my room."
8       Were those the questions and answers that
9  Jim Gibbons gave on November 10 after being informed
10 that the key card showed that he didn't enter his
11 room until 10:47?
12      A. Yes.
13      Q. Did you accept that answer or did you --
14 were you suspicious of it in any way?
15      A. That was his answer. And at that point,
16 we had no independent witnesses or any evidence
17 legally to dispute that.
18      Q. Well, other than his first statement
19 where he left that out, that disputed it, didn't it?
20      A. Well, I don't know if it disputed it.
21 This was in addition to it.
22      Q. But at first, he said that he went right
23 to the gate and right inside. And now he is saying
24 he went back around the front of the hotel and then
25 back around the gate before going inside; correct?

Page 66

1       A. That is correct.
2          MS. LUNDVALL: I will object. Your
3  question is so argumentative.
4  BY MR. KOSSACK:
5       Q. And the fact that he entered the hotel
6  from the back gate was also verified by the fact
7  that he wasn't shown entering through the lobby,
8  would that be correct?
9          MR. CANNON:  Calls for speculation. I
10 will object to the form of that question.
11         Go ahead.
12         THE WITNESS: I can't 100 percent say
13 yes, but it would infer that.
14 BY MR. KOSSACK:
15      Q. Okay. Would it surprise you to learn
16 that at deposition Gibbons said that he didn't enter
17 the back gate, he went around to the front, couldn't
18 find his card, went back to the gate, found his
19 card, but then went back to the front and entered
20 through the front door?
21         MS. LUNDVALL I will object. It is one of
22 the most impermissible questions to ask one witness
23 as to opine as to the credibility of another
24 witness.
25         MR. CANNON: I will also object. I don't

Page 67

1  recall exactly what Governor Gibbons said as far as
2  that is concerned, and you are now asking him to
3  speculate and express surprise, which is irrelevant.
4       But go ahead.
5          THE WITNESS: Yes. Yes.
6          MR. CANNON: Oh, shoot. Don't I get
7  another mark?
8          MR. KOSSACK: Yes. I suppose you should.
9  BY MR. KOSSACK:
10      Q. And also when you investigate cases and
11 you are trying to determine witness credibility, you
12 take into account whether or not they have changed
13 previous statements. Would that be correct?
14      A. It depends on what the change is.
15      Q. And when Gibbons changed his testimony as
16 to whether he entered directly through the back gate
17 or went around through the front and then came back
18 and entered the back gate, did you consider that a
19 significant change in his testimony?
20      A. Not a significant change. Certainly a
21 change.
22      Q. All right.
23      A. Or an addition.
24      Q. Did there come a time that you
25 interviewed the front desk clerk of the

Page 68

1  Marriott Residence Inn?
2       A. I believe we did -- I don't -- I would
3  have to look to know if I specifically spoke with
4  her.
5       Q. Do you recall the desk clerk saying that
6  she talked to Jim Gibbons at the front desk?
7       A. Off the top of my head, no. I would have
8  to --
9       Q. Now, you had also received information at
10 the time that you first interviewed Gibbons or did
11 you that he was -- well, let me withdraw.
12      When did you first learn that there was
13 an issue about whether or not Jim Gibbons had
14 followed Chrissy Mazzeo over to the LaQuinta Inn?
15      A. That would have come from Chrissy Mazzeo.
16 And certainly it did not come -- the first interview
17 we did with her on the 14th when she chose not to
18 prosecute, so without reviewing reports, my best
19 recollection would be when we did the video
20 walk-through with her.
21      Q. All right. And did she mention at that
22 time that he had tried to grab ahold of her as she
23 had exited the LaQuinta Inn and went to the
24 Starbucks?
25      A. My recollection is that her statement was

Page 69

1 that she was -- she was inside the LaQuinta, and she
2 was concerned because she believed he was outside.
3 I don't know if this was an allegation of physical
4 contact at the LaQuinta.
5     Q.   Would it be correct to say that at around
6 the same time frame the desk clerk at the LaQuinta
7 said that she saw some sort of altercation between a
8 man and a woman outside the hotel?
9     A.   That is correct.
10     Q.   And that would be Kimberly Hartnett?
11     A.   I believe so, yes.
12     Q.   Did you ever -- I think I might have
13 asked this before. Did you ever do anything to
14 verify that the key card register was the correct
15 time?
16     A.   I don't recall. I don't recall if I did.
17     Q.   Do you know of anyone else who did?
18     A.   Off the top of my head, no, I don't.
19     Q.   And then looking on -- let me ask this.
20 Gibbons says that she nearly tripped and he kept her
21 from falling by catching her before she hit the
22 ground essentially. Would that be correct?
23     A.   I believe so.
24     Q.   And, of course, he also denied doing
25 anything improper at that time. Would that be

Page 70

1 correct?
2     A.   I believe so, yes.
3     Q.   He also said up to that time he was being
4 a gentleman and helping her find her car. Would
5 that be correct?
6     A.   I believe so.
7     Q.   And then after he says he caught her from
8 stumbling, he says that she just gave a blank stare
9 and walked away. Would that be correct?
10     A.   I believe that was -- yes.
11     Q.   And do you recall that he said that she
12 walked away in the direction of the McCormick -- I
13 mean, in the direction of the Mariott Residence Inn
14 parking garage?
15     A.   Yes, I believe so.
16     Q.   And according to him there was nothing
17 unusual that had happened at that point other than
18 the fact that she gives him this blank stare and
19 walks away; right?
20     A.   Yes.
21     Q.   Did you question him as to why he no
22 longer had any interest in helping her find her car?
23     A.   No, I don't believe we did.
24     Q.   Did it seem suspicious to you at the time
25 that here he is allegedly helping her find her car

Page 71

1 and then just -- they split up from each other
2 before her car is found?
3     A.   Suspicious, no.
4     Q.   Did you come to a conclusion that
5 something happened between the time that he started
6 walking with her across the street to find her car
7 and the time that she made the first 911 call?
8         MS. LUNDVALL: I will object. It is
9 vague and ambiguous.
10         MR. CANNON: I will object to the
11 "something."
12 BY MR. KOSSACK:
13     Q.   You may answer.
14     A.   I have no idea what transpired at that
15 point.
16     Q.   Okay. But at any rate, Chrissy's 911
17 call, the first one, would you say that she is
18 hysterical?
19     A.   I would have to review my notes or
20 listening to the tape again as far as to be able to
21 answer whether or not she was hysterical.
22     Q.   You interviewed some of the people that
23 she said she also called at or around that same time
24 that she made that first 911 call. Would that be
25 correct?

Page 72

1     A.   Yes.
2     Q.   One of those would have been Anna, her
3 sister; correct?
4     A.   Yes.
5     Q.   And Anna, her sister, told you, did she
6 not, at that time that Chrissy had said that
7 Jim Gibbons had said, I'm not going to fuck you.
8 I'm going to rape you?
9     A.   I would have to review the statement to
10 know if that's accurate.
11     Q.   Do you recall whether or not Anna, her
12 sister, said that to the 911 operator during her 911
13 call?
14     A.   Again, I would have to review the
15 transcripts or listen to the tape.
16     Q.   Do you recall that Anna told you that
17 Chrissy said that he had her pinned against the wall
18 in the parking garage?
19         MR. CANNON: Okay. This is Anna telling
20 the 911 operator what Chrissy said? Is that your --
21         MR. KOSSACK: No.
22 BY MR. KOSSACK:
23     Q.   Do you recall in your interview with Anna
24 that she had said that Chrissy at the time had said
25 that he had her pinned against the wall in the

1      Q.  **Do you recall her saying to you over the**
2 **phone when you spoke to her again on the 14th that**
3 **you needed to add in there that alcohol was involved**
4 **and that it was a misunderstanding?**
5      A.  I don't recall that.
6      Q.  **If she had said that, would that have**
7 **been a significant reason why she would not have**
8 **wanted to further the prosecution?**
9      A.  Again, I would have to refer to the
10 answer I just gave.  I have no recollection of
11 saying that.  She may have.  And based on the fact
12 that we already had a no prosecution form and a
13 series of reasons why she didn't want to go forward,
14 I may not have added that.
15      Q.  **I guess my question is as a reason not to**
16 **go forward, being on one hand intoxicated,**
17 **misunderstanding, and on the other hand, just didn't**
18 **want to go up against Jim Gibbons and be involved in**
19 **a three-ring circus, which of those two reasons for**
20 **not wanting to go forward would be most significant**
21 **to the case, in your opinion?**
22      MR. CANNON:  Objection.  Asked and
23 answered.  He just answered that twice.
24      Go ahead.  If you can modify your earlier
25 answer, feel free to do so.

1      THE WITNESS:  I don't know that one would
2 be more significant than another.  People choose not
3 to prosecute for all types of reasons.  And it's not
4 really for me to say which answer is better.
5 BY MR. KOSSACK:
6      Q.  **Okay.  Are prosecutions continued even if**
7 **the victim does not want to prosecute?**
8      MR. CANNON:  I will object.  That lacks
9 foundation.  It is vague and ambiguous as to what
10 kind of crimes, et cetera.
11      Go ahead.  You can answer it.
12      THE WITNESS:  The only -- well, what was
13 the question again?
14 BY MR. KOSSACK:
15      Q.  **In your experience, do prosecutions go**
16 **forward and investigations go forward in any**
17 **instances once the victim has decided that they**
18 **don't want to go forward?**
19      MR. CANNON:  Same objection.
20      Go ahead.
21      THE WITNESS:  The only one that I'm aware
22 where that occurs sometimes is in domestic violences
23 where the State steps in and basically forces the
24 prosecution.  But even then, that is the technical
25 way per the law it is supposed to go.  But even in

1 those cases if the victim is a no show and doesn't
2 want to prosecute, the State generally drops the
3 case.
4      So, no, I would say it is not common for
5 that to continue.  Basically, the phrase that is
6 used, If there is no victim, there is no crime.
7      MR. KOSSACK:  All right.  We will take
8 our lunch break now until 2:00 o'clock, and I will
9 see you back here.
10      MR. CANNON:  You want an hour and a half
11 for lunch?
12      MR. KOSSACK:  No.  It is hour and 20
13 minutes, but I have a few things I need to take care
14 of.
15      (Thereupon, the taking of the deposition
16      concluded at 12:40 p.m.)
17
18      * * * * *
19
20
21
22
23
24
25

1      CERTIFICATE OF DEPONENT
2
3 PAGE     LINE CHANGE     REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15      * * * * * *
16      DECLARATION OF DEPONENT
17      I, MIKE HNATUICK, deponent herein, do hereby
certify and declare the within and foregoing
18 transcription to be my deposition in said action;
that I have read, corrected, and do hereby affix my
19 signature to said deposition this _____ day of
_____, 2010.
20
21
22      _____
23      MICHAEL HNATUICK
24
25

**REPORTER'S DECLARATION**

1

2    STATE OF NEVADA      )
                          ) ss.
3    COUNTY OF CLARK      )

4              I, CAMEO L. KAYSER, CCR No. 569,
     declare as follows:
5
               That I reported the taking of the
6    deposition of the witness, MICHAEL HNATUICK,
     VOLUME I commencing on Thursday, May 6, 2010, at
7    10:05 a.m.

8              That prior to being examined, the
     witness was by me duly sworn to testify to the
9    truth, the whole truth, and nothing but the truth;
     that, before the proceedings' completion, the
10   reading and signing of the deposition has been
     requested by the deponent or a party.
11
               That I thereafter transcribed my said
12   shorthand notes into typewriting and that the
     typewritten transcript of said deposition is a
13   complete, true, and accurate transcription of said
     shorthand notes taken down at said time.
14
               I further declare that I am not a
15   relative or employee of any party involved in said
     action, nor a person financially interested in the
16   action.

17             Dated at Las Vegas, Nevada this 12th
     day of May, 2010.
18

19

20

21

22

23   _____
     CAMEO L. KAYSER, RPR, CCR No. 569
24

25